# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

FILED

2019 FEB 22  A 9: 50

US DI...
BRI...

James Kennedy,
Besa Kennedy,
                    Plaintiffs,

v.

Case No. 3:19 cv 260 (VLB)

JURY TRIAL DEMANDED

Detective Frederick Caruso, official and individual capacities
Carmina Hirsch, née Tessitore, individual capacity
Detective Sergeant Frederick Hine, official and individual capacities
Town of Fairfield, Connecticut,
                    Defendants.

## A. PARTIES

1. James Kennedy ("Plaintiff Mr. Kennedy") is a citizen of Connecticut who

   presently resides at 145 Reid Street, Fairfield, CT.

2. Besa Kennedy ("Plaintiff Mrs. Kennedy") is a citizen of Connecticut who presently

   resides at 145 Reid Street, Fairfield, CT.

3. Defendant Frederick Caruso ("CARUSO") is an individual and police officer of the

   Fairfield Police Department and acted under color of law in the course and scope

   of employment at all times relevant hereto in the Town of Fairfield, County of

   Fairfield, State of Connecticut.  He is sued herein in both his individual and

   official capacities.

4. Defendant Carmina Hirsch ("HIRSCH"), née Tessitore, is a citizen of Connecticut

   whose business address is 4 Research Drive, Suite 402, Shelton, CT, 06484,

who has acted under color of law both as a Guardian ad Litem ("GAL") and also in cooperation and agreement with CARUSO.

5. Defendant Detective Sergeant Frederick Hine ("HINE") is an individual and police officer of the Fairfield Police Department and acted under color of law in the course of scope of employment at all times relevant hereto in the Town of Fairfield, County of Fairfield, State of Connecticut, in a supervisory capacity over defendant CARUSO.  He is sued herein in both his individual and official capacities.

6. Defendant Town of Fairfield ("TOWN") is a municipality charted and carrying on governmental functions in the County of Fairfield, State of Connecticut.

## B. JURISDICTION AND VENUE

7. The Court has jurisdiction over Counts I-CLIII pursuant to 28 U.S.C. §1331 for all claims arising under the Constitution, laws, or treaties of the United States.

8. The Court has jurisdiction over all other Counts pursuant to 28 U.S.C. §1367. Specifically, the remaining claims arise from a common nucleus of operative fact.

9. Venue in this judicial district is proper pursuant to 28 U.S.C. §1391(b)(2) as a substantial part of the events giving rise to the claims occurred here.

## C. INTRODUCTION

10. This action arises from the coordinated efforts of defendants CARUSO and HIRSCH, enabled and supported by defendants HINE and TOWN, to terminate effectively plaintiffs' ability to associate with two minor children, retaliate against plaintiffs for criticizing HIRSCH, retaliate against plaintiffs for filing a motion and communicating with out-of-state parties, and to substitute their fabricated

evidence and their own preferences in place of that of a court order issued by a state court of competent jurisdiction, through a coordinated, open, and documented campaign of threats, coercion, defamation and obstruction, with resulting claims arising under the First, Fifth, Ninth, and Fourteenth Amendments to the Constitution; under federal law, specifically 42 U.S.C. §§1983 and 1988; and under Connecticut common law for invasion of privacy, conspiracy to interfere with custodial relations, negligence, intentional infliction of emotional distress, and violations of the Connecticut Personal Data Act.

## D. FACTS RELEVANT TO PLAINTIFF MR. KENNEDY AND HIS FAMILY THROUGH AUGUST 27, 2009

11. Plaintiff Mr. Kennedy was born in 1970 in Lincoln, Nebraska.  Plaintiff Mr. Kennedy's father and mother divorced when Mr. Kennedy was two years old.  A public record exists containing this information.

12. Mr. Kennedy's father, who passed away in 2017, was a lifelong alcoholic.  There are several public records which exist of Driving While Intoxicated ("DWI") convictions of Mr. Kennedy's father.  There are several living witnesses who can attest to his alcoholism.  There are numerous written admissions by Mr. Kennedy's father of drinking binges.

13. Mr. Kennedy saw or communicated with his father a single time between the age of one and the age of 17.

14. Mr. Kennedy lived with his mother until going to college at the age of 16.

15. Mr. Kennedy sought out his father at the age of 17 and went to live with him after turning 18.  Mr. Kennedy lived with his father for three months.  During that time, Mr. Kennedy's father received at least one DWI, filed for bankruptcy, was drunk

and disappeared for days at a time, and eventually got evicted and left Mr.
Kennedy on his own.  There are public records related to the DWI and records
related to the bankruptcy still in existence.

16. Mr. Kennedy's father ceased paying any support to Mr. Kennedy's mother in
1972 and made no payments from 1972 through his death in 2017.  There have
been public records available since 1988 listing all payments ever made by Mr.
Kennedy's father to his mother.

17. Plaintiff Mr. Kennedy met Fatima De Almeida-Kennedy ("De Almeida-Kennedy")
in December of 1999.  At the time of their meeting, Mr. Kennedy held a Doctorate
and was employed by IBM with a base salary of roughly $100,000.  Mr. Kennedy
had credit card debt and student loan debt totaling roughly $150,000.  De
Almeida-Kennedy held a Master's in International Security and was employed as
an intern with a non-profit for no compensation.  De Almeida-Kennedy had
student loans and credit card debt totaling roughly $100,000.  De Almeida-
Kennedy was present in the United States on a non-immigrant Visa with no
authorization to work.  Mr. Kennedy had no rental overhead nor fixed residence
in 1999, staying wherever IBM assigned him for work with the cost recompensed
by end clients.  De Almeida-Kennedy was living in Washington, D.C., sharing a
two-bedroom apartment with two male students and had rental overhead paid for
by family members.  Both Mr. Kennedy and De Almeida-Kennedy had traveled
internationally for work and school.  De Almeida-Kennedy was a citizen of
Ecuador.  There are records which exist, including federal tax returns, visa
documentation, and employer files that confirm most of these facts.

4

18. Mr. Kennedy's work responsibilities in 1999 included international travel and working with governmental agencies, necessitating continuing background checks by clients of Mr. Kennedy for both credit and criminal history.

19. Mr. Kennedy and De Almeida-Kennedy began living together in 2000 in De Almeida-Kennedy's apartment.  During 2000, De Almeida-Kennedy obtained an H1-B Visa and began receiving compensation toward a salary of $35,000.

20. Mr. Kennedy took De Almeida-Kennedy to Australia in December of 2000 and paid all expenses for the trip.

21. In early 2001, Mr. Kennedy changed employers and began to travel more frequently throughout the United States, Europe and Latin America.  Mr. Kennedy was offered the selection of San Francisco, Chicago or Washington, D.C. as his base territory.  De Almeida-Kennedy did not wish to remain in Washington, D.C.  Mr. Kennedy selected Chicago.  De Almeida-Kennedy quit her job, losing her Visa in the process, and moved to Chicago with Mr. Kennedy.

22. In June of 2001, Mr. Kennedy and De Almeida-Kennedy married.  Immediately afterward, Mr. Kennedy took De Almeida-Kennedy to Europe on a work trip.  De Almeida-Kennedy had no valid return Visa for the United States and was not allowed to travel with Mr. Kennedy by the airline Mr. Kennedy's employer was using.  Mr. Kennedy paid to have De Almeida-Kennedy fly to Italy and then drove from Switzerland to Italy to bring De Almeida-Kennedy to his work site.  De Almeida-Kennedy later had to remain in Europe in Portugal for a period of weeks in order to obtain a valid entry Visa for the United States.  Mr. Kennedy paid for De Almeida-Kennedy's travel and stay in Portugal.

23. De Almeida-Kennedy disclosed to Mr. Kennedy after the marriage a number of mental and physical conditions with which she dealt on a daily basis, including generalized anxiety, neurological problems related to past car accidents, low impulse control, sensitivity to light and noise, social problems with interaction, and challenges with both empathy and executive function.  Further, De Almeida-Kennedy disclosed an intense dislike for the United States, other than New York City, and an even more intense dislike for Americans who were not first-generation immigrants.  De Almeida-Kennedy would frequently cycle, beginning the day either depressed or becoming anxious and angry, getting into arguments with Mr. Kennedy or others, screaming and/or crying, and then experiencing intense remorse followed by calm behavior.  In order to cope, De Almeida-Kennedy engaged in self-calming techniques that included complete control over her schedule and planning in advance for any changes to her daily routine.

24. De Almeida-Kennedy applied for a Portuguese passport in 2001 with Mr. Kennedy's financial and legal assistance and eventually received one.  Her Portuguese passport allows her to live and work anywhere within a European Union member state at her election.

25. In 2002, Mr. Kennedy helped close a strategic sale for his then employer and was offered an open opportunity for promotion, once again at his election.

26. Mr. Kennedy selected a position heading Latin America and moved to Mexico with De Almeida-Kennedy.  During their six-month stay, Mr. Kennedy procured a pre-sales position for De Almeida-Kennedy with a salary of $35,000 per year.  De Almeida-Kennedy voluntarily ceased working after three months.  Mr. Kennedy

had a salary of $175,000, with a potential bonus of $125,000, stock options, and a travel and expense budget exceeding $250,000. De Almeida-Kennedy was flown by Mr. Kennedy to Ecuador for her to visit family during this time. Mr. Kennedy paid off one of De Almeida-Kennedy's credit cards during this time, at a cost of roughly $25,000.

27. In late 2002, Mr. Kennedy was laid off. De Almeida-Kennedy did not seek employment. Mr. Kennedy and De Almeida-Kennedy discussed whether to move to a less expensive location. De Almeida-Kennedy did not wish to remain in Illinois. Mr. Kennedy moved De Almeida-Kennedy and himself from Chicago, Illinois, to Fairfield, Connecticut, to be closer to the only two of De Almeida-Kennedy's immediate family members residing within the United States, which resulted in higher monthly cost-of-living expenses.

28. Mr. Kennedy and De Almeida-Kennedy discussed and agreed to start having children on the basis of Mr. Kennedy sharing day-to-day parenting responsibility.

29. Mr. Kennedy paid for tickets for De Almeida-Kennedy to go to Ecuador in 2002 after his getting laid off.

30. In Fairfield, Connecticut, Mr. Kennedy stopped seeking employment which would require extensive travel and started a business with De Almeida-Kennedy.

31. In late 2002, Mr. Kennedy reached out to and located his father. Mr. Kennedy's father was living in New Jersey. Mr. Kennedy took De Almeida-Kennedy to meet his father and his father's wife.

32. Mr. Kennedy paid for tickets for he and De Almeida-Kennedy to travel to Portugal as part of their business plan, despite not having any incoming revenue.

33. De Almeida-Kennedy then got pregnant in early 2003.

34. Mr. Kennedy and De Almeida-Kennedy's business failed after investing $30,000 and were forced to give up their residence two months prior to the expiration of their annual lease, while De Almeida-Kennedy was 5 months pregnant.

35. When Mr. Kennedy and De Almeida-Kennedy gave up their residence, they were down to $20 in liquid assets.

36. De Almeida-Kennedy was offered and refused to stay with Mr. Kennedy's father after giving up her residence.  Neither of De Almeida-Kennedy's family members in the United States "had room" for Mr. Kennedy and De Almeida-Kennedy.  Mr. Kennedy paid for De Almeida-Kennedy to go to Brazil to stay with relatives.  Mr. Kennedy went to stay with friends for two months while attempting to get a new job.  No one in Mr. Kennedy or De Almeida-Kennedy's family offered to assist with expenses.

37. Mr. Kennedy procured a job with a company in Stamford for roughly $100,000 per year that involved very little travel.  Mr. Kennedy and De Almeida-Kennedy both moved into an apartment in Stamford across the street from Mr. Kennedy's work.  De Almeida-Kennedy's two family members moved away from the area, leaving only Mr. Kennedy with family near Connecticut.

38. In November of 2003, a son was born from the marriage ("Eldest Child") in Stamford, Connecticut.  De Almeida-Kennedy's mother was flown out by Mr. Kennedy to assist De Almeida-Kennedy for two months.  In Mr. Kennedy's presence, De Almeida-Kennedy screamed at her mother, insulted her in Spanish, and ordered her mother to do whatever De Almeida-Kennedy wanted on

numerous occasions, no matter the hour.  One of De Almeida-Kennedy's family members paid for their mother to leave earlier than planned after three weeks.

39. De Almeida-Kennedy would tightly wrap Eldest Child every night in a blanket that would not allow movement of his arms nor legs.  De Almeida-Kennedy wrote and issued a multi-page document to members of Mr. Kennedy's family covering rules concerning handling, speaking with, and otherwise interacting with Eldest Child.  De Almeida-Kennedy expressed great difficulty in handling crying and took great lengths to avoid Eldest Child reaching a point of crying.  If Eldest Child did not produce a regular bowel movement at least once daily, De Almeida-Kennedy would take a piece of paper, roll it up, dip it in Vaseline and insert it into Eldest Child's rectum to induce a movement.  The stated purpose was to ensure that De Almeida-Kennedy was allowed to sleep and be left "in peace".  There are emails sent by De Almeida-Kennedy that confirm these practices and beliefs, along with the multi-page document.  De Almeida-Kennedy never disclosed in Mr. Kennedy's presence either of these practices to doctors or therapists.

40. Shortly after the birth of Eldest Child and the departure of her mother, De Almeida-Kennedy shook Eldest Child firmly for a duration of five seconds while screaming at him at six weeks of age in the presence of plaintiff.  De Almeida-Kennedy was upset with Eldest Child for crying and not holding still.  Mr. Kennedy became alarmed and concerned.  De Almeida-Kennedy expressed remorse.  Mr. Kennedy warned her not to engage in that behavior ever again.

41. Mr. Kennedy slowly began to lessen communications with friends and family.

42. Mr. Kennedy became fearful of allowing De Almeida-Kennedy to cycle through her emotions with Eldest Child.  De Almeida-Kennedy did not seek out any employment.  Rather, De Almeida-Kennedy insisted on going to culinary arts classes to gain certification as a chef.  Mr. Kennedy would watch Eldest Child whenever De Almeida-Kennedy attended classes.  De Almeida-Kennedy ceased taking classes sometime in 2004.

43. In mid-2004, Mr. Kennedy obtained a contract for $80 per hour traveling into New York City during the week.  Originally, the contract did not involve travel, but ultimately involved frequent paid-for trips to Europe.

44. While Mr. Kennedy was away on travel, De Almeida-Kennedy would sometimes send emails detailing that she had spanked and/or slapped Eldest Child on the rear end or in the face, lamenting that Eldest Child was acting like a "retard", or expressing anger and upsettedness with any contact from members of Mr. Kennedy's family.  Mr. Kennedy would receive calls, messages and emails from De Almeida-Kennedy that required Mr. Kennedy's immediate response or intervention on a daily basis.  Mr. Kennedy still has these emails.

45. In November of 2004, De Almeida-Kennedy became pregnant again.  In December of 2004, Mr. Kennedy's father came up for Christmas with his wife and then traveled to the state of Missouri alone, where Mr. Kennedy's father got arrested for his 22nd DWI and for driving without a valid license, and was held in jail for a period of weeks.  There are public records that confirm these events.

46. In early 2005, Mr. Kennedy's mother, who was a mortgage broker at the time, assisted Mr. Kennedy in procuring an Adjustable-Rate Mortgage on a home in

Fairfield for $501,000.  The monthly mortgage payment was roughly $4,000.  Mr. Kennedy closed on May 1, 2005.  Members of Mr. Kennedy's family assisted with moving into the home.  There are records of Mr. Kennedy's mother's assistance.

47. After moving into the home, Eldest Child showed extreme regression in development.  His vocabulary stopped growing, his behaviors become more repetitive and he showed a great deal of difficulty with direct eye contact. Members of Mr. Kennedy's family who saw him suggested that something was wrong and that he needed intervention.

48. De Almeida-Kennedy expressed a high-degree of anxiety over Mr. Kennedy's family's presence in her life.  Mr. Kennedy ceased communication with his mother and three siblings shortly before August of 2005.  De Almeida-Kennedy also expressed a high-degree of anxiety over taking care of two minor children without Mr. Kennedy's constant presence or without professional help.  At De Almeida-Kennedy's request, Mr. Kennedy began to seek out an Au Pair to assist De Almeida-Kennedy for a year.  De Almeida-Kennedy prepared a detailed manual to govern the Au Pair's behavior.  A copy of the emails related to Mr. Kennedy's family and of the Au Pair manual still exist.

49. In August of 2005, a second son was born ("Youngest Child") in Connecticut.  De Almeida-Kennedy requested that a member of Mr. Kennedy's family assist her in the hospital for five days.  De Almeida-Kennedy requested that Mr. Kennedy ask the family member to leave after a few hours, which Mr. Kennedy did, as the member was "not helpful as I need it".

50. Shortly after Youngest Child's birth, Mr. Kennedy paid for an Au Pair to assist De Almeida-Kennedy.  The first Au Pair was fired after one week.  At De Almeida-Kennedy's request, Mr. Kennedy and De Almeida-Kennedy filed a complaint against the first Au Pair.

51. In October of 2005, Mr. Kennedy was offered full-time employment in the United Kingdom, for a gross salary of $150,000 and eligibility for a bonus of up to $30,000.  At the time, Mr. Kennedy was already earning approximately $160,000 gross in the United States.  The poor housing market in Fairfield had lessened the market valuation for the house to below $450,000.  Mr. Kennedy's father and his wife were the only family members who came with some frequency to see Mr. Kennedy's children at that time.  Mr. Kennedy's father could not travel internationally.  Mr. Kennedy's family expressed concerns that the move would result in further regression of Eldest Child.  In addition, neither Mr. Kennedy nor De Almeida-Kennedy had any family residing in the United Kingdom.  De Almeida-Kennedy informed Mr. Kennedy that taking the job would result in her behavior improving and would satisfy her desire not to live in the United States. Mr. Kennedy took the job and began working in Europe in November of 2005. The family home was placed on the market in Fairfield months after its purchase.

52. Mr. Kennedy paid for De Almeida-Kennedy to fly to the United Kingdom to find a residence.  Mr. Kennedy still had a mortgage payment of roughly $4,000 per month in the United States.  Mr. Kennedy's contract work had resulted in most of the gross income passing through.  Mr. Kennedy's employer in the United Kingdom took 52.1% of his gross income out of his pay, as was required by law,

resulting in monthly net income of around $6,250.  Mr. Kennedy began to allow bills to go unpaid in the United States and used credit cards to pay for as many expenses as possible.  Mr. Kennedy received no subsidies for living in the United Kingdom from his employer.  Mr. Kennedy leased an automobile in the United Kingdom and sold the vehicle left behind in the United States.

53. Eldest Child continued to exhibit signs of severe developmental delays.  Mr. Kennedy and De Almeida-Kennedy took Eldest Child to several doctors and therapists and was diagnosed with a range of potential conditions, including severe autism.  No causation of the delays was identified.  Plaintiff and De Almeida-Kennedy discussed possibilities, including De Almeida-Kennedy's treatment of Eldest Child, relocation of Eldest Child, vaccination, genetics and other factors.  Many tests and potential therapies for Eldest Child were not covered by health insurance and were paid in cash.  De Almeida-Kennedy was eligible to work in the U.K. but chose not to seek any employment.

54. From January through June of 2006, Mr. Kennedy and De Almeida-Kennedy continued to experience rapid financial decline.  Mr. Kennedy requested financial assistance from his employer, but was denied.  The house in Fairfield, Connecticut, had not sold.  Both Eldest and Youngest child began to get sick and developed coughing and other symptoms.  Mr. Kennedy and De Almeida-Kennedy took both minor children to general practitioners and then to an area hospital.  Neither would perform some tests that were considered standard in the United States, such as blood work.  Youngest child began to exhibit delays in development.

55. In early 2006, Mr. Kennedy discovered that Mr. Kennedy's father's wife had left Mr. Kennedy's father for another man.

56. In July of 2006, Mr. Kennedy made the decision to avert bankruptcy and to seek contract work back in the United States.  De Almeida-Kennedy did not agree with the decision and requested a divorce.  De Almeida-Kennedy did not wish to return to the United States.  De Almeida-Kennedy made her request in front of the children.  De Almeida-Kennedy later retracted her request for a divorce, but did not make an offer to seek employment in the United Kingdom.

57. In August of 2006, Mr. Kennedy secured contract employment in the United States.  Mr. Kennedy gave notice to his employer in the UK and began to get estimates for moving the household furniture back to the United States.

58. In September of 2006, the Au Pair completed her 12 months of service.  De Almeida-Kennedy ceased communicating with the Au Pair weeks prior to her departure.  Mr. Kennedy had to take the Au Pair to the airport alone.

59. In late September of 2006, Mr. Kennedy returned to the house in Fairfield first, alone, and with minimal supplies.  Mr. Kennedy could not afford to bring back De Almeida-Kennedy nor the minor children, nor afford basic household maintenance.  Mr. Kennedy still owned a car in the United Kingdom that could not be resold, with a monthly payment and quarterly storage expenses.

60. Mr. Kennedy also discovered during that time that Mr. Kennedy's father's wife was potentially going to reunite with Mr. Kennedy's father.

61. The new contract offered $80 per hour with the opportunity of working up to 80 hours per week, onsite.  Mr. Kennedy purchased an SUV with a monthly

payment for the usage of the family.  Mr. Kennedy worked for two months, earning roughly $49,000 gross, prior to bringing back De Almeida-Kennedy, the minor children, and moving the household belongings back to Fairfield in early December of 2006 at a total cost of about $20,000.

62. De Almeida-Kennedy expressed a great deal of anxiety about being back in the United States.  Part of her expressed fear was the potential of her methods of discipline not being accepted.  De Almeida-Kennedy expressed a belief that Europe would allow her to behave as she wished.  When De Almeida-Kennedy experienced depression or anxiety, she would make comments such as "I wish I could kill myself" or "my life is over" or "I didn't want to have kids" or "I want to eliminate [Eldest Child]" or "I'll wring your neck" toward either minor child or "if you try to leave me, I will kill you" to Mr. Kennedy.

63. Mr. Kennedy asked his father in December of 2006 to move in with him to help De Almeida-Kennedy with the minor children to relieve De Almeida-Kennedy's stress, allay her fears, and protect both minor children as much as possible from her behavior.  Mr. Kennedy also financed the purchased of a Mini-Cooper at the request of De Almeida-Kennedy, in order to reduce her stress.

64. In early January of 2007, Mr. Kennedy's contract hours were reduced and he lost 50% of his gross monthly income.  Mr. Kennedy and De Almeida-Kennedy took both minor children to several doctors and procured state-sponsored services for them.  De Almeida-Kennedy did not offer to seek employment.

65. In January of 2007, Mr. Kennedy returned to the United Kingdom to complete the move-out.  De Almeida-Kennedy insisted on traveling with Mr. Kennedy.  Only

Mr. Kennedy's father was available to watch the minor children. Mr. Kennedy's father had not held a valid driver's license since the 1990s. In addition, he had known issues with alcohol consumption. De Almeida-Kennedy still insisted on traveling and asked Mr. Kennedy's father to watch both minor children, as necessary. De Almeida-Kennedy held an expired Permanent Residence Card and had not received approval for its renewal. De Almeida-Kennedy continued to insist on traveling. De Almeida-Kennedy traveled to the United Kingdom on the weekend of Friday, January 18, 2007. After two days had passed, Mr. Kennedy returned to the airport with De Almeida-Kennedy. British Airways would not allow De Almeida-Kennedy to check in, due to her lack of an unexpired Permanent Residence Card. De Almeida-Kennedy got into a physical altercation with an airline agent that resulted in the agent threatening to have De Almeida-Kennedy arrested and removed from the airport. Mr. Kennedy then paid additional hotel and airline charges and stayed with De Almeida-Kennedy until she could visit the U.S. Embassy in London and obtain proper paperwork. While in the U.K., De Almeida-Kennedy insisted on having Mr. Kennedy's father drive both children to all of their scheduled activities. De Almeida-Kennedy knew that Mr. Kennedy's father did not have a valid driver's license. Mr. Kennedy could not perform billable work during the extra time in London.

66. In early 2007, Youngest Child responded very positively to medical treatment and stopped requiring special services. Mr. Kennedy and De Almeida-Kennedy took Eldest Child to a Neuro-Developmental Pediatrician, who recommended Hyperbaric Oxygen Therapy ("HBOT") to assist Eldest Child in development. Mr.

Kennedy read and researched extensively and discussed potential supports for Eldest Child with De Almeida-Kennedy.  De Almeida-Kennedy no longer wanted Mr. Kennedy's father in the house and Mr. Kennedy asked him to leave.  Mr. Kennedy hired a babysitter to assist De Almeida-Kennedy with the children.

67. In the middle of 2007, De Almeida-Kennedy requested that Mr. Kennedy invite back his father, which he did.  Mr. Kennedy started being asked to travel internationally for his client to Geneva, Switzerland.  During one of Mr. Kennedy's trips abroad, De Almeida-Kennedy reported that Mr. Kennedy's father had been drinking and had propositioned her.  Upon Mr. Kennedy's return, he asked his father to leave once again.  Mr. Kennedy's father was at that time preparing to divorce his wife and had separated from her.  Mr. Kennedy's father's wife had decided to live with yet another man different than the one from years prior.

68. De Almeida-Kennedy fired the babysitter.  De Almeida-Kennedy then rehired the babysitter.  De Almeida-Kennedy then fired the babysitter again.  De Almeida-Kennedy then rehired the babysitter.  De Almeida-Kennedy then fired the babysitter one last time, all within a short time span.

69. Mr. Kennedy requested and received from the United Kingdom a partial refund of monies withheld from Mr. Kennedy's pay from 2005 and 2006.  Mr. Kennedy paid $20,000 for De Almeida-Kennedy and the minor children to stay in the Netherlands for nine weeks of HBOT in early fall of 2007, and also paid off one of De Almeida-Kennedy's student loans at $25,000 and her other credit card at $25,000.  Mr. Kennedy paid for treatment to occur in the Netherlands,

specifically, at De Almeida-Kennedy's request.  HBOT treatment facilities existed

throughout the United States.  Records still exist of these payments.

70. After HBOT was finished, De Almeida-Kennedy returned to the United States.

She again began to make negative statements and threats toward the minor

children, herself and Mr. Kennedy.

71. Both Mr. Kennedy and De Almeida-Kennedy noticed a marked improvement in

Eldest Child's development after his return from the Netherlands.  De Almeida-

Kennedy decided to devote attention to the field of child development and began

to discuss potentially becoming a teacher.  De Almeida-Kennedy did not seek nor

discuss any outside employment.  De Almeida-Kennedy began to criticize and

disagree with the Early Childhood Center program offered by the Town of

Fairfield in which Eldest Child had been enrolled.  De Almeida-Kennedy

requested that Mr. Kennedy begin to research the law related to special

education on behalf of Eldest Child.  Mr. Kennedy spent $5,000 on books and

pedagogical materials for De Almeida-Kennedy and helped De Almeida-Kennedy

convert three areas of the house into areas where De Almeida-Kennedy could

teach and/or study in the field of special education.

72. Mr. Kennedy's contract increased the available hours during the fall, and then

terminated in late November of 2007.  Mr. Kennedy immediately began working

on an opportunity for a new contract with a new client for 2008.  As part of the

negotiation, Mr. Kennedy tried to reserve as much time for home-based work and

investigating Eldest Child's educational program as possible.

73. The contract started in early 2008, producing between $10-17,000 monthly in gross income for most of the year.  There are records confirming these amounts.

74. De Almeida-Kennedy then visited a clinical psychologist in May of 2008 at the urging of Mr. Kennedy.  De Almeida-Kennedy was diagnosed by the psychologist with either a Non-Verbal Learning Disorder or Asperger's Syndrome, along with generalized anxiety.  There are records of this report available and the clinical psychologist is still in active practice as of 2019.

75. Mr. Kennedy's father was once again invited to live with Mr. Kennedy at De Almeida-Kennedy's request.  After three months, in early July, De Almeida-Kennedy asked Mr. Kennedy to request that his father leave one more time and Mr. Kennedy asked and Mr. Kennedy's father then left, not to be seen nor heard from again until 2011.

76. Mr. Kennedy paid for De Almeida-Kennedy and the minor children to go to Ecuador for three weeks in August of 2008 to allow De Almeida-Kennedy to reduce her general level of anxiety and see several members of her family.  After driving De Almeida-Kennedy and the minor children to the airport, De Almeida-Kennedy discovered she had left her passport back in Fairfield.  Mr. Kennedy arranged with the airline to have De Almeida-Kennedy and the minor children fly to Miami and stay overnight.  Mr. Kennedy then drove back to Fairfield, purchased a round-trip ticket to Miami, obtained De Almeida-Kennedy's passport, drove back to the airport, then flew to Miami, stayed overnight in the hotel and delivered the passport to De Almeida-Kennedy.  Mr. Kennedy lost one day of work as a result.  De Almeida-Kennedy did not allow Mr. Kennedy to bid farewell

to their children at the hotel in Miami as De Almeida-Kennedy believed that would create more work for her.

77. Eldest child's therapists had recommended against Eldest Child making the trip, both due to the duration Eldest Child would be without services and also concerns over placing him in a non-English-speaking environment.

78. While De Almeida-Kennedy was in Ecuador, Mr. Kennedy's sister moved to New Haven to attend Yale University.  She lived in New Haven from 2008 through July of 2013 at the same address with the same telephone number, with her future husband.  While in Ecuador, De Almeida-Kennedy called Mr. Kennedy and informed him that two of De Almeida-Kennedy's siblings had gotten into an argument with her over her behavior toward Eldest Child.  One of her two siblings had said "someone should call the police on [De Almeida-Kennedy]" and the other had said "[De Almeida-Kennedy] should have your children taken away from you".  De Almeida-Kennedy expressed frustration to Mr. Kennedy that her family members were interfering with her parenting decisions.

79. After De Almeida-Kennedy returned from Ecuador, Mr. Kennedy's sister and her future husband began to stop by and play with the minor children on weekends.

80. Mr. Kennedy spent over 2,000 hours researching laws related to special needs and preparing for a Hearing to contest the Eldest Child's program with TOWN.

81. De Almeida-Kennedy took both minor children for surgeries and procedures in 2007 and 2008 resulting in over 150 reimbursed claims filed with their health insurance carrier.  Mr. Kennedy acquiesced to the frequent trips to therapists and

doctors.  It seemed to calm De Almeida-Kennedy to speak with therapists and doctors, often about her own perceived medical and psychological conditions.

82. In early November of 2008, De Almeida-Kennedy sent an urgent note to her own psychologist describing her ongoing anxiety and its effects, along with her inability to cope.  Shortly after, Fairfield Board of Education signed a settlement agreement with Mr. Kennedy and De Almeida-Kennedy that provided for funding Eldest Child's own private program for a period of 21 months.

83. De Almeida-Kennedy began to exhibit more signs of stress, as Eldest Child now required visits to several locations outside of the home during the week at hours scheduled by De Almeida-Kennedy and also interaction with separate providers. Mr. Kennedy was asked by De Almeida-Kennedy to take Eldest Child roughly half of the time to appointments.  De Almeida-Kennedy further requested Mr. Kennedy to take care of both minor children in the morning so that De Almeida-Kennedy could sleep in.  De Almeida-Kennedy still refused to seek employment. Mr. Kennedy made the decision to try and obtain contracts for software development as they appeared to allow for remote work and therefore would allow Mr. Kennedy to aid De Almeida-Kennedy with her stress and anxiety while she continued not to seek employment.

84. In January of 2009, Mr. Kennedy began to solicit business on Elance.com, a website devoted to freelancing work for software developers.  De Almeida-Kennedy did not seek any work.  On April 20 of 2009, Mr. Kennedy obtained a contract for roughly $10,000 per month.  At that time, the monthly expenses for the household, including debt servicing, was over $20,000.  Mr. Kennedy's credit

line was cut severely at the beginning of 2009, from $175,000 down to less than $120,000.  There are records which exist of these facts.

85. In March of 2009, Mr. Kennedy's sister announced her engagement to her present husband.  De Almeida-Kennedy did not believe it was Mr. Kennedy's sister's choice whether to get engaged because her parents should have approved first, blamed America's "soft" culture, and stated within earshot of the minor children that "someone should shoot Obama", who was at that time the President.  De Almeida-Kennedy told Mr. Kennedy's sister and her future husband that she did not approve of their engagement and that the problem with America was that no one disciplines their kids properly.  These discussions strained the relationship between Mr. Kennedy and his sister.

86. In May of 2009, Mr. Kennedy stopped making house payments due to lack of credit and inability to pay present expenses.  De Almeida-Kennedy began to spend most of her waking hours outside building a garden.  De Almeida-Kennedy declined to look for employment, inside or outside of the home.  De Almeida-Kennedy began to become depressed and angry on a daily basis.  De Almeida-Kennedy spent several thousand dollars for gardening equipment, trench-building equipment, and supplies for her garden.

87. Mr. Kennedy and De Almeida-Kennedy began to discuss what to do next.  De Almeida-Kennedy wished to return to Europe.  Mr. Kennedy expressed concern over how they could afford to live abroad since they had already tried that and failed.  Both agreed not to remain in Connecticut due to the expense and the

depressed housing market.  Both discussed that they could not remain in the house and needed to vacate it or face foreclosure.

88. On June 4, 2009, Mr. Kennedy and De Almeida-Kennedy got into an argument over what to do next.  De Almeida-Kennedy yelled out "those are not even my children" within earshot of both minor children.  De Almeida-Kennedy would often say things in a loud voice.

89. During a discussion later in June, De Almeida-Kennedy ran into the kitchen screaming, grabbed a sharp knife, put it to her wrist, and pressed it against her wrist.  She then started crying hard and stated "I was trying to have a good day."

90. In the interim, Mr. Kennedy urged De Almeida-Kennedy to seek out further help, not to take out her anxiety on the minor children and to move to Europe by herself if that is what she needed in order to function.  Mr. Kennedy was so frightened about what De Almeida-Kennedy would do he did not communicate directly with anyone his situation with De Almeida-Kennedy, instead scheduled an unannounced trip to seek advice from his father's wife on July 17, 2009.

91. In early July of 2009, Mr. Kennedy and De Almeida-Kennedy filed for bankruptcy. After filing for bankruptcy, De Almeida-Kennedy spent another $2,000 on the backyard of the house, which was now going to be foreclosed.

92. In mid-July of 2009, Mr. Kennedy and De Almeida-Kennedy discussed relocating to Florida, Georgia, Texas, or California after vacating the home to avoid foreclosure.  There was no discussion of remaining within Connecticut nor New England.  De Almeida-Kennedy believed that cold climates added to her depression and caused her to have more physical ailments.  Both minor children

were told that they would be moving by Mr. Kennedy and De Almeida-Kennedy together.  Eldest Child was repeatedly being prepared for a future move.

93. Mr. Kennedy went to see his father's wife on July 17, 2009, alone, thinking the discussion would cover De Almeida-Kennedy's behavior.  Upon Mr. Kennedy's arrival, Mr. Kennedy found out that Mr. Kennedy's father was on a drinking binge in another state and was not at that time living with his wife.  His wife was living with another man.  His father's wife expressed a fear of her then live-in boyfriend and told Mr. Kennedy that her boyfriend was physically abusing her and that she had called the police on him twice.

94. Mr. Kennedy opened up to his father's wife about the situation with De Almeida-Kennedy.  He then called his mother and her then husband and discussed the situation.  All three recommended that Mr. Kennedy call the police and have De Almeida-Kennedy arrested.  Mr. Kennedy's mother's then husband was disgusted with Mr. Kennedy for allowing De Almeida-Kennedy to shake Eldest Child at such a young age without repercussion.  Mr. Kennedy expressed guilt and remorse over the actions he had witnessed and allowed to occur.  The three other adults urged Mr. Kennedy to file for divorce, which Mr. Kennedy refused to do.  The three other adults urged Mr. Kennedy that were he not to file for divorce, that he should at least remove the minor children from an unsafe environment.

95. The three other adults urged Mr. Kennedy to seek legal counsel on how to separate from De Almeida-Kennedy.  Mr. Kennedy agreed to seek out legal advice, but was too afraid to call himself in fear of De Almeida-Kennedy's potential reaction around the minor children.  Mr. Kennedy asked his mother to

24

schedule an appointment for him, which she did.  The three others asked Mr.

Kennedy whether and how he could separate from De Almeida-Kennedy without

any violence occurring.  Mr. Kennedy suggested a separation would occur if De

Almeida-Kennedy were offered the opportunity to travel to Europe, regardless of

whether it was in the minor children's best interest or whether it was financially

responsible.  The other three adults agreed and also suggested that Mr. Kennedy

make recordings of De Almeida-Kennedy's abuse in Mr. Kennedy's presence.

96. Mr. Kennedy met with attorney Daiga Osis in Fairfield the following week.

Among other discussion points, Attorney Osis advised Mr. Kennedy that as long

as there were no Orders in place regarding the minor children, Mr. Kennedy

could relocate with the children.  If De Almeida-Kennedy were to initiate a divorce

action, Mr. Kennedy would have to litigate it in Connecticut, as it was the minor

children's home state.  Attorney Osis also urged Mr. Kennedy to file a police

report, but he refused.

97. Mr. Kennedy had a discussion with De Almeida-Kennedy where he urged her to

get help and to stop screaming at, hitting and making statements like "I want to

eliminate [Eldest Child]", "Every day I will hit you", "I will give you the smack of

your life", "I'm going to smash [Eldest Child] against the wall".  Mr. Kennedy

urged De Almeida-Kennedy to seek therapeutic help again.  De Almeida-

Kennedy went to a Neurologist on July 29, 2009.  De Almeida-Kennedy reported

to Mr. Kennedy that the doctor thought she might be Bi-Polar and prescribed

Topamax.  De Almeida-Kennedy did not take any of the prescribed medication.

98. Mr. Kennedy began to make audio recordings of De Almeida-Kennedy screaming at and hitting both the Eldest Child and Youngest Child in Mr. Kennedy's presence, between July 24, 2009, and August 7, 2009.  There were eight taped incidents and in three of them she hit Eldest and/or Youngest Child in the face.

99. Mr. Kennedy would also call his mother.  His mother repeatedly overheard the screaming and slapping and continually advised Mr. Kennedy to call the police.

100.      In early August, Mr. Kennedy had determined that Texas had the best and least expensive quality schools and work environment among prospective choices.  There was a specialist in Autism who was available to work with Eldest Child there.  Between August 5, 2009, and August 17, 2009, Mr. Kennedy communicated with two attorneys in Texas.  Mr. Kennedy was advised not to let De Almeida-Kennedy into his residence or temporary lodging and to let the police know once he had obtained a permanent residence that he did not want De Almeida-Kennedy on his property.

101.      On August 12, 2009, Mr. Kennedy offered De Almeida-Kennedy a trip to France and to stay at one of the most expensive hotels in Cannes, a wealthy area, from August 23 through August 30, 2009.  De Almeida-Kennedy agreed to go and requested agreement to spend up to $7,000 for her trip.  There are records of the trip still in existence.

102.      Mr. Kennedy ordered boxes to pack up the household furnishings on August 13, 2009, in De Almeida-Kennedy's presence.  Mr. Kennedy and De Almeida-Kennedy both discussed the urgent requirement to vacate the home

prior to a foreclosure, which would be reflected negatively on their credit and make it difficult for them to relocate and rebuild their credit.

103.     Mr. Kennedy continued to prepare the house for moving out in De Almeida-Kennedy's presence through August 23, 2009.  On August 23, 2009, Mr. Kennedy took De Almeida-Kennedy to the airport with the minor children.

104.     On Wednesday, August 26, 2009, Mr. Kennedy left with the minor children for Austin, Texas.  Mr. Kennedy paid for the trip using funds from a joint bank account shared with De Almeida-Kennedy.  Mr. Kennedy left one vehicle, all of De Almeida-Kennedy's belongings, half the household furniture, a shed filled with equipment, and a garage half full.  Mr. Kennedy contacted a therapist specializing in abuse in Austin and scheduled an appointment for the week of August 31st to take both children.  There are records that still exist of these communications.

105.     From August 23 through August 28, 2009, Mr. Kennedy communicated with De Almeida-Kennedy daily via email and phone.  De Almeida-Kennedy viewed properties in France for potential relocation and sent emails to Mr. Kennedy with locations she liked.  De Almeida-Kennedy made no offer to work herself.  De Almeida-Kennedy was aware that it would cost at least $15,000 to transport the household goods overseas.  De Almeida-Kennedy was also aware of the time and expense required for Mr. Kennedy to obtain work authorization in France.  Emails and records still exist that confirm these facts.

## E. FACTS RELEVANT TO ALL COUNTS FROM AUGUST 28, 2009 THROUGH NOVEMBER 27, 2018

106.      On August 28, 2009, Mr. Kennedy sent an email to De Almeida-Kennedy. The email demanded that De Almeida-Kennedy stop abusing the minor children, pleading with De Almeida-Kennedy to seek help and providing information to De Almeida-Kennedy as to how to communicate with Mr. Kennedy.  Mr. Kennedy informed De Almeida-Kennedy that he wanted to keep the abuse private.  De Almeida-Kennedy had access to $3,600 in cash and two cars as of that date, one in Europe and one in Fairfield.

107.      Mr. Kennedy was afraid of De Almeida-Kennedy and her potential reaction.

108.      De Almeida-Kennedy contacted the Department of Homeland Security and demanded that they arrest Mr. Kennedy.

109.      De Almeida-Kennedy then made contact with defendant CARUSO, who was working for defendant TOWN as a detective, and also HINE, who was also working for defendant TOWN as a detective, and claimed that she had been abandoned without assets nor belongings, that there was no reason for the separation, that she had no means to contact Mr. Kennedy, did not know his location, and that both minor children were in a medical emergency.  Further, she claimed that there was never any intention to leave Fairfield by Mr. Kennedy or herself.

110.      De Almeida-Kennedy went to Superior Court on Monday, August 31, 2009, and filed an Ex Parte Motion for Emergency Custody, alleging that Mr. Kennedy was behaving "erratically" and that the minor children were in danger.

111.    De Almeida-Kennedy did not notify Mr. Kennedy she had contacted the Department of Homeland Security.

112.    De Almeida-Kennedy did not notify Mr. Kennedy she had applied for an Ex Parte Order.

113.    De Almeida-Kennedy did not notify Mr. Kennedy that the Order had been granted.

114.    De Almeida-Kennedy did not demand the return of the minor children to Connecticut.

115.    De Almeida-Kennedy did not notify Mr. Kennedy that she had contacted CARUSO and HINE.

116.    De Almeida-Kennedy sent an email to Mr. Kennedy that she was sorry and would agree to go to therapy.

117.    Detective CARUSO and detective HINE did not contact Mr. Kennedy.

118.    CARUSO and HINE did not inquire into De Almeida-Kennedy's mental health.

119.    CARUSO and HINE did not contact Mr. Kennedy's sister in New Haven.

120.    CARUSO and HINE did not go out to the home to verify its condition.

121.    CARUSO and HINE did not verify that De Almeida-Kennedy had in fact two cars, not none.

122.    CARUSO and HINE did not verify that De Almeida-Kennedy had indeed two phones, not none.

123.    CARUSO and HINE did not verify the minor children's medical history.

124.     CARUSO and HINE did not contact the hotel at which Mr. Kennedy was staying.

125.     CARUSO and HINE did not listen to the audio recordings Mr. Kennedy had made of De Almeida-Kennedy hitting and screaming at the minor children.

126.     CARUSO and HINE did not check the bank account balances for which De Almeida-Kennedy had had access.

127.     CARUSO and HINE did not validate the underlying assertions stated in the Ex Parte Motion filed by De Almeida-Kennedy in 2009.

128.     CARUSO and HINE did not review the emails that Mr. Kennedy and De Almeida-Kennedy had exchanged.

129.     CARUSO and HINE did not inquire as to how De Almeida-Kennedy could afford to retain two attorneys.

130.     On August 31, 2009, in the afternoon, De Almeida-Kennedy received an Ex Parte Order of temporary sole legal custody for Eldest Child and Youngest Child.  CARUSO and HINE were aware that the order was granted on August 31, 2009.

131.     CARUSO then intervened on September 1, 2009 at 9am, the moment that the courthouse opened.

132.     As a result of CARUSO'S intervention, Mr. Kennedy lost 17 days of billable work and five out of six active contracts on which he had been working.

133.     Mr. Kennedy lost 40 pounds of weight in just under three weeks.

134.     Mr. Kennedy was unavailable to meet the moving truck that had come to Texas, and its contents were placed in storage, inaccessible to Mr. Kennedy.

135.     CARUSO requested that Mr. Kennedy's passport, driver's license, bank
cards and credit cards not be returned to Mr. Kennedy.

136.     On September 2, 2009, De Almeida-Kennedy flew to Austin, Texas, and
stole Mr. Kennedy's primary work computer, which included all of his contacts for
the purpose of developing business and much of his intellectual property.

137.     Sometime during the week of September 7th, Mr. Kennedy opened up a
complaint with the Texas Department of Child Welfare and reported De Almeida-
Kennedy's behavior and actions.

138.     During the same week, Mr. Kennedy's mother opened up a complaint with
the Department of Children and Families within Connecticut concerning De
Almeida-Kennedy's abuse of the minor children.

139.     Between August 28, 2009, and April 2, 2011, TOWN spent tens of
thousands of dollars on behalf of De Almeida-Kennedy related to her divorce.

140.     Mr. Kennedy was prevented by CARUSO and HINE from seeing the minor
children from September 2, 2009, through September 17, 2009.

141.     De Almeida-Kennedy filed for divorce around September 12, 2009.

142.     De Almeida-Kennedy filed to prevent Mr. Kennedy from any contact with
the minor children without De Almeida-Kennedy's agreement.

143.     De Almeida-Kennedy filled out a form which listed Mr. Kennedy's father as
an "alcoholic" and Mr. Kennedy's mother as "very violent" and requested that
neither be allowed to contact the minor children.

144.     During the week of September 14th, Mr. Kennedy opened a case with the
Department of Children and Families in Connecticut and shared his recordings.

145.     On September 23, 2009, Mr. Kennedy agreed to allow De Almeida-Kennedy temporary sole legal custody and decision-making over visitation while addressing the legal issues raised by CARUSO'S activity.

146.     Mr. Kennedy requested and formed an agreement with De Almeida-Kennedy to see the minor children on September 26, 2009.

147.     Mr. Kennedy went with his sister to attempt to see the minor children on September 26, 2009.  De Almeida-Kennedy came with one of her own sisters. De Almeida-Kennedy did not allow any physical contact between Mr. Kennedy and the minor children.  De Almeida-Kennedy demanded in the minor children's presence that Mr. Kennedy's sister leave.  Mr. Kennedy was uncomfortable with not having a witness and refused her request.  De Almeida-Kennedy phoned the police and asked for Mr. Kennedy's arrest in front of the minor children.  Mr. Kennedy left with his sister.

148.     De Almeida-Kennedy retained two attorneys at a cost of over $20,000 and Mr. Kennedy also had to retain two attorneys.  Neither Mr. Kennedy nor De Almeida-Kennedy had assets outside of De Almeida-Kennedy's engagement ring.  De Almeida-Kennedy claimed she had lost it around that time.  Mr. Kennedy had only a single contract and De Almeida-Kennedy was not working. Mr. Kennedy left Connecticut on October 16, 2009, to stay at his mother's in California.

149.     Mr. Kennedy flew back to Connecticut roughly once per month in November and December of 2009.  Mr. Kennedy's company's gross earnings for 2009 were under $70,000.  De Almeida-Kennedy would not agree to allow Mr.

Kennedy to see nor communicate with the minor children unless or until she received $4-5,000 per week in support. De Almeida-Kennedy approached Mr. Kennedy each time they went to court and would say some variation of "you give me what I want and I will give you what you want." In December of 2009, Mr. Kennedy was threatened with a criminal charge of Grand Theft Auto by a collection agency because De Almeida-Kennedy had taken the car left behind by Mr. Kennedy and hidden it at a friend's home. De Almeida-Kennedy did not turn over the car until February of 2010. De Almeida-Kennedy called the car company during this time and attempted to speak with them about his account, claiming that he was in Europe and unavailable to speak with them himself.

150.    Between January and May of 2010, Mr. Kennedy flew back to or drove to Connecticut roughly once per month. Mr. Kennedy had to transport any household goods from Texas to Connecticut. De Almeida-Kennedy called the company that was holding the moving truck's contents and claimed that Mr. Kennedy was a criminal, that she had two autistic children that required full-time care, and that she needed access to the unit. After the moving truck's contents were brought to Fairfield, and the truck emptied, De Almeida-Kennedy left two personal items of Mr. Kennedy's in the truck, along with a sticky note that read "you give me what I want, I give you what you want".

151.    On March 2, 2010, Mr. Kennedy obtained a favorable resolution in one court related to De Almeida-Kennedy's contact with CARUSO. De Almeida-Kennedy continued to threaten Mr. Kennedy at each meeting.

152.    After the favorable resolution, Mr. Kennedy then reobtained his passport.

153.    Mr. Kennedy could not afford to pay for supervised visitation until May of
2010.  Mr. Kennedy saw Eldest Child and Youngest Child for approximately four
hours over the course of a weekend.

154.    Sometime between April and July of 2010, Mr. Kennedy requested and
then went to FPD and met with HINE and provided HINE with details concerning
De Almeida-Kennedy's history of physical contact with and verbal statements
made to both minor children, including an eight-page document refuting
information provided by De Almeida-Kennedy to CARUSO.

155.    Between September 2, 2009, and August 2, 2010, De Almeida-Kennedy
filed four motions in Court potentially requesting Mr. Kennedy's incarceration.

156.    In May of 2010, De Almeida-Kennedy offered to drop the divorce action if
Mr. Kennedy paid for relocation to Australia for her and their children.

157.    On August 2, 2010, Mr. Kennedy reached an agreement with De Almeida-
Kennedy to divorce.  Mr. Kennedy was living outside of Connecticut at the time.

158.    Mr. Kennedy agreed to continue supervised visitation until a third-party
therapist no longer recommended it.  For the remainder of 2010, Mr. Kennedy
was only allowed roughly 3.5 hours of contact in total with his children, either
over the phone or on Skype.  With each communication, De Almeida-Kennedy
would make demands for Mr. Kennedy to solve, pay for, or perform some
function for De Almeida-Kennedy.  Mr. Kennedy agreed to pay $1,000 per week
to De Almeida-Kennedy as unallocated support.  De Almeida-Kennedy was not
working full-time.

159.     De Almeida-Kennedy allowed the home to go into foreclosure.  De Almeida-Kennedy did not make any payments toward the mortgage at any point after May of 2009.

160.     In 2010, Mr. Kennedy earned roughly $42,000 gross.  By February of 2011, Mr. Kennedy could not stay current with payments.  De Almeida-Kennedy threatened Mr. Kennedy with incarceration if he did not pay on time.  De Almeida-Kennedy did not work full-time in 2010.

161.     Between January and August of 2011, Mr. Kennedy was allowed roughly 10.75 hours of Skype contact with the minor children.  Mr. Kennedy could not afford any supervised visits.

162.     Sometime in 2011, De Almeida-Kennedy obtained work part-time at an attorney's office.  She filed an appearance on Mr. Kennedy's behalf under the attorney's name in the pending foreclosure action without notifying Mr. Kennedy.

163.     On April 2, 2011, records related to De Almeida-Kennedy's contact with defendants CARUSO and HINE were erased by operation of state statute.

164.     In August of 2011, again Mr. Kennedy experienced an income interruption and an inability to pay $1,000 per week consistently.  De Almeida-Kennedy cut off all contact with the minor children.  Mr. Kennedy begged and pled with De Almeida-Kennedy numerous times between August of 2011 and February of 2012.  De Almeida-Kennedy did not allow a call for Christmas, did not allow the minor children to receive gifts from Mr. Kennedy nor his family, and did not allow Mr. Kennedy to schedule a supervised visit.

165.     On January 3, 2012, Mr. Kennedy sent a request to the Fairfield Board of Education for information about the minor children's educational programs.  Mr. Kennedy discovered that De Almeida-Kennedy had listed Mr. Kennedy's address with their school as the same as hers.  After Mr. Kennedy corrected the address, De Almeida-Kennedy had her attorney draft a letter to the school district demanding they not provide any information to Mr. Kennedy.

166.     For the year 2009 from September forward, Mr. Kennedy had a sum total of five minutes of contact with his children.  For 2010, Mr. Kennedy had a sum total of 12.5 hours of contact with his children.  For 2011, Mr. Kennedy had a sum total of 10.75 hours of contact with his children.

167.     In 2012, Mr. Kennedy's finances improved.  Mr. Kennedy moved to Florida in February.

168.     In March of 2012, Mr. Kennedy began consulting with an attorney in preparation for filing a motion to see his children again.

169.     On April 28, 2012, De Almeida-Kennedy allowed the minor children contact with Mr. Kennedy, by phone.  Mr. Kennedy experienced a better financial year, earning roughly $117,000 gross for the year and paid roughly $46,000 in unallocated to De Almeida-Kennedy.

170.     On July 3, 2012, Mr. Kennedy filed a Motion to Modify and requested the appointment of a Guardian ad Litem ("GAL").  Ms. Ellen Morgan, attorney and psychologist, was appointed.

171.     On October 20, 2012, Mr. Kennedy had a supervised visit with the minor children for the first time since May of 2010.  Mr. Kennedy provided phones to

the minor children for communication between Mr. Kennedy and the minor children.  Between October 20, 2012, and April of 2013, Mr. Kennedy gradually went from supervised to unsupervised visitation.  De Almeida-Kennedy was opposed throughout the process.

172.     Mr. Kennedy informed De Almeida-Kennedy that he was moving back to Connecticut in late 2012.  De Almeida-Kennedy texted him that he was not a member of the minor children's family anymore and that he should stay away.  She also texted that she wished he were dead.  Mr. Kennedy moved back to Connecticut in February of 2013.

173.     De Almeida-Kennedy agreed to supervise Mr. Kennedy upon his return to Connecticut in February of 2013 in exchange for Mr. Kennedy purchasing food, gas, and groceries for her, in addition to the unallocated payments.

174.     In March of 2013, Mr. Kennedy moved into an apartment in Orange, Connecticut.  De Almeida-Kennedy insisted on inspecting the apartment prior to allowing supervised visitation.  De Almeida-Kennedy screamed at Mr. Kennedy outside the apartment in front of the minor children and neighbors "I will let [your neighbors] know who you are".

175.     In April of 2013, De Almeida-Kennedy started a cash-based business selling gluten-free food.  De Almeida-Kennedy did not disclose this to Mr. Kennedy.  Between 2013 and 2019, De Almeida-Kennedy has reported between $0 and $60 per week as gross earnings, most recently $18 per week for 2018.

176.     De Almeida-Kennedy has not sought any employment at all since April of 2013 and any full-time employment since 2009.

177.     Between April of 2013 and December 9, 2014, Mr. Kennedy's access to

the children and their medical and educational records gradually increased.

While De Almeida-Kennedy had sole legal custody, she would often deny Mr.

Kennedy the ability to have his family and himself to see his children.  De

Almeida-Kennedy specifically did not allow Mr. Kennedy to have the minor

children contact his mother at all.

178.     Sometime in 2013, Mr. Kennedy discovered that De Almeida-Kennedy

had taken the minor children outside of the country three times without notifying

him during the time in which he was not allowed contact with his children.

179.     Mr. Kennedy married the present Mrs. Kennedy in September of 2014.

Between September and December of 2014, De Almeida-Kennedy would see

Mrs. Kennedy in court and make disparaging remarks to her about Mr. Kennedy,

such as "he will take your money" and "you'll learn who he is".

180.     In the summer of 2014, De Almeida-Kennedy traveled out of the country

for a weeklong period and left both minor children in Mr. Kennedy's custody.

181.     Mr. Kennedy earned exceptional gross revenue in 2014 of just over

$200,000, which allowed him to pay for a new agreement with De Almeida-

Kennedy.  In exchange for joint legal custody, Mr. Kennedy agreed to pay $900

per week to De Almeida-Kennedy for unallocated support and $200 per week in

arrearage.  Mr. Kennedy also gave De Almeida-Kennedy roughly $13,000 as

payment toward asserted unreimbursed medical expenses.

182.     Mr. Kennedy later learned that the asserted medical expenses were

mostly not medical at all.

183.     De Almeida-Kennedy filed a number of fraudulent Financial Affidavits

between 2009 and 2016, asserting that she was paying a mortgage when she

was in fact not.

184.     Between July of 2012 and December of 2014, De Almeida-Kennedy filed

three Motions for Contempt requesting the immediate and indefinite incarceration

of Mr. Kennedy.

185.     In May of 2015, Eldest Child reported to Mr. Kennedy and other family

members of Mr. Kennedy that De Almeida-Kennedy had been hitting him in the

face again.  He also reported that she was screaming at him and calling him a

"retard".  Eldest Child reported De Almeida-Kennedy's most recent hitting of him

to a therapist who then reported the contact to DCF.  DCF recorded statements

by Youngest Child that De Almeida-Kennedy would spank Youngest Child and

then smack Youngest Child in the mouth if he blocked the spanking as a method

of discipline.

186.     In November of 2015, the financial organization holding the mortgage to

the residence in Fairfield re-initiated foreclosure.  De Almeida-Kennedy reported

to the finance company that Mr. Kennedy would pay the mortgage, which had

payments exceeding $375,000 due and owing, for payments not made since May

of 2009.

187.     In December of 2015, Mr. Kennedy filed a motion to modify.  De Almeida-

Kennedy began the process of having Connecticut Support Enforcement

Services attempt to incarcerate Mr. Kennedy.  Since January of 2016, Mr.

Kennedy has not been allowed to renew his passport and has had a monthly

negative report on his credit from the State of Connecticut.

188.     On March 10, 2016, HIRSCH was appointed in relation to the motion to

modify as a GAL.

189.     Mr. Kennedy requested that De Almeida-Kennedy undergo a mental

health evaluation.  HIRSCH made the recommendation on Mr. Kennedy's also

agreeing to undergo a mental health evaluation.  Mr. Kennedy agreed in April of

2016 to undergo one.

190.     In August of 2016, De Almeida-Kennedy was ordered to undergo a

psychological evaluation.  In preparation for the evaluations, Mr. Kennedy and

De Almeida-Kennedy were invited to ask questions of the psychologist who

would be performing the evaluations.  The judge ordered HIRSCH to review and

filter the questions.

191.     De Almeida-Kennedy produced an extensive set of questions full of

defamatory statements which also invaded plaintiffs' privacy.

192.     De Almeida-Kennedy requested that HIRSCH not share these questions

with Mr. Kennedy prior to submission to the psychologist.

193.     HIRSCH agreed and, later, presented a set of completely unfiltered

questions that were released as part of her case file.  HIRSCH did not make a

single redaction nor modification to De Almeida-Kennedy's questions.

194.     In November of 2016, HIRSCH solicited monetary payment by Mr.

Kennedy to De Almeida-Kennedy in exchange for parenting time already due to

Mr. Kennedy.

195.     In December of 2016, De Almeida-Kennedy was evicted from the

foreclosed residence.  De Almeida-Kennedy did not disclose her new address to

Mr. Kennedy until over a week after she signed a lease.

196.     The evaluations took place from December of 2016 through February of

2017.  The conclusions reached in terms of De Almeida-Kennedy were

consistent with Mr. Kennedy's experience.  De Almeida-Kennedy underwent a

battery of tests, of which four test results were invalid due to intentional

deception.  De Almeida-Kennedy had signs of potential histrionic personality

disorder, and was assessed as "anxious and angry".

197.     HIRSCH was provided a copy of the report.

198.     Between December 9, 2014, and August 14, 2017, Mr. Kennedy and Mrs.

Kennedy attended extracurricular events and school events on De Almeida-

Kennedy's parenting time, along with similar activities occurring during Mr.

Kennedy's scheduled parenting time.

199.     In June of 2015, Mr. Kennedy and Mrs. Kennedy moved to a house on a

lake in Trumbull, Connecticut, less than five miles from the children's mother's

residence.

200.     In 2013, Mr. Kennedy had seen or spoken with his children for roughly 540

hours.

201.     In 2014, it went up to roughly 1,500 hours.

202.     In 2015 and 2016, it went up further to about 2,304 and 2,136 hours,

respectively.

203.     Mr. and Mrs. Kennedy swam with Eldest Child and Youngest Child, ate

with them, played board games, had snowball fights, went on trips, educated

them, watched movies, and enjoyed general family activities.  Mr. and Mrs.

Kennedy saw them for Eldest Child's birthday, Youngest Child's birthday, and Mr.

Kennedy's birthday, and on several holidays, especially Thanksgiving and

Christmas, along with bi-weekly visits and two to three weeks in summer.

204.     Mr. and Mrs. Kennedy took his children outside of the state of Connecticut

no fewer than ten times between December 9, 2014, and August 2, 2017, each

time providing information to De Almeida-Kennedy about their location and a

general itinerary.

205.     Mr. and Mrs. Kennedy took Eldest Child and Youngest Child to over nine

different states and Washington, D.C.

206.     Between December 9, 2014, and August 2, 2017, De Almeida-Kennedy

took the minor children at least seven times outside the state of Connecticut

without providing Mr. Kennedy advanced notice and/or their location.

207.     HIRSCH was aware of both parents' trips and the issues with notification.

208.     In September of 2016, Mr. and Mrs. Kennedy attended an open house at

Eldest Child's school.  In Eldest Child's language arts class, a poem that Eldest

Child had written was hanging on the wall.  The second line of the poem

contained the statement "I wonder why my mom yells too much".

209.     Between July 23, 2017, and August 2, 2017, a four-day hearing took place

on Mr. Kennedy's motion to modify.  HIRSCH recommended that Mr. Kennedy

not have two weeks pass by without parenting time and that he have a couple of hours every other Friday with the minor children, in addition to the existing plan.

210.    No changes to custody or parenting time resulted from the hearing.

211.    On August 11, 2017, Mr. and Mrs. Kennedy saw his children for the weekend.  On August 12, 2017, Mr. Kennedy allowed his children to see De Almeida-Kennedy on her birthday.

212.    De Almeida-Kennedy had an argument with Eldest Child.  Eldest Child called HIRSCH "lazy and stupid".  Eldest Child was upset with not seeing plaintiffs more frequently.  De Almeida-Kennedy recorded Eldest Child.

213.    De Almeida-Kennedy called HIRSCH to complain about Eldest Child and about Mr. and Mrs. Kennedy.  De Almeida-Kennedy had frequently called HIRSCH to complain about Mr. and Mrs. Kennedy since March 10, 2016.

214.    HIRSCH decided for the first time to visit De Almeida-Kennedy's home upon De Almeida-Kennedy's request and for the second time without scheduling a corresponding visit to plaintiffs' residence.

215.    On August 24, 2017, HIRSCH filed a status conference request that indicated there were urgent safety issues requiring a court hearing.

216.    HIRSCH did not notify Mr. and Mrs. Kennedy prior to filing the status conference request.

217.    HIRSCH did not allow plaintiffs to discuss the visit with her.

218.    In early October of 2017, Eldest Child reported to plaintiff that De Almeida-Kennedy had again hit him and was screaming at him. Youngest Child would also berate him.

219.     HIRSCH refused to speak with Eldest Child at plaintiffs' residence.

220.     Mr. Kennedy and Mrs. Kennedy temporarily moved to Florida in October of 2017.

221.     Mr. Kennedy requested De Almeida-Kennedy's and HIRSCH'S assistance with following the same parenting plan in Florida, but was not provided any assistance.

222.     As of November 6, 2017, Mr. and Mrs. Kennedy have not seen either minor child in person.

223.     On November 8, 2017, HIRSCH and De Almeida-Kennedy attended a hearing without Mr. and Mrs. Kennedy present.

224.     HIRSCH represented to the Court that plaintiff Mr. Kennedy was a criminal who would kidnap his minor children if given the opportunity.

225.     The Court relied explicitly on HIRSCH'S representation and temporarily suspended Mr. Kennedy's right of visitation, specifically related to seeing the children outside of Connecticut.  The Court made the requirement temporary and predicated removing restrictions on Mr. Kennedy filing a Motion to Modify in Connecticut.

226.     On April 4, 2018, Mr. Kennedy filed a Motion to Modify in Connecticut that was eventually scheduled for a hearing on May 25, 2018.

227.     Sometime after April 17, 2018, De Almeida-Kennedy relocated with the minor children to Tennessee.  De Almeida-Kennedy did not notify Mr. Kennedy until May 8, 2018, in violation of several statutes and prior agreements.

228.     On May 1, 2018, plaintiffs returned to Connecticut for one month.

229.     Mr. Kennedy filed an Ex Parte Motion after discovering his children had been removed from Connecticut, which was denied.

230.     On Monday, May 14, 2018, in response to Mr. Kennedy's Ex Parte Motion, De Almeida-Kennedy sent an email to HIRSCH which included the statement "[Mr. Kennedy] is dangerous to me and my family.  Something has to be done about him."

231.     Plaintiff's Ex Parte Motion was not heard by the Court, nor scheduled for a hearing. Two days before the hearing on Mr. Kennedy's motion to modify, De Almeida-Kennedy filed for an indefinite continuance and HIRSCH agreed to the continuance.

232.     HIRSCH did not consult with Mr. Kennedy prior to agreeing to the continuance.

233.     HIRSCH knew that the continuance in effect deprived Mr. Kennedy of a method of addressing the Order of November 8, 2017.

234.     On September 22, 2018, Mr. and Mrs. Kennedy returned to Connecticut to live.

235.     On September 26, 2018, Mr. Kennedy filed a request to the Court to be heard on several motions not yet heard, which was granted.

236.     On October 23, 2018, Mr. Kennedy attended a hearing wherein no motions were heard.  HIRSCH attended that hearing.  HIRSCH called De Almeida-Kennedy, who was not physically present, later at a different location and heard, along with several witnesses, that De Almeida-Kennedy was not

willing to let Mr. Kennedy have any access to the minor children and that Mr. Kennedy was "insane".

237.    On October 30, 2018, plaintiffs were allowed a video conference call with both minor children for the first time since November 6, 2017.  On the call, De Almeida-Kennedy asserted control over both minor children and Eldest Child repeatedly looked toward De Almeida-Kennedy for guidance.  Neither child demonstrated any independence nor ability to speak freely.  Their tone was almost robotic and very formal.  The call terminated without any expressions of affection.

238.    Several more calls took place on consecutive Mondays through November 26, 2018.   De Almeida-Kennedy was present and exercised control for the entire duration of all calls.

239.    On November 27, 2018, Mr. Kennedy applied for, and was granted, temporary sole legal custody by Bridgeport Superior Court ("Superior Court"), the Honorable Mark J. Gould, Presiding Judge ("Judge Gould"), through an Ex Parte Motion.

240.    The Ex Parte Order suspended De Almeida-Kennedy's right of visitation

241.    The Ex Parte Order stated that the minor children should be "returned immediately" to plaintiff Mr. Kennedy in Fairfield, Connecticut.

242.    HIRSCH and De Almeida-Kennedy both received notice of the Ex Parte Order on November 27, 2018, and actual copies of the Ex Parte Order on November 28, 2018.

**F. GENERAL FACTS RELATED TO DEFENDANTS CARUSO, HINE AND TOWN**

46

243.     In mid-2010, CARUSO was awarded a Letter of Commendation for his time spent related to De Almeida-Kennedy's contact in 2009.

244.     The Letter of Commendation was either directly or indirectly awarded through the efforts of De Almeida-Kennedy.

245.     CARUSO received a favorable performance review based on the Letter and a 6.35% raise in gross income from 2010 to 2011.

246.     CARUSO received a .02% reduction in gross income from 2011 to 2012.

247.     CARUSO's employee file includes a positive evaluation related to efforts on De Almeida-Kennedy's behalf.

248.     CARUSO has received no other publicized commendations or awards.

249.     In 2015, CARUSO was involved in a series of televised segments entitled "Crime Watch Daily", as an employee of defendant TOWN.  CARUSO is visible in at least one televised segment, shown during an arrest of a suspect.

250.     There are no publicized commendations which resulted from the ten televised segments.

251.     The minor children have been told about CARUSO, his report written in December of 2018, and his work in 2009, all by De Almeida-Kennedy.

252.     CARUSO has been publicized as one of the highest-paid employees with defendant TOWN at least three times after 2009.

253.     CARUSO did not disclose to Mr. Kennedy his Letter nor financial benefit from 2009 at any time.

254.     CARUSO made no attempts between 2009 and the present to contact Mr. Kennedy and ask Mr. Kennedy on his views on De Almeida-Kennedy or De Almeida-Kennedy's behavior and actions.

## G. GENERAL BACKGROUND RELATED TO DEFENDANT HIRSCH

255.     After HIRSCH'S appointment as GAL, Mr. Kennedy provided HIRSCH with information about the past physical and verbal acts by De Almeida-Kennedy with both minor children.

256.     HIRSCH was provided with contact information for the prior GAL.

257.     On August 2, 2017, a four-day hearing concluded on the December of 2015 motion.  HIRSCH testified on the last day of the hearing that she had concluded her investigation.

258.     No one was allowed at the hearing to discuss any events related to both minor children from prior to December of 2014.  The judge issued very clear instructions on that point.

259.     HIRSCH'S case file notes from August 23, 2017, include as the first comment that Mr. Kennedy had commented negatively on HIRSCH.

260.     On August 24, 2017, HIRSCH sent Mr. and Mrs. Kennedy an email that accused plaintiffs of making negative comments about HIRSCH.

261.     The email included an accusation that Mrs. Kennedy had made a threatening statement to the minor children against De Almeida-Kennedy.

262.     In November of 2017, HIRSCH told the minor children that Mr. Kennedy had a criminal record.

263.     Between November 8, 2017, and October 23, 2018, defendant HIRSCH

made no attempts to facilitate contact between plaintiffs and Eldest Child nor

Youngest Child.

## H. FACTS RELATED TO PLAINTIFF MRS. KENNEDY

264.     Mrs. Kennedy was born in Albania.  Mrs. Kennedy's family was

persecuted by the Communist regime that held power from prior to her birth until

1991.

265.     Mrs. Kennedy's family had and has members that were murdered,

imprisoned, exiled, persecuted and deprived of liberty without due process.

266.     Mrs. Kennedy grew up in a town where it took solely the word of a

Communist party member to result in loss of freedom or life.

267.     Albanians have a sizable presence in the State of Connecticut.  Their

surnames and first names are recognizable.  Mrs. Kennedy speaks with a

noticeable accent.

268.     Mrs. Kennedy has several members of her close family, including her

brother, an uncle, two aunts, and several cousins, who also live in Connecticut

and experienced the same persecution in Albania.

## I. COUNT I (42 U.S.C. §1983 – First Amendment, Ninth Amendment, Fourteenth Amendment) All Defendants

269.     Plaintiffs incorporate and reallege prior paragraphs 11-242 as to all

defendants, 243-254 as to CARUSO, HINE, and TOWN, 255-263 as to HIRSCH,

and 264-268 for Mrs. Kennedy, as if they were contained herein.

270.   On November 28, 2018, Mr. Kennedy issued a written demand for the return of his minor children to Mr. Kennedy's custody to De Almeida-Kennedy and HIRSCH.

271.   Mr. Kennedy informed HIRSCH and De Almeida-Kennedy that he would be flying to Tennessee in order to return the minor children and requested HIRSCH'S assistance.

272.   HIRSCH did not provide any assistance nor response to Mr. Kennedy.

273.   De Almeida-Kennedy informed HIRSCH on November 27, 2018, of her intent not to comply with the Ex Parte Order.

274.   HIRSCH did not instruct De Almeida-Kennedy to comply with the Ex Parte Order.

275.   On November 28, 2018, HIRSCH filed a status conference request with Superior Court and was notified the next day that her status conference request would not be heard until December 11, 2018.

276.   After Mr. Kennedy arrived in Tennessee on November 28, 2018, he received an email from De Almeida-Kennedy, shared with HIRSCH, that De Almeida-Kennedy would not be complying with the Ex Parte Order.

277.   The Franklin, Tennessee, police department was contacted by Mr. Kennedy after his arrival in Franklin.

278.   The Franklin Police Department asked for and received a certified copy of the Ex Parte Order.

279.   The Franklin Police Department, at Mr. Kennedy's request, accompanied Mr. Kennedy to the listed address of De Almeida-Kennedy.

280.     No one was home at the residence.

281.     One police officer told Mr. Kennedy that the residence looked like it was abandoned or that someone had just moved in.

282.     One police officer told Mr. Kennedy that De Almeida-Kennedy utilized a device on her front door that sent video to her phone of who was ringing the doorbell at the house.

283.     One police officer rang the doorbell.

284.     Mr. Kennedy returned to Connecticut later that night.

285.     On Thursday, November 29, 2018, Mr. Kennedy contacted the Fairfield Police Department ("FPD") and reached the duty desk.  Mr. Kennedy inquired as to whether the FPD would provide assistance to return the minor children to Fairfield.  The duty officer placed Mr. Kennedy on hold and then replied that CARUSO overheard the name of the caller and wished to speak with Mr. Kennedy.

286.     CARUSO called Mr. Kennedy later that day and asked Mr. Kennedy to provide a copy of the Ex Parte Order and to come in on Friday, November 30, 2018, to speak about the Order.

287.     CARUSO assured Mr. Kennedy that he "would help" and requested background information from Mr. Kennedy.

288.     De Almeida-Kennedy filed an Ex Parte Motion on November 29, 2018, and provided a copy to HIRSCH.  Judge Gould denied the Motion on the same day.  HIRSCH received notification of the denial.

289.     Mr. Kennedy met with CARUSO at the FPD on Friday, November 30, 2018, and provided CARUSO with an affidavit about the case.

290.     The affidavit did not contain any references to any dates prior to Tuesday, November 27, 2018.

291.     CARUSO did not discuss any dates nor events prior to Tuesday, November 27, 2018, with Mr. Kennedy.

292.     CARUSO did not disclose any contacts from De Almeida-Kennedy initiated by CARUSO or De Almeida-Kennedy after September of 2009 and prior to November 29, 2018.

293.     HIRSCH did not disclose any of De Almeida-Kennedy's contacts made with CARUSO after March 10, 2016, yet HIRSCH was aware of all contacts De Almeida-Kennedy made with CARUSO after March 10, 2016.

294.     After the meeting started, CARUSO stated "I will not help you unless you win the hearing on December 11th".

295.     CARUSO then stated "you aren't going to win that hearing."

296.     He then stated "I have spoken with [De Almeida-Kennedy]".

297.     He also asked "what are you going to do if either kid runs away?"

298.     CARUSO made no mention of Mr. Kennedy's trip to Tennessee.

299.     CARUSO did not mention any interest in, nor intention of, attending the hearing on December 11th.

300.     CARUSO only made clear that he would not assist, but did not make any statement to Mr. Kennedy for Mr. Kennedy not to try and return his children on his own.

301.    On Saturday, December 1, 2018, De Almeida-Kennedy sent an email to

Mr. Kennedy stating "Under legal advice from attorneys in TN and in CT, the

Plaintiff, F De Almeida-Kennedy, here forewarns the Defendant, James Kennedy,

that if he, or any of his family members or any other party comes on his behalf

near the Plaintiff or the minor children to their home or in any other public setting,

or follows any of them, a Protective Order or a Restraining Order for harassment

will be filed and other protective measures will be taken."

302.    De Almeida-Kennedy sent this email also to HIRSCH and CARUSO.

303.    On Monday, December 3, 2018, Mr. Kennedy contacted the schools in

Tennessee where both children were reportedly attending.  Neither school would

provide any information at all to Mr. Kennedy without receiving a copy of the Ex

Parte Order.  Mr. Kennedy provided a copy of the Ex Parte Order, after which

both schools asked Mr. Kennedy for further instructions.  Both schools disclosed

that neither minor child had attended school on Thursday, November 29 nor

Friday, November 30.

304.    CARUSO contacted, without plaintiffs' knowledge nor consent, both De

Almeida-Kennedy and HIRSCH to assure them that Mr. Kennedy would make no

further attempt to return either child to Fairfield.

305.    After Mr. Kennedy provided a copy of the Ex Parte Order to the

Tennessee schools, someone notified De Almeida-Kennedy immediately of the

contact and she went and removed Eldest Child from school.

306.    De Almeida-Kennedy contacted both HIRSCH and CARUSO immediately

after being contacted herself by the Tennessee schools.

307.    HIRSCH and CARUSO knew that the Ex Parte Order was valid.

308.    HIRSCH and CARUSO knew that Mr. Kennedy had not physically seen his children since November 6, 2017.

309.    After contacting De Almeida-Kennedy, the Tennessee schools contacted Mr. Kennedy to ask for his instructions.

310.    Mr. Kennedy instructed Youngest Child's school to hold him for retrieval, but then decided to allow him to return to De Almeida-Kennedy in order to await both minor children returning to school.

311.    Unbeknownst to Mr. Kennedy, CARUSO was contacted by both of Mr. Kennedy's children's schools as well as the contact by De Almeida-Kennedy.

312.    CARUSO drove out while on duty to plaintiffs' home.

313.    CARUSO logged his destination with the FPD.

314.    CARUSO knew Mrs. Kennedy's name and also knew she was Albanian.

315.    CARUSO knew that Mr. Kennedy had not refused to come to the Fairfield Police Department, if asked.

316.    CARUSO was aware prior to December 3, 2018, that De Almeida-Kennedy had made numerous attempts to have Mr. Kennedy arrested.

317.    CARUSO was personally aware that De Almeida-Kennedy had made numerous attempts to have CARUSO arrest Mr. Kennedy.

318.    HIRSCH was aware that De Almeida-Kennedy had made numerous attempts to have Mr. Kennedy incarcerated.

319.    HIRSCH had multiple communications within her case file sent by De Almeida-Kennedy indicating De Almeida-Kennedy wished to have Mr. Kennedy incarcerated.

320.    HIRSCH was aware that De Almeida-Kennedy had started attempting to have the Federal government in 2018 to incarcerate Mr. Kennedy and De Almeida-Kennedy's efforts were ongoing.

321.    CARUSO was aware that Mr. Kennedy had had a bad experience with him in 2009 that led to a favorable disposition for Mr. Kennedy.

322.    HINE was aware that Mr. Kennedy had had a bad experience with CARUSO in 2009 that led to a favorable disposition for Mr. Kennedy.

323.    CARUSO did not notify Mr. Kennedy in advance, neither calling nor emailing.

324.    CARUSO took photographs of Mr. Kennedy's car.

325.    CARUSO intended to frighten Mrs. Kennedy due to her background and fear of police intervention.

326.    CARUSO made the conscious choice to keep his handgun visible and loaded in plaintiffs' presence.

327.    CARUSO rang the doorbell and plaintiff Mrs. Kennedy called through the door and asked who was outside.  CARUSO said "this is the police."  CARUSO did not provide his name until Mrs. Kennedy had opened the door.

328.    Mrs. Kennedy called out to Mr. Kennedy and informed him that a police officer was at the front door and Mr. Kennedy asked for their name.  CARUSO

provided his name.  Mrs. Kennedy asked CARUSO if he wanted to come in and CARUSO replied "Yes, I'm coming in."

329.      CARUSO'S response created discomfort in Mrs. Kennedy but she felt she had no right to refuse him entrance, based on his statement.

330.      Both plaintiffs stood in the living room of their home and noticed that CARUSO had a loaded firearm visible on his hip.

331.      CARUSO asked Mr. Kennedy whether he was planning on picking up his children in Tennessee, to which plaintiff replied in the affirmative.

332.      CARUSO'S face began to turn red and his tone rose in anger and he said "how can you pick them up if you are here?"  Mr. Kennedy replied that he would take an airplane.

333.      CARUSO then adopted a very angry tone and he began to put both of his hands near his hips in a controlling stance.  He stated very loud "didn't you and I have a talk and didn't I make it clear to you that I would help you if you won the hearing?  Why are you making plans to go get your children?"

334.      Mr. Kennedy asked CARUSO whether he was advising Mr. Kennedy not to return his children to Fairfield.

335.      CARUSO stated in a commanding tone "that's exactly what I'm telling you. You're a smart guy.  You understood what I told you."

336.      Mr. Kennedy told CARUSO that he had only understood that CARUSO would not assist him unless he prevailed at a later hearing.

337.      CARUSO reiterated "You're a lawyer.  You're not going to win a hearing. You don't have visitation with your children".

338.     Mr. Kennedy replied that the Superior Court Order gave him sole legal

custody.  CARUSO replied that the Superior Court Order was not valid.

339.     CARUSO told Mr. Kennedy "you do what you want to do".

340.     CARUSO insisted to plaintiffs that they had no rights in the matter.

341.     CARUSO did not inform Mr. Kennedy of what consequences there would

be for not following CARUSO'S instructions.

342.     As CARUSO left, he told Mr. Kennedy that he was receiving calls from the

minor children's school and also from De Almeida-Kennedy.

343.     CARUSO did not disclose that CARUSO had initiated contact that day

with the Franklin County Sheriffs Department and "advised [them] of the facts of

this case."

344.     CARUSO did not provide any information regarding his intended actions.

345.     On December 3, 2018, HIRSCH contacted De Almeida-Kennedy, Eldest

Child and Youngest Child without notifying nor obtaining Mr. Kennedy's consent.

346.     Immediately after HIRSCH'S contact, the minor children ceased

communication with plaintiffs except to inform them that they "did not want to

talk".  This cessation continued from December 3, 2018, through January 16,

2019.

347.     Plaintiffs have had no contact allowed at all with Mr. Kennedy's children

since the end of January.

348.     HIRSCH'S contact with the minor children in De Almeida-Kennedy's

presence was a violation of the Ex Parte Order.

349.     HIRSCH told Mr. Kennedy's children that she had "no authority nor power to step in and we have a hearing date 12/11.  The court's orders are in place until a hearing where the court will make further decisions."

350.     Neither minor child attended school from Tuesday, December 4, 2018, through Tuesday, December 11, 2018.  De Almeida-Kennedy removed them from school to prevent Mr. Kennedy from effectuating the Superior Court Order.

351.     On Tuesday, December 4, without the knowledge nor consent of Mr. Kennedy, CARUSO wrote out a report using FPD software with the FPD logo.

352.     HIRSCH contacted Tennessee public schools without Mr. Kennedy's knowledge nor consent and sent them documents indicating that she had authority to speak for the Court in Connecticut as GAL on the same day.

353.     In fact, HIRSCH did not have the authority, nor power, nor duty to contact the schools.

354.     CARUSO'S report included the designation of De Almeida-Kennedy as "V".  There is a legend on the form which indicates "V" is "Victim".  This designation is false and misleading and CARUSO knew it.

355.     CARUSO'S report stated that "Ms. Kennedy was granted sole legal and physical custody of the children [in 2010]."  This is false and does not reflect that Mr. Kennedy agreed to allow Ms. Kennedy sole legal custody due to CARUSO'S actions in 2009.  CARUSO knew this or was recklessly indifferent in adopting it as the truth.

356.    HIRSCH was aware that this statement was false, as she had been
provided with a copy of the separation agreement that specified custody in March
of 2016.

357.    CARUSO'S report stated "in 2013, Mr. Kennedy was granted Supervised
visitation with his two minor children."  This is false.  In 2013, Mr. Kennedy, after
filing a Motion to Modify and moving to Connecticut, was allowed unsupervised
visitation with his two minor children pursuant to the recommendation of the then
GAL.  CARUSO knew this or was recklessly indifferent in adopting it as the truth.

358.    HIRSCH was aware that this statement was false or was recklessly
indifferent in adopting it as the truth.

359.    CARUSO'S report stated "[a]t some point Mr Kennedy's visitation was
again restricted to supervised visitation [prior to November 8, 2017]."  This
statement is false.  CARUSO knew this or was recklessly indifferent in adopting it
as the truth.

360.    HIRSCH was aware that this statement is false, as she was involved in the
case during this time period.

361.    CARUSO'S report stated "Mr Kennedy writes in his affidavit for the order
that shares joint legal custody of the two minor children with Ms. Kennedy.  This
statement is inconsistent with the facts as set forth in the court order dated
November 8, 2017, which clearly states that his supervised visitation has been
suspended."  This statement is false and is a statement of a legal opinion.

362.    HIRSCH was aware that this statement is false, as she was involved in the
case during this time period.

363.     CARUSO'S report stated "Mr Kennedy was arrested in August of 2009 because he cleared out his house of all belongings while still married to Ms. Kennedy." This statement is false. Mr. Kennedy has no arrest record and upon separation Mr. Kennedy left De Almeida-Kennedy with substantial belongings. CARUSO knew the relevant statute controlling discussion of his involvement and he also was aware of the documentation provided by Mr. Kennedy to HINE in 2010. CARUSO never went out to the house to verify the information provided by De Almeida-Kennedy.

364.     HIRSCH was aware that this statement was false, as Mr. Kennedy had supplied HIRSCH with information about the separation in March of 2016.

365.     CARUSO'S report stated "[Mr. Kennedy] then fled Connecticut with both minor children leaving Ms. Kennedy with no usable cell phone, no vehicle and no idea where either of her two minor children were." This statement is false. CARUSO knew about the information provided to HINE in 2010, which was objectively verifiable. CARUSO'S own report later states that De Almeida-Kennedy informed the detective of Mr. Kennedy's location.

366.     HIRSCH was either aware this statement was false, or was recklessly indifferent based on the significant number of falsehoods supplied to HIRSCH by De Almeida-Kennedy over the past three years.

367.     CARUSO'S report stated "Mr Kennedy writes that he had no idea that Ms Kennedy moved to Tennessee and did not know her address. This is also an inconsistent statement as Ms. Kennedy kept him updated." This statement is

60

false and CARUSO knew or should have known it was false, as HIRSCH held

that information in her own case file.

368.     HIRSCH knew the statement was false and had released prior information

from her own case file indicating that Mr. Kennedy did not know De Almeida-

Kennedy had moved until May 8, 2018, and did not know De Almeida-Kennedy's

residential address for over a month after she moved.  There are at least eight

emails in HIRSCH'S file from Mr. Kennedy continuing to ask where his children

were living during May of 2018, and a number of emails from HIRSCH asking for

the address during the same time period.

369.     CARUSO'S report states "Mr Kennedy's own parents issued a strong

written letter denouncing his character and parental skills as it pertained to his

two minor children."  This statement is false.  CARUSO has never spoken with

Mr. Kennedy's parents and CARUSO was recklessly indifferent to whether and

what opinion Mr. Kennedy's parents have about him.  Mr. Kennedy's parents

have not been in the same room since 1971.

370.     HIRSCH knew this statement was false.  Mr. Kennedy's father is

deceased and Mr. Kennedy's mother has come several times to Superior Court

to testify on Mr. Kennedy's behalf.

371.     CARUSO'S report states "[Mr. Kennedy] has violated the court order as it

pertains to support payments."  This statement is false and CARUSO was

recklessly indifferent to its truth or falsity.

372.     HIRSCH knows that the statement is false, as she has been included on numerous communications from De Almeida-Kennedy filled with unsubstantiated allegations.

373.     CARUSO'S report states "[Mr. Kennedy] voluntarily left the State of Connecticut in an effort to avoid those payments." This statement is false and CARUSO was recklessly indifferent to its truth or falsity. CARUSO has never asked plaintiffs why they left the state.

374.     HIRSCH knows that the statement is false, as she was serving as GAL and received an email with information about the move at the time.

375.     CARUSO'S report states "[Mr. Kennedy's] own parents have written a comprehensive report detailing his poor parental skills and lack of compassion." That statement is false. CARUSO has never spoken with Mr. Kennedy's parents and CARUSO was recklessly indifferent to whether and what opinion Mr. Kennedy's parents have about him.

376.     HIRSCH knew this statement was false. Mr. Kennedy's father is deceased and Mr. Kennedy's mother has come several times to Superior Court to testify on Mr. Kennedy's behalf.

377.     CARUSO'S report states "[Mr. Kennedy's] disregard for the rule of law is blatant in the false affidavit he presented to obtain custody." This statement is false. CARUSO is not an attorney and is not qualified to render a legal opinion. CARUSO was recklessly indifferent to the truth or falsity of his statement, but he wrote it as a statement of his own knowledge and belief.

378.     HIRSCH knew that the affidavit was not false but the statement by

CARUSO was.  Further, there was a hearing scheduled on December 11, 2018,

where the affidavit would have been under discussion, anyway.

379.     CARUSO'S report states "[Mr. Kennedy] knows full well that as of

November 8, 2017 he had lost his supervised visitation with his children."  This is

a false statement and also a legal opinion.  CARUSO was recklessly indifferent

as to the truth or falsity of his statement.

380.     HIRSCH knew this statement was false, as she was present in the hearing

referenced.

381.     CARUSO'S report states "That was the last standing order of the court."

That is a false statement.  CARUSO knew it was false as he had a copy of the

granted Ex Parte Order.

382.     HIRSCH knew the statement was false, as she had filed a status

conference request after the issuance of the Ex Parte Order.

383.     HINE reviewed CARUSO'S report and approved it on behalf of TOWN

sometime on December 6, 2018.

384.     On December 6, 2018, without Mr. Kennedy's knowledge nor consent,

CARUSO emailed his report to HIRSCH using a TOWN-issued email account.

385.     HIRSCH reviewed the report.

386.     HIRSCH knew that De Almeida-Kennedy had written an email in May that

stated that Mr. Kennedy was dangerous and that something needed to be done

about Mr. Kennedy.

63

387.     HIRSCH was aware that on May 31, 2018, De Almeida-Kennedy had written a motion calling for Mr. Kennedy's incarceration for an indefinite time period.

388.     HIRSCH was aware that De Almeida-Kennedy's own Ex Parte Motion had been denied.

389.     HIRSCH was aware that she had a status conference not scheduled until December 11, 2018.

390.     HIRSCH was aware that De Almeida-Kennedy had sent a warning to Mr. Kennedy on Saturday, December 1, threatening legal action if Mr. Kennedy or his family approached Mr. Kennedy's children.

391.     HIRSCH distributed the incident report to six further parties, including five members of Tennessee public schools, among them their legal counsel, on December 6.

392.     CARUSO and HIRSCH were both aware that De Almeida-Kennedy was going to file a registration of foreign decree in the Chancery Court of Tennessee on December 7, 2018.

393.     CARUSO and HIRSCH both intended to provide a document admissible in evidence under a hearsay exception in Tennessee on De Almeida-Kennedy's behalf.

394.     CARUSO and HIRSCH both intended to introduce the report into evidence on December 11, 2018.

395.     An attorney for a victim's rights organization was provided with a copy of CARUSO'S report.  The attorney agreed to represent De Almeida-Kennedy at

the hearing on December 11, 2018, on the basis of the "V" designation in the report.

396.     On December 11, 2018, no hearing took place.

397.     CARUSO was present at Superior Court, without disclosing such intent to Mr. Kennedy prior.

398.     HIRSCH was aware that CARUSO would be present.

399.     HIRSCH told the Court that Mr. Kennedy's children were in danger from Mr. Kennedy and that CARUSO was there to testify to that effect.

400.     HIRSCH and CARUSO were to be the only two witnesses on De Almeida-Kennedy's behalf.

401.     The Ex Parte Order was "frozen" by the court, pending an evidentiary hearing.

402.     Since that date, no hearing has taken place.

403.     Mr. Kennedy has not been able to return his children to Connecticut.

404.     Mr. Kennedy has not been allowed contact with the minor children except for one to three minute periods, with the exception of one 16-minute call.

405.     De Almeida-Kennedy has started referencing CARUSO'S report in recent filings with Superior Court.

406.     CARUSO and HIRSCH both acted with malice, wantonness and intent to injure.

407.     HINE knew about CARUSO'S prior contact with Mr. Kennedy.

408.     HINE discussed specifically with Mr. Kennedy the numerous lies in De Almeida-Kennedy's writings.

409.     HINE read the report written by CARUSO and approved it.

410.     HINE read in the report about CARUSO'S trip to Mr. Kennedy's home.

411.     HINE knew that his failure to act and supervise CARUSO would be likely
to subject plaintiffs to imminent harm.

412.     HINE did not validate any of the statements in CARUSO'S report.

413.     HINE did not validate the report for compliance with Connecticut law on
privacy nor on the erasure of records.

414.     TOWN was aware of CARUSO'S prior contact with Mr. Kennedy.

415.     TOWN was aware that HINE had been the subject of litigation for the
failure to intercede while supervising police officers who engaged in the violation
of the civil rights of TOWN residents.

416.     In fabricating evidence and communicating with third parties in Tennessee
and Connecticut, defendants acted under color of state law and conducted a
coordinated campaign to deprive Mr. Kennedy the ability to enforce a valid order
of a competent court of jurisdiction, which deprived him of his right of intimate
association with his minor children and his substantive due process
rights.  TOWN had actual notice that allowing CARUSO'S report to be issued
would be substantially certain to result in a constitutional violation, and TOWN
consciously and deliberately chose to disregard the risk.  Further HINE was
negligent in failing to supervise CARUSO adequately in terms both of preparation
of the report and also the visit to the plaintiffs' home.

417.     TOWN failed to train HINE in handling complainants with prior history with
FPD who have had a favorable resolution to their contact.

418.     TOWN further failed to train HINE to recuse himself from a case that had also involved HINE.

419.     TOWN further failed to train HINE on complying with Ex Parte Orders and reviewing incident reports for violations of statute and complainants' rights.

420.     TOWN further failed to train HINE on what information should be distributed to a GAL.

421.     TOWN further failed to train HINE on the proper protocol for not fabricating evidence.

422.     TOWN'S failures resulted in CARUSO disseminating a fabricated incident report containing private information to a GAL in violation of Mr. Kennedy's rights and causing plaintiffs tremendous loss.

423.     As a direct and proximate result of the violation of his constitutional rights by all the defendants, plaintiffs suffered general and special damages as alleged in this Complaint.  Mr. Kennedy cannot regain the lost time with his children.  In this specific case, the violation is more egregious given the past actions of HIRSCH and CARUSO.  Mr. Kennedy cannot easily repair the damage that CARUSO and HIRSCH have caused to plaintiffs in relation to their relationship with Eldest Child and Youngest Child.  Plaintiffs have suffered anxiety and depression as a result of defendants' actions.  Plaintiffs are further afraid of CARUSO and HIRSCH.  The minor children will require extensive therapy to reunify with plaintiffs.  Plaintiffs have further suffered from anxiety to the point of seeking medical intervention.  Plaintiffs do not have an entire day pass by without suffering the loss of the minor children in plaintiffs' lives.

424.    The conduct of defendants CARUSO and HIRSCH was willful, malicious, oppressive and/or reckless, and was of such a nature that punitive damages should be imposed on CARUSO and HIRSCH in an amount commensurate with the wrongful acts alleged herein.

425.    TOWN is responsible for any liability for HINE under this Count pursuant to Connecticut General Statutes §7-465.

**J. COUNT II (42 U.S.C. §1983 – First Amendment - Retaliation) All Defendants**

426.    On November 27, 2018, Mr. Kennedy applied for, and was granted, temporary sole legal custody by Bridgeport Superior Court ("Superior Court"), the Honorable Mark J. Gould, Presiding Judge ("Judge Gould"), through an Ex Parte Motion.

427.    Filing the Ex Parte Motion was an activity protected by the First Amendment, specifically an exercise in Freedom of Speech.

428.    The Ex Parte Order granted Mr. Kennedy a right protected by the First, Ninth and Fourteenth Amendments, specifically Freedom of Association.

429.    HIRSCH became aware of the Ex Parte Order on November 27, 2018.

430.    Mr. Kennedy provided a certified copy of the Order to HIRSCH on November 28 and to CARUSO on November 29.

431.    Mr. Kennedy's contact with FPD on November 29, 2018, was protected First Amendment activity.  To wit, Mr. Kennedy called and asked for assistance in enforcing a granted Ex Parte Order.

432.    CARUSO initiated a meeting with Mr. Kennedy on November 30, 2018, and attempted to dissuade Mr. Kennedy from exercising his rights.

433.     CARUSO further attempted to dissuade Mr. Kennedy from appearing on December 11, 2018, telling Mr. Kennedy that he would lose the hearing.

434.     CARUSO was aware of the threat issued by De Almeida-Kennedy on Saturday, December 1, 2018.

435.     HIRSCH was aware of De Almeida-Kennedy's action of withdrawing the minor children from school in order to prevent them from being returned to Connecticut.

436.     CARUSO and HIRSCH were aware that Mr. Kennedy had flown to Tennessee on November 28, 2018.

437.     Mr. Kennedy contacted two Tennessee public schools on December 3, 2018, a protected First Amendment activity.

438.     CARUSO went to plaintiffs' home on December 3, 2018, as a direct and proximate result of Mr. Kennedy's contact with Tennessee schools.

439.     CARUSO also went to plaintiffs' home as a result of Mr. Kennedy's filing an Ex Parte Motion and then Mr. Kennedy's attempt to execute the Ex Parte Order, and attempted to threaten and coerce Mr. Kennedy.

440.     CARUSO placed Mr. Kennedy in fear of executing the Ex Parte Order.

441.     CARUSO placed Mr. Kennedy in fear of communicating freely with the Tennessee public schools where Mr. Kennedy's children were attending.

442.     CARUSO placed Mr. Kennedy in fear of returning to Court and filing further motions.

443.     Mr. Kennedy did not acquiesce to CARUSO'S demand.

444.     CARUSO wrote up an incident report.

445.     CARUSO discussed the report with HIRSCH.

446.     CARUSO completed the report on December 6, 2018.

447.     HINE knew the background of CARUSO'S involvement with Mr. Kennedy.

448.     HINE ratified CARUSO'S conduct.

449.     HINE signed CARUSO'S report in his official capacity.

450.     TOWN authorized CARUSO to proceed to plaintiffs' home for the purpose of coercion.

451.     CARUSO documented the threats and coercion in his incident report.

452.     The incident report was sent by CARUSO to HIRSCH.  HIRSCH sent the incident report to multiple third parties, including De Almeida-Kennedy.

453.     Both CARUSO and HIRSCH induced third parties to take actions adverse to plaintiffs, including ceasing to cooperate with Mr. Kennedy, ceasing to attempt to enforce the Ex Parte Order, and ceasing to treat the Ex Parte Motion as valid.

454.     CARUSO appeared in Court for four hours on December 11, 2018, while on-duty and for the purpose of quashing Mr. Kennedy's First, Ninth, and Fourteenth Amendment rights as a consequence of Mr. Kennedy's exercise of protected First Amendment activity.

455.     HINE authorized CARUSO to appear in Court.

456.     TOWN authorized CARUSO to appear in Court.

457.     HIRSCH stated on January 16, 2019, to a Family Services coordinator, that Mr. Kennedy was potentially subject to federal prosecution.

458.     HIRSCH made the statement for the purpose of punishing Mr. Kennedy for filing an Ex Parte Motion.

459.      TOWN was aware of prior communication between De Almeida-Kennedy and CARUSO.

460.      TOWN has engaged in a longstanding practice or custom of allowing officers to threaten or coerce litigants.

461.      The incident report was retaliatory and caused Mr. Kennedy injury.  Not only did Mr. Kennedy lose his Freedom of Association, but also was chilled from exercising his Freedom of Speech.

462.      Mr. Kennedy claims damages.

463.      TOWN failed to train HINE in handling complainants presenting valid Ex Parte Orders based on filed Ex Parte Motions.

464.      TOWN failed to train HINE on ordering officers not to go threaten complainants for exercising their freedom of speech and contacting other states.

465.      As a direct and proximate result of the violation of his constitutional rights by all the defendants, Mr. Kennedy suffered general and special damages as alleged in this Complaint.  Mr. Kennedy cannot regain the lost time with his children.  In this specific case, the violation is more egregious given the past actions of HIRSCH and CARUSO.  Mr. Kennedy cannot easily repair the damage that CARUSO and HIRSCH have caused to Mr. Kennedy in relation to his relationship with Eldest Child and Youngest Child.  Mr. Kennedy has suffered anxiety and depression as a result of defendants' actions.  Mr. Kennedy is further afraid of CARUSO and HIRSCH.

466.      The conduct of defendants CARUSO and HIRSCH was willful, malicious, oppressive and/or reckless, and was of such a nature that punitive damages

should be imposed on CARUSO and HIRSCH in an amount commensurate with the wrongful acts alleged herein.

467.    TOWN is responsible for any liability for HINE under this Count pursuant to Connecticut General Statutes §7-465.

### K. COUNTS III-XX  (42 U.S.C. §1983 – Defamation, Stigma-Plus) CARUSO and HINE only

468.    On Tuesday, December 4, without the knowledge nor consent of Mr. Kennedy, CARUSO wrote out a report using FPD software with an FPD logo.

469.    On December 6, 2018, HINE approved the distribution of the report on TOWN letterhead using an official TOWN-issued email address.

470.    On December 6, 2018, without Mr. Kennedy's knowledge nor consent, CARUSO emailed his report to HIRSCH using a TOWN-issued email account.

471.    CARUSO'S report stated that "Ms. Kennedy was granted sole legal and physical custody of the children [in 2010]."  That publication was false and stigmatizing.  It is a major misrepresentation of the agreement that was reached by the parties and the circumstances of that agreement and, taken in context with the next statement, implies that a Judge was involved in the decision, which is untrue.

472.    CARUSO'S report next stated "in 2013, Mr. Kennedy was granted Supervised visitation with his two minor children."  That publication was false and stigmatizing and implies Mr. Kennedy had no right of visitation from 2009 until 2013.  Further, the statement implies that Mr. Kennedy involuntarily had supervised visitation in 2013 by Order and not agreement and does not reflect

that Mr. Kennedy reached agreement to end supervised visitation in 2013, not
commence it.

473.    CARUSO'S report stated "[a]t some point Mr Kennedy's visitation was
again restricted to supervised visitation." That publication was false and
stigmatizing, as there were no restrictions on visitation prior to November 8,
2017. In fact, the opposite. After CARUSO stopped being involved in Mr.
Kennedy's life in 2010, Mr. Kennedy eventually had gained joint legal custody
and substantially increased parenting time.

474.    CARUSO'S report stated "Mr Kennedy writes in his affidavit for the order
that shares joint legal custody of the two minor children with Ms. Kennedy. This
statement is inconsistent with the facts as set forth in the court order dated
November 8, 2017, which clearly states that his supervised visitation has been
suspended." That statement is false and stigmatizing. It misstates the Order,
suggests that Mr. Kennedy had had supervised visitation prior to November 8,
2017, and implies that Mr. Kennedy did not have joint legal custody. It also
implies that CARUSO has legal knowledge of the status of the case. Further, the
Ex Parte Order granted Mr. Kennedy sole legal custody.

475.    CARUSO'S report stated "Mr Kennedy was arrested in August of 2009
because he cleared out his house of all belongings while still married to Ms.
Kennedy." That statement is false and stigmatizing. Mr. Kennedy has no
criminal record, has never been arrested according to Connecticut statute, and
the house was not empty upon separation of Mr. Kennedy with De Almeida-
Kennedy.

476.     CARUSO'S report stated "[Mr. Kennedy] then fled Connecticut with both
minor children leaving Ms. Kennedy with no usable cell phone, no vehicle and no
idea where either of her two minor children were." That statement is false and
stigmatizing.  No one fled Connecticut.  The home was about to go into
foreclosure and a move had been planned.  There was a vehicle left, De
Almeida-Kennedy had two cell phones, and she herself told CARUSO where the
children were.

477.     CARUSO'S report stated "Mr Kennedy writes that he had no idea that Ms
Kennedy moved to Tennessee and did not know her address.  This is also an
inconsistent statement as Ms. Kennedy kept him updated." That publication is
false and stigmatizing.  It suggests Mr. Kennedy is a liar.  It also suggests De
Almeida-Kennedy is a truthteller and that CARUSO is vouching for De Almeida-
Kennedy's veracity.

478.     CARUSO'S report states "Mr Kennedy's own parents issued a strong
written letter denouncing his character and parental skills as it pertained to his
two minor children." That publication is false and stigmatizing.  The statement
implies that Mr. Kennedy did not have familial support and further implies that Mr.
Kennedy has a bad character and lacks parenting skills.  It implies that Mr.
Kennedy's children would not be safe with him.

479.     CARUSO'S report states "Guardian-Ad-Litem, Attomey Carmina Hirsch
has advocated against Mr Kennedy in regards to physical custody and or
unsupervised visitation, due in large part to his past history and his lack of
parental skills." That is a republication of false and stigmatizing statements made

74

by HIRSCH that suggested Mr. Kennedy was guilty of a crime to which an infamous penalty attaches.  In addition, it omits relevant case history.

480.     CARUSO'S report states "[Mr. Kennedy] told me he misunderstood our conversation.  (He did not)."  That publication is false and stigmatizing.  It suggests that CARUSO has knowledge and information that supports his statement.  As the creator of the report, it implies that his knowledge, tied with other statements, is more than mere opinion.  It also implies Mr. Kennedy is a liar who should not be trusted nor taken at face value.

481.     CARUSO'S report states "[Mr. Kennedy] has violated the court order as it pertains to support payments."  That publication is false and stigmatizing.  It labels Mr. Kennedy as a deadbeat dad and suggests that CARUSO has information about Mr. Kennedy that is not contained within his report.  Further, Mr. Kennedy has not violated any court orders pertaining to support.

482.     CARUSO'S report states "[Mr. Kennedy] voluntarily left the State of Connecticut in an effort to avoid those payments."  That publication is false and stigmatizing and suggests that Mr. Kennedy has engaged in a crime of moral turpitude.  Further, it implies that CARUSO has information beyond what is contained within his report.

483.     CARUSO'S report states "[Mr. Kennedy's] own parents have written a comprehensive report detailing his poor parental skills and lack of compassion."  That publication is false and stigmatizing.  The statement implies that Mr. Kennedy did not have familial support and further implies that Mr. Kennedy lacks

parenting skills and compassion.  It further purports to have psychological insights.

484.      CARUSO'S report states "[Mr. Kennedy's] disregard for the rule of law is blatant in the false affidavit he presented to obtain custody."  That publication is false and stigmatizing and suggests that Mr. Kennedy has engaged in a crime of moral turpitude.  Further, it suggests that the Ex Parte Order is not a valid Order to be followed.

485.      CARUSO'S report states "[Mr. Kennedy] knows full well that as of November 8, 2017 he had lost his supervised visitation with his children."  That publication is false and stigmatizing.  It suggests Mr. Kennedy had had supervised visitation prior to November 8, 2017, and further suggests that CARUSO had knowledge not contained within his report.

486.      CARUSO'S report states "That was the last standing order of the court." That publication is false and stigmatizing.  It implies that Mr. Kennedy did not have a valid court order for the return of the minor children and suggests that Mr. Kennedy is a liar.  Further, it implies that legally the Ex Parte Order is not valid.

487.      CARUSO'S report states "[Mr. Kennedy's] sole motivation is to take these children from their mother."  That publication is false and stigmatizing.  It attributes to Mr. Kennedy a false pretense and implies knowledge that is not contained within the report.  It makes Mr. Kennedy out to have ulterior motives for associating with his own children.

488.    CARUSO'S report designates De Almeida-Kennedy as "V" for victim.  That
publication is false and stigmatizing and suggests that Mr. Kennedy is a
perpetrator in the eyes of TOWN.

489.    Plaintiff Mr. Kennedy claims damages, including for the loss of reputation,
for the violation of due process, and for Mr. Kennedy's difficulties in interacting
with the children's schools as a result of CARUSO'S publication.

490.    CARUSO'S publications were willful, wanton, and made in reckless
disregard of Mr. Kennedy's rights.  CARUSO acted with actual malice, with the
intent to injure Mr. Kennedy's reputation and prevent him from exercising his First
Amendment, Ninth Amendment and Fourteenth Amendment rights in relation to
the Ex Parte Order of November 27, 2018.

491.    Mr. Kennedy has not, in fact, been able to execute the Ex Parte Order and
associate with his children from November 27, 2018, to present.

492.    HINE reviewed the report, knew that unconstitutional acts were occurring
directed specifically at Mr. Kennedy, and exhibited a deliberate indifference by
failing to act.

493.    Further, CARUSO'S publication was done without offering Mr. Kennedy an
opportunity to respond to the report and clear his name.  CARUSO intentionally
released the report without Mr. Kennedy's review in order to stigmatize Mr.
Kennedy and deprive Mr. Kennedy of due process.  CARUSO also knew that his
later testimony would not result in any ability of Mr. Kennedy to clear his name,
as the report had gone to another state and various third parties who would not
correct it, including De Almeida-Kennedy.

494.     Mr. Kennedy in effect would have no ability to move to exclude or objection to the submission of the report in any court, anywhere.  Since the original publication, the report has gone to at least five organizations in two states.  Mr. Kennedy has no practical method of correcting the contents of the report any longer.

495.     Plaintiff Mr. Kennedy claims punitive damages.

## L. COUNTS XXI-CXLIX (42 U.S.C. §1983 – Defamation, Stigma-Plus) HIRSCH Only

496.     Mr. Kennedy realleges and incorporates herein by reference the facts and allegations set forth in paragraphs 471-488 of this Complaint.

497.     In November of 2017, HIRSCH told the minor children that "[Mr. Kennedy] has a past record."  That publication was false and stigmatizing and suggested Mr. Kennedy was guilty of a crime to which an infamous penalty attaches. Further, the communication resulted in both minor children ceasing association and communication with Mr. Kennedy.  HIRSCH provided Mr. Kennedy with no opportunity to clear his name and stigmatized his reputation with his children.

498.     On October 23, 2018, HIRSCH stated to a Family Relations caseworker at Superior Court that "[Mr. Kennedy] kidnapped his children" in Mr. Kennedy's presence.  That publication was false and stigmatizing and suggests a crime to which an infamous penalty attaches.  Further, HIRSCH made the statement for the purpose of influencing Family Relations not to intercede in a custody matter. In fact, Family Relations did not intercede, continuing the injury to Mr. Kennedy's First Amendment right of association and Fourteenth Amendment due process rights.

499.    Mr. Kennedy corrected HIRSCH but HIRSCH refused to stop slandering Mr. Kennedy nor to admit she was wrong.

500.    Mr. Kennedy has no criminal record and no record of any arrests.

501.    HIRSCH continued to maintain that Mr. Kennedy had kidnapped his children, in front of and outside of Mr. Kennedy's presence.

502.    HIRSCH republished CARUSO'S report as written.

503.    HIRSCH did not offer Mr. Kennedy any review of the report prior to distribution.

504.    HIRSCH did not offer Mr. Kennedy and has not offered Mr. Kennedy any method of clearing his name.

505.    HIRSCH knew that CARUSO'S report would be shared with the minor children by De Almeida-Kennedy.

506.    On January 16, 2019, HIRSCH stated to a different Family Services caseworker that "[Mr. Kennedy] kidnapped his children."  That publication is false and stigmatizing and suggests a crime to which an infamous penalty attaches. Furthermore, HIRSCH referenced CARUSO'S report and ratified its truthfulness to the same Family Services caseworker, thus republishing yet again the statements contained in that report.

507.    HIRSCH was aware of numerous false statements published by De Almeida-Kennedy over the course of prior years.

508.    HIRSCH knew that De Almeida-Kennedy's psychological evaluation showed a tendency to prevaricate.

509.    HIRSCH knew that De Almeida-Kennedy had issues with telling the truth and disclosing information to Mr. Kennedy.

510.    Plaintiff Mr. Kennedy claims damages.

511.    HIRSCH'S publications were done without offering Mr. Kennedy an opportunity to respond to the report and clear his name.  HIRSCH intentionally released the report without Mr. Kennedy's review in order to stigmatize Mr. Kennedy and deprive Mr. Kennedy of due process.  HIRSCH also knew that her later testimony would not result in any ability of Mr. Kennedy to clear his name, as the report had gone to another state and various third parties who would not correct it, including De Almeida-Kennedy.  HIRSCH published the report at least eight times to different parties, including Mr. Kennedy.

512.    HIRSCH'S publications were willful, wanton, and made in reckless disregard of Mr. Kennedy's rights.  HIRSCH acted with actual malice, and knew that many of the statements within CARUSO'S report were false based on her own experience.  HIRSCH intended to and did injure Mr. Kennedy's reputation and prevented him from exercising his First Amendment, Ninth Amendment and Fourteenth Amendment rights and further deprived him of procedural due process.

513.    Plaintiff Mr. Kennedy claims punitive damages.

## M. COUNT CL (42 U.S.C. §1983 – Fourteenth Amendment – Procedural Due Process) CARUSO and HIRSCH Only

514.    Plaintiffs incorporate and reallege prior paragraphs 11-242 as to all defendants, 243-254 as to CARUSO, HINE, and TOWN, 255-263 as to HIRSCH, and 264-268 for Mrs. Kennedy, as if they were contained herein.

515.    CARUSO fabricated evidence, specifically the incident report written on
December 6, 2018.

516.    HIRSCH agreed to republish the fabricated evidence.

517.    Further, HIRSCH agreed to attempt to influence a tribunal in the state of
Tennessee.

518.    De Almeida-Kennedy filed a request to register a foreign decree on
December 7, 2018 in Tennessee.

519.    A hearing was scheduled for December 11, 2018, in Connecticut, wherein
HIRSCH and CARUSO could have provided admissible, non-fabricated
testimony to a judge.

520.    HIRSCH and CARUSO agreed not to provide Mr. Kennedy with notice and
an opportunity to be heard prior to publication.

521.    The fabricated evidence did result in Mr. Kennedy being denied a hearing.

522.    The fabricated evidence was shared with a tribunal in the state of
Tennessee for the purpose of denying Mr. Kennedy a hearing in Connecticut.

523.    The fabricated evidence was transmitted through an incident report to
allow its admission without a valid hearsay objection in Tennessee.

524.    Mr. Kennedy has not been allowed a hearing since November 27, 2018.

525.    On January 16, 2019, a hearing was scheduled to take place.

526.    On January 16, 2019, a hearing did not take place.

527.    On January 16, 2019, HIRSCH notified a Family Services coordinator in
Mr. Kennedy's presence that De Almeida-Kennedy was attempting to have the
Federal government arrest Mr. Kennedy.

528.     HIRSCH and CARUSO have both volunteered to testify on behalf of any prosecution of Mr. Kennedy.

529.     Mr. Kennedy demanded a hearing on the "frozen" Ex Parte Order as soon as possible.

530.     A week later, a date of May 1, 2019, appeared on the Court docket.

531.     Mr. Kennedy asked De Almeida-Kennedy's counsel about the date.

532.     HIRSCH sent an email to Mr. Kennedy and De Almeida-Kennedy's counsel stating "Last week caseflow left a voicemail that they were bumping us due to other matters (they are down a Judge (due to injury) and other scheduling issues) and asked that I stop in to see about scheduling a new date, which I did do on Wed. last week when I was there on another matter – the earliest date that worked was May 1 (I am not available in March nor most of April due to other already scheduled matters – several trials, private mediations, hearings, depositions, etc)."

533.     HIRSCH did not consult Mr. Kennedy prior to delaying the hearing.

534.     The fabricated evidence denied Mr. Kennedy procedural due process.

535.     Mr. Kennedy has suffered general and specific damages in terms of lost economic opportunity, lost association, and both anxiety and depression over being denied an opportunity to return his children to Connecticut and clear his name.

536.     HIRSCH and CARUSO'S actions were malicious and egregious.

537.     Mr. Kennedy requests punitive damages.

**N. COUNT CLI (42 U.S.C. §1983 – Fourteenth Amendment – Procedural Due Process) HIRSCH Only**

538.     Plaintiffs incorporate and reallege prior paragraphs 11-242 and 255-263,
as if they were contained herein.

539.     On November 8, 2017, HIRSCH presented false testimony to a tribunal.

540.     As a result of HIRSCH'S false testimony, Mr. Kennedy was denied access
to his children from November 8, 2017, through November 27, 2018.

541.     The tribunal instructed Mr. Kennedy to file a Motion to Modify in order to
remove the restrictions advocated by HIRSCH through false testimony.

542.     On April 4, 2018, Mr. Kennedy filed a Motion to Modify as instructed by the
Court.

543.     In April of 2018, De Almeida-Kennedy unilaterally moved out of
Connecticut without notifying Mr. Kennedy.

544.     De Almeida-Kennedy filed a Motion for Continuance on May 23, 2018.

545.     HIRSCH knew as of that date the situation of Mr. Kennedy.

546.     HIRSCH agreed to an indefinite continuance.

547.     HIRSCH knew that De Almeida-Kennedy had moved in order to prevent
Mr. Kennedy from obtaining a hearing on the matter.

548.     HIRSCH made no attempts to schedule a hearing at any time thereafter.

549.     HIRSCH undertook to deny Mr. Kennedy the right to a hearing through
out-of-court activity.

550.     Mr. Kennedy made a second attempt to get a hearing on September 26,
2018.

551.     HIRSCH opposed Mr. Kennedy having a hearing.

552.     Mr. Kennedy made a third attempt to get a hearing on October 23, 2018.

553.     HIRSCH opposed Mr. Kennedy having a hearing.

554.     HIRSCH would offer her schedule specifically to delay Mr. Kennedy's obtaining of a hearing.

555.     Over the course of almost three years, HIRSCH has not once delayed nor obstructed a hearing requested by De Almeida-Kennedy.

556.     Mr. Kennedy has suffered damages from the denial by HIRSCH of procedural due process through fabrications and out-of-court delays.

557.     HIRSCH'S conduct was willful and wanton, malicious and intended to cause Mr. Kennedy injury.  Mr. Kennedy requests both nominal and compensatory damages for the anxiety and depression he has suffered and the loss of association with his minor children.  Further, Mr. Kennedy requests punitive damages.

## O. COUNT CLII (42 U.S.C. §1983 – Conspiracy) CARUSO and HIRSCH Only

558.     Plaintiffs incorporate prior paragraphs 351-405, as if they were contained herein.

559.     HIRSCH and CARUSO made an agreement to generate a police report with falsified evidence.

560.     HIRSCH and CARUSO made an agreement to distribute a police report with stigmatizing, false content.

561.     HIRSCH and CARUSO made an agreement to influence tribunals in two states not to enforce a granted Ex Parte Order.

562.     HIRSCH and CARUSO made an agreement to prevent Mr. Kennedy from prevailing at any future hearings.

563.     HIRSCH and CARUSO made an agreement to utilize official FPD
computer systems and a TOWN-issued email address to effectuate their
agreement.

564.     HIRSCH communicated with CARUSO and agreed to distribute
CARUSO'S report.

565.     HIRSCH reviewed CARUSO'S report prior to distributing it.

566.     HIRSCH and CARUSO further agreed to provide CARUSO'S report to
Bridgeport Superior Court for the purpose of terminating Mr. Kennedy's sole legal
custody of the minor children.

567.     HIRSCH and CARUSO further agreed to have both CARUSO and
HIRSCH urge officials in Tennessee not to comply with the Ex Parte Order.

568.     HIRSCH and CARUSO further agreed to prevent Mr. Kennedy from
having any direct contact with the minor children.

569.     HIRSCH and CARUSO further agreed to have CARUSO testify and
introduce his report into evidence in tribunals in Tennessee, Connecticut and in
Federal District Court, if that were to come to pass.

570.     HIRSCH met with Family Services on January 16, 2019, and in Mr.
Kennedy's presence, referred to the report, smirked and stated "[CARUSO] wrote
a report and it was scathing".

571.     HIRSCH and CARUSO have communicated with third parties in the State
of Tennessee and referenced the report as "the facts of this [custody] case".

572.     HIRSCH and CARUSO have communicated to multiple third parties,
including the public schools that Mr. Kennedy's children attend and Family

Services in Connecticut, to ignore the Ex Parte Order and, those parties have in fact ignored the Ex Parte Order in reliance upon their representations.

573.     CARUSO wrote in his report that he had shared its contents with other people and was sending it to HIRSCH only, in furtherance of their agreement.

574.     CARUSO distributed his report on December 6, 2018, per his agreement with HIRSCH.  HIRSCH distributed CARUSO'S report on December 6, 2018, per her agreement with CARUSO.

575.     CARUSO appeared at Superior Court on December 11, 2018, by agreement with HIRSCH.  CARUSO attended for four hours in preparation to testify and introduce his report into evidence.

576.     HIRSCH, by agreement with CARUSO, delayed proceedings until January 16, 2019, in order to have CARUSO return from vacation to testify and introduce his report into evidence.

577.     CARUSO and HIRSCH made an agreement to deny Mr. Kennedy's Constitutional Rights under the First, Fifth, Ninth and Fourteenth Amendments. CARUSO and HIRSCH committed overt acts, referenced above, in furtherance of their conspiracy.

578.     CARUSO and HIRSCH'S conduct was willful and malicious and Mr. Kennedy requests nominal and compensatory damages for economic and non-economic loss, including for anxiety and depression and the loss of intimate association as a result of their conspiracy.  Further, Mr. Kennedy requests punitive damages.

**P. COUNT CLIII (42 U.S.C. §1983 – Equal Protection – Selective Enforcement) All Defendants**

579.     Plaintiffs incorporate prior paragraphs 239-242 and 270-405 as to all defendants.

580.     CARUSO'S treatment of Mr. Kennedy is unique.

581.     CARUSO has treated other complainants with granted Ex Parte Orders all differently than Mr. Kennedy.

582.     CARUSO has never before issued a false report in relation to a complainant with a granted Ex Parte Order.

583.     CARUSO has never before made any attempts to prevent a complainant from enforcing a granted Ex Parte Order.

584.     CARUSO singled out Mr. Kennedy due to CARUSO'S prior actions taken in 2009, because CARUSO'S prior contact was resolved favorably to Mr. Kennedy.

585.     HIRSCH'S treatment of Mr. Kennedy is unique.

586.     HIRSCH has never disobeyed a granted Ex Parte Order prior to Mr. Kennedy's presentment.

587.     HIRSCH has never before presented false evidence in relation to a granted Ex Parte Order.

588.     HIRSCH singled out Mr. Kennedy due to Mr. Kennedy's prior criticism of HIRSCH'S work.

589.     CARUSO and HIRSCH were both motivated by willful disobedience of a granted Ex Parte Order because it was Mr. Kennedy who had obtained it.

590.     Both CARUSO and HIRSCH were motivated by a bad faith intent to injure Mr. Kennedy in his exercise of his First, Ninth, and Fourteenth Amendment rights.

591.     CARUSO'S and HIRSCH'S actions did prevent Mr. Kennedy from exercising his First, Ninth, and Fourteenth Amendment rights.

592.     HINE knew about CARUSO'S prior contact with Mr. Kennedy and the disposition in Mr. Kennedy's favor.

593.     HINE knew about the Letter of Commendation that CARUSO received in 2010 related to Mr. Kennedy.

594.     HINE knew about CARUSO'S attempts to coerce Mr. Kennedy into not enforcing the Ex Parte Order because they were in CARUSO'S report.

595.     HINE approved the report for distribution.

596.     Plaintiffs reallege paragraphs 414-424, as if they were contained herein.

597.     TOWN is responsible for any liability for HINE under this Count pursuant to Connecticut General Statutes §7-465.

**Q. COUNTS CLIV-CLXVIII (Common Law Invasion of Privacy) CARUSO And HINE Only**

598.     On Tuesday, December 4, without the knowledge nor consent of Mr. Kennedy, CARUSO wrote out a report using FPD software, on FPD systems.

599.     On December 6, 2018, HINE approved the distribution of the report on TOWN's systems using an official TOWN-issued email address.

600.     On December 6, 2018, without Mr. Kennedy's knowledge nor consent, CARUSO emailed his report to HIRSCH using a TOWN-issued email account.

601.     CARUSO knew the incident report would be made public.

602.      CARUSO utilized the Internet and a TOWN-issued email address to
ensure the report could be obtained through a FOIA request.

603.      CARUSO and HIRSCH further intended to submit the incident report into
evidence in two states, and possibly at the Federal level, where they would then
be made part of the public record and further published.

604.      CARUSO'S report stated "[CARUSO] investigated this case.  Mr. Kennedy
was tracked to Texas.  An arrest warrant was obtained charging Mr. Kennedy
with Custodial Interference 1st degree.  He was subsequently arrested by the
Texas Authorities and held as a Fugitive of Justice.  Det. Bravo and I went to
Austin, Texas, at the end of September 2009, and brought Mr. Kennedy back to
Connecticut for trial."  The matter published (1) was stated by CARUSO in
violation of Mr. Kennedy's rights under Connecticut General Statutes §§54-
142a(c), 54-142a(e), which statutes exist for protection of innocent persons, (2) is
extremely misleading in that Mr. Kennedy has no criminal record and was never
prosecuted in relation to CARUSO'S investigation, (3) is information not relevant
nor necessary for this report, and (4) is a major misrepresentation of Mr.
Kennedy's character, history, beliefs and the situation surrounding events in
2009 as detailed in paragraphs 11-151.

605.      CARUSO'S report stated "[Mr. Kennedy] was living in Florida when he
filed an emergency order of custody in the State of Connecticut.  This was
dismissed as neither party was living in the state at that time."  That publication
constitutes an invasion of privacy in that the matter published (1) was not true,
(2) is information not relevant nor necessary for this report, and (3) creates both

an impression that the matter was dismissed, which it was not, and that the

reason for dismissal was due to jurisdictional issues, which is not known.

Further, it creates the impression that the motion was without merit and was

designed to mislead the reader into assuming jurisdiction rests with Tennessee.

606.    CARUSO'S report stated "[o]n November 18, 2017 the Honorable Judge

Wenzel then granted the suspension of Mr Kennedy's supervised visitation.  This

order is still in place today."  That publication constitutes an invasion of privacy in

that the matter published (1) is not true, (2) is information not relevant nor

necessary for this report, and (3) creates an impression that Mr. Kennedy

somehow had no right to the custody of his minor children and also that a Judge

had suspended a right of supervised visitation, which suggests that there was an

order of supervised visitation *ab initio*.

607.    CARUSO'S report stated "Mr Kennedy writes that prior to taking either or

both minor children out of the State of Connecticut the other party shall be

notified.  However, he chose to move to Florida in October of 2017."  The matter

published (1) is not true in suggesting that Mr. Kennedy's move to Florida had

any relevance to the obligation of De Almeida-Kennedy, (2) is information not

relevant nor necessary for this report, and (3) suggests that Mr. Kennedy violated

an obligation or agreement.

608.    CARUSO'S report stated "[Mr. Kennedy] was eventually tracked to the

State of Texas, via his usage of a joint credit card.  This detective applied for and

was granted an arrest warrant charging James Kennedy with Custodial

Interference 1st degree.  He was eventually returned to Connecticut to face that

charge." The matter published (1) was stated by CARUSO in violation of Mr.

Kennedy's rights under Connecticut General Statutes §§54-142a(c), 54-142a(e),

which statutes exist for protection of innocent persons, (2) is extremely

misleading in that Mr. Kennedy has no criminal record and was never prosecuted

in relation to CARUSO'S investigation, (3) is information not relevant nor

necessary for this report, and (4) is a major misrepresentation of Mr. Kennedy's

character, history, beliefs and the situation surrounding events in 2009 as

detailed in paragraphs 11-151.

609.     CARUSO'S report states "Mr. Kennedy did in fact have Ms. Kennedy's

Tennessee address of 266 Rich Circle, Franklin, Tennessee, which has not been

disputed." The matter published (1) is not true and implies that Mr. Kennedy had

knowledge he did not, as the address provided by Ms. Kennedy at the time was a

P.O. Box in a different city, (2) is a residence with the listed owner as De

Almeida-Kennedy's boyfriend, Joseph Meade, with whom De Almeida-Kennedy

has stated in numerous documents she does not live despite his residing there,

(3) is information not relevant nor necessary for this report, and (4) is not within

the personal knowledge of CARUSO.

610.     CARUSO'S report states "From 2009 until present I have had intermittent

conversations with Ms. Kennedy relative to her two minor children. When

speaking with Ms. Kennedy during those times she would often complain about

Mr Kennedy's treatment of the two minor children. She was advised to lodge a

complaint with the Trumbull Police Department as that is where Mr Kennedy was

living during those times." The matter published (1) creates an impression that

Mr. Kennedy has engaged in behavior that would constitute actionable
mistreatment of the minor children by police officers in another jurisdiction
without ever having notified Mr. Kennedy of any of those complaints nor offering
Mr. Kennedy the opportunity to address any of them and further, (2) is
information not relevant nor necessary for this report, and (3) is not true to the
extent any maltreatment is alleged.  Further, Mr. Kennedy has never had any
contact with the Trumbull Police Department in relation to the health, safety and
welfare of either minor child, which fact is not included in CARUSO'S report.

611.     CARUSO'S report states "During my discussion with Mr. Kennedy I
advised him that he should not return to Tennessee at this time."  The matter
published (1) is not true, (2) is information not relevant nor necessary for this
report, (3) suggests that Mr. Kennedy did not have the right to seek the return of
his minor children to Fairfield per the Superior Court Order, and (4) is a post-hoc
justification for traveling to Mr. Kennedy's home unannounced.

612.     CARUSO'S report states "During the early morning hours of December 4,
2018 Officer Montgomery reported to me early that Mr. Kennedy had a
scheduled appointment in 30 minutes with the principal at one of his son's
schools.  Officer Montgomery told me that he would keep me informed.  Later
that day he stated that Mr. Kennedy did not show up."  The matter published (1)
is not true in relation to what happened, (2) intentionally omits the key detail that
neither minor child attended school over the following eight-day period, including
the day listed in the report, (3) is information not relevant nor necessary for this

report, and (4) creates a false impression that Mr. Kennedy did not carry out his intentions.

613.     CARUSO'S report states "[Mr. Kennedy's] actions in this case are deplorable and purely selfish."  The matter published (1) creates a false impression by omitting any facts favorable to Mr. Kennedy, (2) is information not relevant nor necessary for this report, and (3) is a major misrepresentation of Mr. Kennedy's character, history, beliefs and the situation surrounding events in 2018.

614.     CARUSO'S report states "[Mr. Kennedy] has previously been arrested for taking his two sons to another stated without knowledge and or consent of their mother."  The matter published (1) was stated by CARUSO in violation of Mr. Kennedy's rights under Connecticut General Statutes §§54-142a(c), 54-142a(e), which statutes exist for protection of innocent persons, (2) is extremely misleading in that Mr. Kennedy has no criminal record and was never prosecuted in relation to CARUSO'S investigation, (3) is information not relevant nor necessary for this report, and (4) is a major misrepresentation of Mr. Kennedy's character, history, beliefs and the situation surrounding events in 2009 as detailed in paragraphs 11-151.

615.     CARUSO'S report states "[Mr. Kennedy] has made no real attempt at being involved in his children's lives."  The matter published (1) is not true, (2) combined with other statements suggests that CARUSO has actual knowledge of Mr. Kennedy's relationship with his minor children, (3) is information not relevant

nor necessary for this report, and (4) suggests falsely that CARUSO'S own continual interference in that relationship is not relevant.

616.     CARUSO'S report states "[Mr. Kennedy] pretends to want what's best for his children."  The matter published (1) is not true, (2) is information not relevant nor necessary for this report, and (3) suggests that CARUSO has personal knowledge and experience and has reached a conclusion through personal knowledge and experience, coupled with other statements made by CARUSO.

617.     CARUSO'S report states "Mr Kennedy may abscond with [minor children]. It is my believe that if given the opportunity Mr Kennedy would not return to Connecticut with these two children."  The matter published (1) is not true, (2) is information not relevant nor necessary for this report and (3) suggests that CARUSO has personal knowledge and experience and has reached a conclusion through personal knowledge and experience for which there is no basis in fact.

618.     CARUSO'S report includes the language "THE UNDERSIGNED, AN INVESTIGATOR HAVING BEEN DULY SWORN DEPOSES AND SAYS THAT: I AM THE WRITER OF THE ATTACHED POLICE REPORT PERTAINING TO THIS INCIDENT NUMBER THAT THE INFORMATION CONTAINED THEREIN WAS SECURED AS A RESULT OF (1) MY PERSONAL OBSERVATION AND KNOWLEDGE OR (2) INFORMATION RELAYED TO ME BY OTHER MEMBERS OF MY POLICE DEPARTMENT OR OF ANOTHER POLICE DEPARTMENT OR (3) INFORMATION SECURED BY MYSELF OR ANOTHER MEMBER OF A POLICE DEPARTMENT FROM THE PERSON OR PERSONS

NAMED OR IDENTIFIED THEREIN, AS INDICATED BY THE ATTACHED
REPORT.  THAT THE REPORT IS AN ACCURATE STATEMENT OF THE
INFORMATION SO RECEIVED BY ME".  The signed report itself published
indicates that the statements by CARUSO about Mr. Kennedy are a result of
CARUSO'S personal knowledge and true and correct in the eyes of TOWN, and
ratified by HINE.  The report on the whole is designed to paint Mr. Kennedy as a
criminal with no interest in his children and no right to associate with them or to
the enforcement of the Ex Parte Order.

619.      HINE read CARUSO'S report and authorized its publication to multiple
third parties, and the public at large through dissemination by De Almeida-
Kennedy and HIRSCH and by utilizing a TOWN-issued email address.

620.      The publications by CARUSO with HINE'S approval were lies and/or
major misrepresentations highly offensive to Mr. Kennedy, have caused distress
and mental suffering, have caused emotional and mental anxiety, and harm to
his interest and privacy.

621.      CARUSO made those statements without disclosing that Mr. Kennedy
achieved a favorable outcome from CARUSO'S involvement with Mr. Kennedy in
2009.

622.      Mr. Kennedy claims damages.

623.      CARUSO'S publications were willful, wanton, and made in reckless
disregard of Mr. Kennedy's rights.  CARUSO acted with the intent to offend and
calculated to invade Mr. Kennedy's privacy and cause him intentional distress.
CARUSO and HINE were both aware of numerous misleading statements

published by De Almeida-Kennedy over the course of prior years and knew that

De Almeida-Kennedy would republish the report.

624.      Mr. Kennedy claims punitive damages.

### R. COUNTS CLXIX-CLXXXIII (Common Law Invasion of Privacy) HIRSCH Only

625.      HIRSCH republished CARUSO'S report multiple times and provided a

copy to De Almeida-Kennedy, who has further republished to multiple parties.

Further, HIRSCH provided a copy of CARUSO'S report both to Tennessee public

schools, knowing they would become part of a public record and also to Family

Services at Superior Court, where the report would be published to several

caseworkers.  HIRSCH knew that CARUSO'S report would be shared with the

minor children, painting Mr. Kennedy in an extremely negative light.

626.      On January 16, 2019, HIRSCH stated to a different Family Services

caseworker that "[CARUSO] issued a scathing report."  HIRSCH did not raise

any issues with a single statement in the report, despite having read the contents

and thus ratifying the statements and having already provided a copy to Family

Services at Superior Court.  HIRSCH'S dissemination to Family Services

constitutes a republication and every false and misleading statement was ratified

by HIRSCH.  HIRSCH was smirking when she made that statement.

627.      Publication by HIRSCH to Family Services constitutes a publication into

the public domain.  Publication to five persons in the State of Tennessee using

official email addresses further places the report in the public domain, and all

invasions of privacy in consequence distributed to the wider public.

628.     The publications by HIRSCH were lies and/or major misrepresentations highly offensive to Mr. Kennedy, have caused distress and mental suffering, have caused emotional and mental anxiety, and harm to his interest and privacy.

629.     Mr. Kennedy claims damages.

630.     HIRSCH'S publications were willful, wanton, and made in reckless disregard of Mr. Kennedy's rights.  HIRSCH acted with the intent to offend and calculated to invade Mr. Kennedy's privacy and cause him intentional distress. HIRSCH was both aware of numerous misleading statements published by De Almeida-Kennedy over the course of prior years and knew that De Almeida-Kennedy would republish the report.

631.     Mr. Kennedy claims punitive damages.

### S. COUNTS CLXXXIV (Common Law Conspiracy to Interfere with Custodial Relations) CARUSO and HIRSCH Only

632.     On November 27, 2018, HIRSCH became aware of the Ex Parte Order.

633.     On November 28, 2018, HIRSCH was provided a copy of the Ex Parte Order.

634.     The Ex Parte Order demanded the immediate return of Mr. Kennedy's children to Mr. Kennedy's sole legal custody with no visitation to De Almeida-Kennedy.

635.     On November 27, 2018, and again on November 28, 2018, HIRSCH was informed by De Almeida-Kennedy that De Almeida-Kennedy would not comply with the Ex Parte Order.

636.    On November 29, 2018, CARUSO was provide a copy of the Ex Parte Order.

637.    On November 29 or 30, 2018, CARUSO was informed by De Almeida-Kennedy that De Almeida-Kennedy would not comply with the Ex Parte Order.

638.    On December 3, 2018, CARUSO attempted to coerce Mr. Kennedy into not returning his children to Connecticut.

639.    On December 3, 2018, HIRSCH contacted the minor children without Mr. Kennedy's consent.  HIRSCH did not notify Mr. Kennedy she was attempting to make contact.  HIRSCH told De Almeida-Kennedy she did not have to return Mr. Kennedy's children to Connecticut.

640.    On December 4, 2018, HIRSCH and CARUSO made an agreement to interfere with Mr. Kennedy's custody of his children.

641.    On December 6, 2018, CARUSO sent HIRSCH a fabricated report.

642.    HIRSCH sent out the fabricated report in furtherance of their agreement, to various third parties, including law enforcement in Tennessee, for the purpose of interfering with Mr. Kennedy's custodial rights.

643.    The fabricated report did interfere with Mr. Kennedy's custodial rights.

644.    Mr. Kennedy has suffered general and specific damages from the conspiracy, including anxiety, depression, and lost economic opportunity.

645.    CARUSO and HIRSCH'S conspiracy was malicious and wanton.

646.    Mr. Kennedy is requesting punitive damages.

**T. COUNT CLXXXV (Common Law Negligence) CARUSO and HINE only**

647.    On April 2, 2011, TOWN had a duty to erase all records relating to CARUSO and HINE'S activities initiated by De Almeida-Kennedy in 2009.

648.    As of April 2, 2011, CARUSO and HINE had a duty not to disclose any information related to activities undertaken in their official capacity in 2009 on behalf of De Almeida-Kennedy.

649.    The duty to erase and the duty not to disclose are both ministerial, not within the discretion of CARUSO nor HINE.

650.    CARUSO made at least three references to information that should not have been disclosed nor referenced in his report of December 6, 2018.

651.    HINE supervised the release of the report and had personal knowledge that the information should not have been disclosed nor referenced in the report.

652.    Both CARUSO and HINE breached their duty.  The release of the report provided to a wider audience information not permitted to be reported.  The release of the report to a wide audience has caused damage to Mr. Kennedy's reputation and business prospects.

653.    Mr. Kennedy has as a normal course of business the requirement to obtain security clearance where background questions are asked of the nature that this disclosure impacts.  Further, Mr. Kennedy will continue to be impacted as De Almeida-Kennedy will continue to distribute the report for the foreseeable future.

654.    Mr. Kennedy has suffered financial loss and reputational loss as a result of the disclosure, caused by the disclosure.

**U. COUNT CLXXXVI (Common Law Negligence - Liability) TOWN Only**

655.     Mr. Kennedy incorporates and realleges prior paragraphs 657-664, as if they were contained herein.

656.     TOWN is responsible for CARUSO'S and HINE'S negligent acts committed while acting within the scope of their duties.  Mr. Kennedy asserts liability for Count CLXXXV under Connecticut General Statutes §52-557n.

### V. COUNT CLXXXVII (Common Law Negligence - Indemnity) TOWN Only

657.     Mr. Kennedy incorporates and realleges prior paragraphs 657-664, as if they were contained herein.

658.     TOWN is responsible for any liability for CARUSO and HINE under Count CLXXXV pursuant to Connecticut General Statutes §7-465.

### W. COUNT CLXXXVIII (Common Law Intentional Infliction of Emotional Distress) CARUSO Only

659.     Plaintiffs incorporates and realleges prior paragraphs 312-342.

660.     Mrs. Kennedy's fear increased at seeing CARUSO enter her home with a firearm on December 3, 2018.

661.     Mr. Kennedy also began to experience anxiety.

662.     CARUSO was aware, or should have been aware, that De Almeida-Kennedy had stated that Mr. Kennedy was "dangerous" and that something "should be done" about him earlier in 2018.

663.     CARUSO knew that his conduct would upset both plaintiffs.

664.     CARUSO knew or should have known Mrs. Kennedy's background.

665.     CARUSO knew that Mr. Kennedy had not seen his children in person since November 6, 2017.

666.     CARUSO knew that Mr. Kennedy had an Ex Parte Order that directed that the minor children be "returned immediately" to Connecticut.

667.     CARUSO knew that he had engaged in prior activity with Mr. Kennedy that resulted in a favorable disposition for Mr. Kennedy.

668.     CARUSO chose to go to plaintiffs' home unannounced.

669.     CARUSO did not announce the purpose of his visit prior to entering the plaintiffs' home.

670.     CARUSO chose to enter the plaintiffs' home with a loaded weapon.

671.     CARUSO chose to direct Mr. Kennedy.

672.     CARUSO chose to raise his voice.

673.     CARUSO chose to enter a controlling stance.

674.     CARUSO'S angry tone, raised voice and controlling stance upset and scared Mr. Kennedy into thinking that CARUSO was threatening his freedom if he did not comply.

675.     CARUSO'S angry tone, raised voice and controlling stance placed Mrs. Kennedy in fear of her safety and Mr. Kennedy in fear of his own safety.

676.     CARUSO was aware that De Almeida-Kennedy had called him and requested Mr. Kennedy be arrested on multiple occasions.

677.     CARUSO made no attempt to calm Mrs. Kennedy, who was visibly upset.

678.     Following CARUSO'S visit, plaintiffs both experienced severe anxiety and depression, especially over the knowledge they would not see the minor children even with a granted Ex Parte Order.

679.     Mrs. Kennedy became fearful for her safety in Fairfield.

680.     Mr. Kennedy became fearful for his safety at his home.

681.     Plaintiffs claim compensatory and exemplary damages.

682.     Plaintiffs have lost work opportunities and have been depressed, demoralized and made anxious from CARUSO'S unannounced visit.

683.     CARUSO'S conduct was extreme and outrageous.

684.     Plaintiffs claim punitive damages.

### X. COUNT CLXXXIX (Violation of Personal Data Act) TOWN Only

685.     CARUSO is an employee of TOWN.

686.     CARUSO created a report on December 4, 2018.

687.     CARUSO'S report contains Mr. Kennedy's date of birth.

688.     CARUSO'S report contains Mr. Kennedy's driver's license number.

689.     CARUSO'S report contains false information.

690.     CARUSO'S report contains information about Mr. Kennedy not relevant nor necessary for the agency to accomplish its lawful purpose.

691.     CARUSO released his report to third parties.

692.     CARUSO did not offer Mr. Kennedy an opportunity to review it prior to releasing it.

693.     CARUSO did not offer Mr. Kennedy an opportunity to correct inaccurate information.

694.     CARUSO did not allow Mr. Kennedy to challenge the relevancy of information contained within the report.

695.     CARUSO did not offer Mr. Kennedy an opportunity to notate in the record Mr. Kennedy's objections to information contained therein.

696.     CARUSO made no attempt to safeguard the private information.

697.     Mr. Kennedy claims damages, including loss of potential revenue due to the harm from the improper disclosure, under Connecticut General Statutes §4-197.

698.     Mr. Kennedy requests an injunction against any further distribution of the incident report by TOWN or any of its agents.

699.     Mr. Kennedy requests a writ of mandamus instructing the TOWN'S agents to erase any electronic or printed copies of the incident report in TOWN'S possession.

## Y. REQUEST FOR RELIEF

WHEREFORE, the plaintiffs respectfully request relief as follows:

700.     Nominal damages for each violation of plaintiffs' Constitutional rights by the defendants.

701.     Compensatory damages in an amount to be proved at trial.

702.     Punitive damages against defendants CARUSO, HIRSCH, and HINE in an amount to be proved at trial.

703.     Costs, including reasonable attorneys' fees actually incurred, under 42 U.S.C. §1988, and under other applicable law.

704.     An injunction against any further publication of the incident report written by CARUSO on December 4, 2018, and published on December 6, 2018, related to plaintiffs, under Connecticut General Statutes §§4-197, 54-142a(c), and 54-142a(e).

705.     A writ of mandamus directing TOWN to direct its agents to erase all copies of the aforementioned report under Connecticut General Statutes §§4-197, 54-142a(c), and 54-142a(e).

706.     Any other relief that this Court deems just and equitable.

## Z. JURY DEMAND

Plaintiffs demand a jury trial.

_____

Original signature of attorney (if any)

**Plaintiff's Original Signature**

_____

Printed Name

James Kennedy

Printed Name

James Kennedy
Besa Kennedy
145 Reid St
Fairfield, CT  06824

james@kennedyideaworks.com

## DECLARATION UNDER PENALTY OF PERJURY

The undersigned declares under penalty of perjury that he/she is the plaintiff in the above action, that he/she has read the above complaint and that the information contained in the complaint is true and correct.  28 U.S.C. § 1746; 18 U.S.C. § 1621.

Executed at _145 Reid St, Fairfield, CT_ on _2/22/19_.
              (location)                          (date)

**Plaintiff's Original Signature**