# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

James Kennedy, Besa Kennedy,

     Plaintiffs,

     v.                      Case No.: 3-19-CV-260-VLB

Frederick Caruso, Carmina Hirsch,        August 12, 2020

née Tessitore, Frederick Hine, Town of

Fairfield,

     Defendants.

## PLAINTIFFS' FIRST AMENDED COMPLAINT

## A. PARTIES

1. James Kennedy ("Plaintiff Mr. Kennedy") is a citizen of Connecticut who presently resides at 145 Reid Street, Fairfield, CT.

2. Besa Kennedy ("Plaintiff Mrs. Kennedy") is a citizen of Connecticut who presently resides at 145 Reid Street, Fairfield, CT.

3. Defendant Frederick Caruso ("CARUSO") is an individual and police officer of the Fairfield Police Department and acted under color of law in the course and scope of employment at all times relevant hereto in the Town of Fairfield, County of Fairfield, State of Connecticut.  He is sued herein in both his individual and official capacities.

4. Defendant Carmina Hirsch ("HIRSCH"), née Tessitore, is a citizen of Connecticut whose business address is 4 Research Drive, Suite 402, Shelton, CT, 06484, who has acted under color of law in cooperation and agreement with CARUSO.

1

5. Defendant Detective Sergeant Frederick Hine ("HINE") is an individual and police officer of the Fairfield Police Department and acted under color of law in the course of scope of employment at all times relevant hereto in the Town of Fairfield, County of Fairfield, State of Connecticut, in a supervisory capacity over defendant CARUSO. He is sued herein in both his individual and official capacities.

6. Defendant Town of Fairfield ("TOWN") is a municipality charted and carrying on governmental functions in the County of Fairfield, State of Connecticut.

## B. JURISDICTION AND VENUE

7. The Court has jurisdiction pursuant to 28 U.S.C. §1331 for all claims arising under the Constitution, laws, or treaties of the United States.

8. The Court has jurisdiction over all other Counts pursuant to 28 U.S.C. §1367. Specifically, the remaining claims arise from a common nucleus of operative fact.

9. Venue in this judicial district is proper pursuant to 28 U.S.C. §1391(b)(2) as a substantial part of the events giving rise to the claims occurred here.

## D. FACTS RELEVANT TO PLAINTIFF MR. KENNEDY AND HIS FAMILY THROUGH AUGUST 27, 2009

10. In June of 2001, Mr. Kennedy and Fatima De Almeida-Kennedy married.

11. In November of 2003, a son was born from the marriage ("Eldest Child") in Stamford, Connecticut.

12. De Almeida-Kennedy shook Eldest Child firmly for a duration of five seconds while screaming at him at six weeks of age in the presence of plaintiff. De Almeida-Kennedy was upset with Eldest Child for crying and not holding still. Mr.

Kennedy became alarmed and concerned.  De Almeida-Kennedy expressed remorse.  Mr. Kennedy warned her not to engage in that behavior ever again.

13. While Mr. Kennedy was away on travel, De Almeida-Kennedy would sometimes send emails detailing that she had spanked and/or slapped Eldest Child on the rear end or in the face, lamenting that Eldest Child was acting like a "retard", or expressing anger and upsettedness with any contact from members of Mr. Kennedy's family.  Mr. Kennedy would receive calls, messages and emails from De Almeida-Kennedy that required Mr. Kennedy's immediate response or intervention on a daily basis.

14. In August of 2005, a second son was born ("Youngest Child") in Connecticut.

15. De Almeida-Kennedy expressed a belief that Europe would allow her to behave as she wished.  When De Almeida-Kennedy experienced depression or anxiety, she would make comments such as "I wish I could kill myself" or "my life is over" or "I didn't want to have kids" or "I want to eliminate [Eldest Child]" or "I'll wring your neck" toward either minor child or "if you try to leave me, I will kill you" to Mr. Kennedy.

16. In March of 2009, Mr. Kennedy's sister announced her engagement to her present husband.  De Almeida-Kennedy did not believe it was Mr. Kennedy's sister's choice whether to get engaged because her parents should have approved first, blamed America's "soft" culture, and stated within earshot of the minor children that "someone should shoot Obama", who was at that time the President.  De Almeida-Kennedy told Mr. Kennedy's sister and her future husband that she did not approve of their engagement and that the problem with

3

America was that no one disciplines their kids properly.  These discussions strained the relationship between Mr. Kennedy and his sister.

17. In May of 2009, Mr. Kennedy stopped making house payments due to lack of credit and inability to pay present expenses.  De Almeida-Kennedy began to spend most of her waking hours outside building a garden.  De Almeida-Kennedy declined to look for employment, inside or outside of the home.  De Almeida-Kennedy began to become depressed and angry on a daily basis.  De Almeida-Kennedy spent several thousand dollars for gardening equipment, trench-building equipment, and supplies for her garden.

18. Mr. Kennedy and De Almeida-Kennedy began to discuss what to do next.  De Almeida-Kennedy wished to return to Europe.  Mr. Kennedy expressed concern over how they could afford to live abroad since they had already tried that and failed.  Both agreed not to remain in Connecticut due to the expense and the depressed housing market.  Both discussed that they could not remain in the house and needed to vacate it or face foreclosure.

19. On June 4, 2009, Mr. Kennedy and De Almeida-Kennedy got into an argument over what to do next.  De Almeida-Kennedy yelled out "those are not even my children" within earshot of both minor children.  De Almeida-Kennedy would often say things in a loud voice.

20. During a discussion later in June, De Almeida-Kennedy ran into the kitchen screaming, grabbed a sharp knife, put it to her wrist, and pressed it against her wrist.  She then started crying hard and stated "I was trying to have a good day."

4

21. Mr. Kennedy had a discussion with De Almeida-Kennedy where he urged her to get help and to stop screaming at, hitting and making statements like "I want to eliminate [Eldest Child]", "Every day I will hit you", "I will give you the smack of your life", "I'm going to smash [Eldest Child] against the wall".  Mr. Kennedy urged De Almeida-Kennedy to seek therapeutic help again.  De Almeida-Kennedy went to a Neurologist on July 29, 2009.  De Almeida-Kennedy reported to Mr. Kennedy that the doctor thought she might be Bi-Polar and prescribed Topamax.  De Almeida-Kennedy did not take any of the prescribed medication.

22. Mr. Kennedy began to make audio recordings of De Almeida-Kennedy screaming at and hitting both the Eldest Child and Youngest Child in Mr. Kennedy's presence, between July 24, 2009, and August 7, 2009.  There were eight taped incidents and in three of them she hit Eldest and/or Youngest Child in the face.

23. Mr. Kennedy would also call his mother.  His mother repeatedly overheard the screaming and slapping and continually advised Mr. Kennedy to call the police.

24. On August 12, 2009, Mr. Kennedy offered De Almeida-Kennedy a trip to France.

25. Mr. Kennedy ordered boxes to pack up the household furnishings on August 13, 2009, in De Almeida-Kennedy's presence.  Mr. Kennedy and De Almeida-Kennedy both discussed the urgent requirement to vacate the home prior to a foreclosure, which would be reflected negatively on their credit and make it difficult for them to relocate and rebuild their credit.

26. Mr. Kennedy continued to prepare the house for moving out in De Almeida-Kennedy's presence through August 23, 2009.  On August 23, 2009, Mr. Kennedy took De Almeida-Kennedy to the airport with the minor children.

27. On Wednesday, August 26, 2009, Mr. Kennedy left with the minor children for Austin, Texas.  Mr. Kennedy paid for the trip using funds from a joint bank account shared with De Almeida-Kennedy.  Mr. Kennedy left one vehicle, all of De Almeida-Kennedy's belongings, half the household furniture, a shed filled with equipment, and a garage half full.  Mr. Kennedy contacted a therapist specializing in abuse in Austin and scheduled an appointment for the week of August 31st to take both children.  There are records that still exist of these communications.

28. From August 23 through August 28, 2009, Mr. Kennedy communicated with De Almeida-Kennedy daily via email and phone.  De Almeida-Kennedy viewed properties in France for potential relocation and sent emails to Mr. Kennedy with locations she liked.  De Almeida-Kennedy made no offer to work herself.

## E. FACTS RELEVANT TO ALL COUNTS FROM AUGUST 28, 2009 THROUGH NOVEMBER 27, 2018

29. On August 28, 2009, Mr. Kennedy sent an email to De Almeida-Kennedy.  The email demanded that De Almeida-Kennedy stop abusing the minor children, pleading with De Almeida-Kennedy to seek help and providing information to De Almeida-Kennedy as to how to communicate with Mr. Kennedy.  Mr. Kennedy informed De Almeida-Kennedy that he wanted to keep the abuse private.  De Almeida-Kennedy had access to $3,600 in cash and two cars as of that date, one in Europe and one in Fairfield.

30. De Almeida-Kennedy then made contact with defendant CARUSO, who was working for defendant TOWN as a detective, and also HINE, who was also

working for defendant TOWN as a detective, and claimed that she had been abandoned without assets nor belongings, that there was no reason for the separation, that she had no means to contact Mr. Kennedy, did not know his location, and that both minor children were in a medical emergency.  Further, she claimed that there was never any intention to leave Fairfield by Mr. Kennedy or herself.

31. De Almeida-Kennedy went to Superior Court on Monday, August 31, 2009, and filed an Ex Parte Motion for Emergency Custody, alleging that Mr. Kennedy was behaving "erratically" and that the minor children were in danger.

32. De Almeida-Kennedy did not notify Mr. Kennedy she had contacted the Department of Homeland Security.

33. De Almeida-Kennedy did not notify Mr. Kennedy she had applied for an Ex Parte Order.

34. De Almeida-Kennedy did not demand the return of the minor children to Connecticut.

35. De Almeida-Kennedy did not notify Mr. Kennedy that she had contacted CARUSO and HINE.

36. De Almeida-Kennedy sent an email to Mr. Kennedy that she was sorry and would agree to go to therapy.

37. Detective CARUSO and detective HINE did not contact Mr. Kennedy.

38. CARUSO and HINE did not inquire into De Almeida-Kennedy's mental health.

39. CARUSO and HINE did not contact Mr. Kennedy's sister in New Haven.

40. CARUSO and HINE did not go out to the home to verify its condition.

41. CARUSO and HINE did not verify that De Almeida-Kennedy had in fact two cars, not none.

42. CARUSO and HINE did not verify that De Almeida-Kennedy had indeed two phones, not none.

43. CARUSO and HINE did not verify the minor children's medical history.

44. CARUSO and HINE did not contact the hotel at which Mr. Kennedy was staying.

45. CARUSO and HINE did not listen to the audio recordings Mr. Kennedy had made of De Almeida-Kennedy hitting and screaming at the minor children.

46. CARUSO and HINE did not check the bank account balances for which De Almeida-Kennedy had had access.

47. CARUSO and HINE did not validate the underlying assertions stated in the Ex Parte Motion filed by De Almeida-Kennedy in 2009.

48. CARUSO and HINE did not review the emails that Mr. Kennedy and De Almeida-Kennedy had exchanged.

49. CARUSO and HINE did not inquire as to how De Almeida-Kennedy could afford to retain two attorneys.

50. CARUSO then intervened on September 1, 2009 at 9am, the moment that the courthouse opened.

51. Sometime during the week of September 7th, Mr. Kennedy opened up a complaint with the Texas Department of Child Welfare and reported De Almeida-Kennedy's behavior and actions.

52. During the same week, Mr. Kennedy's mother opened up a complaint with the Department of Children and Families within Connecticut concerning De Almeida-Kennedy's abuse of the minor children.

53. Between August 28, 2009, and April 2, 2011, TOWN spent tens of thousands of dollars on behalf of De Almeida-Kennedy related to her divorce.

54. Mr. Kennedy was prevented by CARUSO and HINE from seeing the minor children from September 2, 2009, through September 17, 2009.

55. De Almeida-Kennedy filed for divorce around September 12, 2009.

56. De Almeida-Kennedy filed to prevent Mr. Kennedy from any contact with the minor children without De Almeida-Kennedy's agreement.

57. De Almeida-Kennedy filled out a form which listed Mr. Kennedy's father as an "alcoholic" and Mr. Kennedy's mother as "very violent" and requested that neither be allowed to contact the minor children.

58. During the week of September 14th, Mr. Kennedy opened a case with the Department of Children and Families in Connecticut and shared his recordings.

59. On September 23, 2009, Mr. Kennedy agreed to allow De Almeida-Kennedy temporary sole legal custody and decision-making over visitation while addressing the legal issues raised by CARUSO'S activity.

60. Mr. Kennedy went with his sister to attempt to see the minor children on September 26, 2009. De Almeida-Kennedy came with one of her own sisters. De Almeida-Kennedy did not allow any physical contact between Mr. Kennedy and the minor children. De Almeida-Kennedy phoned the police and asked for

Mr. Kennedy's arrest in front of the minor children.  Mr. Kennedy left with his sister.

61. On March 2, 2010, Mr. Kennedy obtained a favorable resolution in one court related to De Almeida-Kennedy's contact with CARUSO.  De Almeida-Kennedy continued to threaten Mr. Kennedy at each meeting.

62. Sometime between April and July of 2010, Mr. Kennedy requested and then went to FPD and met with HINE and provided HINE with details concerning De Almeida-Kennedy's history of physical contact with and verbal statements made to both minor children, including an eight-page document refuting information provided by De Almeida-Kennedy to CARUSO.

63. On August 2, 2010, Mr. Kennedy reached an agreement with De Almeida-Kennedy to divorce.  Mr. Kennedy was living outside of Connecticut at the time.

64. Mr. Kennedy agreed to continue supervised visitation until a third-party therapist no longer recommended it.

65. De Almeida-Kennedy allowed the home to go into foreclosure.  De Almeida-Kennedy did not make any payments toward the mortgage at any point after May of 2009.

66. On April 2, 2011, records related to De Almeida-Kennedy's contact with defendants CARUSO and HINE were erased by operation of state statute.

67. On July 3, 2012, Mr. Kennedy filed a Motion to Modify and requested the appointment of a Guardian ad Litem ("GAL").  Ms. Ellen Morgan, attorney and psychologist, was appointed.

68. Sometime in 2013, Mr. Kennedy discovered that De Almeida-Kennedy had taken the minor children outside of the country three times without notifying him during the time in which he was not allowed contact with his children.

69. Mr. Kennedy married the present Mrs. Kennedy in September of 2014.

70. In the summer of 2014, De Almeida-Kennedy traveled out of the country for a weeklong period and left both minor children in Mr. Kennedy's custody.

71. In May of 2015, Eldest Child reported to Mr. Kennedy and other family members of Mr. Kennedy that De Almeida-Kennedy had been hitting him in the face again. He also reported that she was screaming at him and calling him a "retard". Eldest Child reported De Almeida-Kennedy's most recent hitting of him to a therapist who then reported the contact to DCF.  DCF recorded statements by Youngest Child that De Almeida-Kennedy would spank Youngest Child and then smack Youngest Child in the mouth if he blocked the spanking as a method of discipline.

72. In December of 2015, Mr. Kennedy filed a motion to modify.  De Almeida-Kennedy began the process of having Connecticut Support Enforcement Services attempt to incarcerate Mr. Kennedy.

73. On March 10, 2016, HIRSCH was appointed in relation to the motion to modify as a GAL.

74. The evaluations took place from December of 2016 through February of 2017. The conclusions reached in terms of De Almeida-Kennedy were consistent with Mr. Kennedy's experience.  De Almeida-Kennedy underwent a battery of tests, of which four test results were invalid due to intentional deception.  De Almeida-

Kennedy had signs of potential histrionic personality disorder, and was assessed as "anxious and angry".

75. HIRSCH was provided a copy of the report.

76. Mr. and Mrs. Kennedy took his children outside of the state of Connecticut no fewer than ten times between December 9, 2014, and August 2, 2017, each time providing information to De Almeida-Kennedy about their location and a general itinerary.

77. Mr. and Mrs. Kennedy took Eldest Child and Youngest Child to over nine different states and Washington, D.C.

78. Between December 9, 2014, and August 2, 2017, De Almeida-Kennedy took the minor children at least seven times outside the state of Connecticut without providing Mr. Kennedy advanced notice and/or their location.

79. HIRSCH was aware of both parents' trips and the issues with notification.

80. Between July 23, 2017, and August 2, 2017, a four-day hearing took place on Mr. Kennedy's motion to modify.  HIRSCH recommended that Mr. Kennedy not have two weeks pass by without parenting time and that he have a couple of hours every other Friday with the minor children, in addition to the existing plan.

81. No changes to custody or parenting time resulted from the hearing.

82. On August 11, 2017, Mr. and Mrs. Kennedy saw his children for the weekend. On August 12, 2017, Mr. Kennedy allowed his children to see De Almeida-Kennedy on her birthday.

83. De Almeida-Kennedy had an argument with Eldest Child.  Eldest Child called HIRSCH "lazy and stupid".  Eldest Child was upset with not seeing plaintiffs more frequently.  De Almeida-Kennedy recorded Eldest Child.

84. HIRSCH decided for the first time to visit De Almeida-Kennedy's home upon De Almeida-Kennedy's request and for the second time without scheduling a corresponding visit to plaintiffs' residence.

85. On August 24, 2017, HIRSCH filed a status conference request that indicated there were urgent safety issues requiring a court hearing.

86. HIRSCH did not notify Mr. and Mrs. Kennedy prior to filing the status conference request.

87. HIRSCH did not allow plaintiffs to discuss the visit with her.

88. In early October of 2017, Eldest Child reported to plaintiff that De Almeida-Kennedy had again hit him and was screaming at him. Youngest Child would also berate him.

89. Mr. Kennedy and Mrs. Kennedy temporarily moved to Florida in October of 2017.

90. As of November 6, 2017, Mr. and Mrs. Kennedy have not seen either minor child in person.

91. On November 8, 2017, HIRSCH and De Almeida-Kennedy attended a hearing without Mr. and Mrs. Kennedy present.

92. HIRSCH represented to the Court that plaintiff Mr. Kennedy was a criminal who would kidnap his minor children if given the opportunity.

93. The Court relied explicitly on HIRSCH'S representation and temporarily suspended Mr. Kennedy's right of visitation, specifically related to seeing the

children outside of Connecticut.  The Court made the requirement temporary and predicated removing restrictions on Mr. Kennedy filing a Motion to Modify in Connecticut.

94. On April 4, 2018, Mr. Kennedy filed a Motion to Modify in Connecticut that was eventually scheduled for a hearing on May 25, 2018.

95. Sometime after April 17, 2018, De Almeida-Kennedy relocated with the minor children to Tennessee.  De Almeida-Kennedy did not notify Mr. Kennedy until May 8, 2018.

96. On May 1, 2018, plaintiffs returned to Connecticut for one month.

97. Mr. Kennedy filed an Ex Parte Motion after discovering his children had been removed from Connecticut, which was denied.

98. On Monday, May 14, 2018, in response to Mr. Kennedy's Ex Parte Motion, De Almeida-Kennedy sent an email to HIRSCH which included the statement "[Mr. Kennedy] is dangerous to me and my family.  Something has to be done about him."

99. On September 22, 2018, Mr. and Mrs. Kennedy returned to Connecticut to live.

100.    On September 26, 2018, Mr. Kennedy filed a request to the Court to be heard on several motions not yet heard, which was granted.

101.    On October 23, 2018, Mr. Kennedy attended a hearing wherein no motions were heard.  HIRSCH attended that hearing.  HIRSCH called De Almeida-Kennedy, who was not physically present, later at a different location and heard, along with several witnesses, that De Almeida-Kennedy was not

willing to let Mr. Kennedy have any access to the minor children and that Mr. Kennedy was "insane".

102.     On November 27, 2018, Mr. Kennedy applied for, and was granted, temporary sole legal custody by Bridgeport Superior Court ("Superior Court"), the Honorable Mark J. Gould, Presiding Judge ("Judge Gould"), through an Ex Parte Motion.

103.     The Ex Parte Order suspended De Almeida-Kennedy's right of visitation

104.     The Ex Parte Order stated that the minor children should be "returned immediately" to plaintiff Mr. Kennedy in Fairfield, Connecticut.

105.     HIRSCH and De Almeida-Kennedy both received notice of the Ex Parte Order on November 27, 2018, and actual copies of the Ex Parte Order on November 28, 2018.

**F. GENERAL FACTS RELATED TO DEFENDANTS CARUSO, HINE AND TOWN**

106.     In mid-2010, CARUSO was awarded a Letter of Commendation for his time spent related to De Almeida-Kennedy's contact in 2009.

107.     The Letter of Commendation was either directly or indirectly awarded through the efforts of De Almeida-Kennedy.

108.     CARUSO received a favorable performance review based on the Letter and a 6.35% raise in gross income from 2010 to 2011.

109.     CARUSO's employee file includes a positive evaluation related to efforts on De Almeida-Kennedy's behalf.

110.     CARUSO has received no other publicized commendations or awards.

111.     In 2015, CARUSO was involved in a series of televised segments entitled "Crime Watch Daily", as an employee of defendant TOWN.  CARUSO is visible in at least one televised segment, shown during an arrest of a suspect.

112.     There are no publicized commendations which resulted from the ten televised segments.

113.     The minor children have been told about CARUSO, his report written in December of 2018, and his work in 2009, all by De Almeida-Kennedy.

114.     CARUSO has been publicized as one of the highest-paid employees with defendant TOWN at least three times after 2009.

115.     CARUSO did not disclose to Mr. Kennedy his Letter nor financial benefit from 2009 at any time.

116.     CARUSO made no attempts between 2009 and the present to contact Mr. Kennedy and ask Mr. Kennedy on his views on De Almeida-Kennedy or De Almeida-Kennedy's behavior and actions.

## G. GENERAL BACKGROUND RELATED TO DEFENDANT HIRSCH

117.     After HIRSCH'S appointment as GAL, Mr. Kennedy provided HIRSCH with information about the past physical and verbal acts by De Almeida-Kennedy with both minor children.

118.     HIRSCH was provided with contact information for the prior GAL.

119.     On August 2, 2017, a four-day hearing concluded on the December of 2015 motion.  HIRSCH testified on the last day of the hearing that she had concluded her investigation.

120.     HIRSCH'S case file notes from August 23, 2017, include as the first comment that Mr. Kennedy had commented negatively on HIRSCH.

121.     On August 24, 2017, HIRSCH sent Mr. and Mrs. Kennedy an email that accused plaintiffs of making negative comments about HIRSCH.

## H. FACTS RELATED TO PLAINTIFF MRS. KENNEDY

122.     Mrs. Kennedy was born in Albania.  Mrs. Kennedy's family was persecuted by the Communist regime that held power from prior to her birth until 1991.

123.     Mrs. Kennedy's family had and has members that were murdered, imprisoned, exiled, persecuted and deprived of liberty without due process.

124.     Mrs. Kennedy grew up in a town where it took solely the word of a Communist party member to result in loss of freedom or life.

125.     Albanians have a sizable presence in the State of Connecticut.  Their surnames and first names are recognizable.  Mrs. Kennedy speaks with a noticeable accent.

126.     Mrs. Kennedy has several members of her close family, including her brother, an uncle, two aunts, and several cousins, who also live in Connecticut and experienced the same persecution in Albania.

## I. COUNT I (42 U.S.C. §1983 – First Amendment, Ninth Amendment, Fourteenth Amendment) All Defendants

127.     Plaintiff Mr. Kennedy incorporates and reallege prior paragraphs 10-127 as if they were contained herein.

128.    On November 28, 2018, Mr. Kennedy issued a written demand for the return of his minor children to Mr. Kennedy's custody to De Almeida-Kennedy and HIRSCH.

129.    Mr. Kennedy informed HIRSCH and De Almeida-Kennedy that he would be flying to Tennessee in order to return the minor children and requested HIRSCH'S assistance.

130.    HIRSCH did not provide any assistance nor response to Mr. Kennedy.

131.    De Almeida-Kennedy informed HIRSCH on November 27, 2018, of her intent not to comply with the Ex Parte Order.

132.    HIRSCH did not instruct De Almeida-Kennedy to comply with the Ex Parte Order.

133.    On November 28, 2018, HIRSCH filed a status conference request with Superior Court and was notified the next day that her status conference request would not be heard until December 11, 2018.

134.    After Mr. Kennedy arrived in Tennessee on November 28, 2018, he received an email from De Almeida-Kennedy, shared with HIRSCH, that De Almeida-Kennedy would not be complying with the Ex Parte Order.

135.    The Franklin, Tennessee, police department was contacted by Mr. Kennedy after his arrival in Franklin.

136.    The Franklin Police Department asked for and received a certified copy of the Ex Parte Order.

137.    The Franklin Police Department, at Mr. Kennedy's request, accompanied Mr. Kennedy to the listed address of De Almeida-Kennedy.

18

138.     No one was home at the residence.

139.     Mr. Kennedy returned to Connecticut later that night.

140.     On Thursday, November 29, 2018, Mr. Kennedy contacted the Fairfield

Police Department ("FPD") and reached the duty desk.  Mr. Kennedy inquired as

to whether the FPD would provide assistance to return the minor children to

Fairfield.  The duty officer placed Mr. Kennedy on hold and then replied that

CARUSO overheard the name of the caller and wished to speak with Mr.

Kennedy.

141.     CARUSO called Mr. Kennedy later that day and asked Mr. Kennedy to

provide a copy of the Ex Parte Order and to come in on Friday, November 30,

2018, to speak about the Order.

142.     CARUSO assured Mr. Kennedy that he "would help" and requested

background information from Mr. Kennedy.

143.     De Almeida-Kennedy filed an Ex Parte Motion on November 29, 2018,

and provided a copy to HIRSCH.  Judge Gould denied the Motion on the same

day.  HIRSCH received notification of the denial.

144.     Mr. Kennedy met with CARUSO at the FPD on Friday, November 30,

2018, and provided CARUSO with an affidavit about the case.

145.     The affidavit did not contain any references to any dates prior to Tuesday,

November 27, 2018.

146.     CARUSO did not discuss any dates nor events prior to Tuesday,

November 27, 2018, with Mr. Kennedy.

19

147.     CARUSO did not disclose any contacts from De Almeida-Kennedy initiated by CARUSO or De Almeida-Kennedy after September of 2009 and prior to November 29, 2018.

148.     HIRSCH did not disclose any of De Almeida-Kennedy's contacts made with CARUSO after March 10, 2016, yet HIRSCH was aware of all contacts De Almeida-Kennedy made with CARUSO after March 10, 2016.

149.     After the meeting started, CARUSO stated "I will not help you unless you win the hearing on December 11th".

150.     CARUSO then stated "you aren't going to win that hearing."

151.     He then stated "I have spoken with [De Almeida-Kennedy]".

152.     He also asked "what are you going to do if either kid runs away?"

153.     CARUSO made no mention of Mr. Kennedy's trip to Tennessee.

154.     CARUSO did not mention any interest in, nor intention of, attending the hearing on December 11th.

155.     CARUSO only made clear that he would not assist, but did not make any statement to Mr. Kennedy for Mr. Kennedy not to try and return his children on his own.

156.     On Saturday, December 1, 2018, De Almeida-Kennedy sent an email to Mr. Kennedy stating "Under legal advice from attorneys in TN and in CT, the Plaintiff, F De Almeida-Kennedy, here forewarns the Defendant, James Kennedy, that if he, or any of his family members or any other party comes on his behalf near the Plaintiff or the minor children to their home or in any other public setting,

or follows any of them, a Protective Order or a Restraining Order for harassment will be filed and other protective measures will be taken."

157.    De Almeida-Kennedy sent this email also to HIRSCH and CARUSO.

158.    On Monday, December 3, 2018, Mr. Kennedy contacted the schools in Tennessee where both children were reportedly attending.  Neither school would provide any information at all to Mr. Kennedy without receiving a copy of the Ex Parte Order.  Mr. Kennedy provided a copy of the Ex Parte Order, after which both schools asked Mr. Kennedy for further instructions.  Both schools disclosed that neither minor child had attended school on Thursday, November 29 nor Friday, November 30.

159.    CARUSO contacted, without plaintiffs' knowledge nor consent, both De Almeida-Kennedy and HIRSCH to assure them that Mr. Kennedy would make no further attempt to return either child to Fairfield.

160.    After Mr. Kennedy provided a copy of the Ex Parte Order to the Tennessee schools, someone notified De Almeida-Kennedy immediately of the contact and she went and removed Eldest Child from school.

161.    De Almeida-Kennedy contacted both HIRSCH and CARUSO immediately after being contacted herself by the Tennessee schools.

162.    HIRSCH and CARUSO knew that the Ex Parte Order was valid.

163.    HIRSCH and CARUSO knew that Mr. Kennedy had not physically seen his children since November 6, 2017.

164.    After contacting De Almeida-Kennedy, the Tennessee schools contacted Mr. Kennedy to ask for his instructions.

165.    Unbeknownst to Mr. Kennedy, CARUSO was contacted by both of Mr. Kennedy's children's schools as well as the contact by De Almeida-Kennedy.

166.    CARUSO drove out while on duty to plaintiffs' home.

167.    CARUSO logged his destination with the FPD.

168.    CARUSO knew Mrs. Kennedy's name and also knew she was Albanian.

169.    CARUSO knew that Mr. Kennedy had not refused to come to the Fairfield Police Department, if asked.

170.    CARUSO was aware prior to December 3, 2018, that De Almeida-Kennedy had made numerous attempts to have Mr. Kennedy arrested.

171.    CARUSO was personally aware that De Almeida-Kennedy had made numerous attempts to have CARUSO arrest Mr. Kennedy.

172.    HIRSCH was aware that De Almeida-Kennedy had made numerous attempts to have Mr. Kennedy incarcerated.

173.    HIRSCH had multiple communications within her case file sent by De Almeida-Kennedy indicating De Almeida-Kennedy wished to have Mr. Kennedy incarcerated.

174.    HIRSCH was aware that De Almeida-Kennedy had started attempting to have the Federal government in 2018 to incarcerate Mr. Kennedy and De Almeida-Kennedy's efforts were ongoing.

175.    CARUSO was aware that Mr. Kennedy had had a bad experience with him in 2009 that led to a favorable disposition for Mr. Kennedy.

176.    HINE was aware that Mr. Kennedy had had a bad experience with CARUSO in 2009 that led to a favorable disposition for Mr. Kennedy.

177.     CARUSO did not notify Mr. Kennedy in advance, neither calling nor emailing.

178.     CARUSO took photographs of Mr. Kennedy's car.

179.     CARUSO intended to frighten Mrs. Kennedy due to her background and fear of police intervention.

180.     CARUSO rang the doorbell and plaintiff Mrs. Kennedy called through the door and asked who was outside.  CARUSO said "this is the police."  CARUSO did not provide his name until Mrs. Kennedy had opened the door.

181.     Mrs. Kennedy called out to Mr. Kennedy and informed him that a police officer was at the front door and Mr. Kennedy asked for their name.  CARUSO provided his name.  Mrs. Kennedy asked CARUSO if he wanted to come in and CARUSO replied "Yes, I'm coming in."

182.     CARUSO'S response created discomfort in Mrs. Kennedy but she felt she had no right to refuse him entrance, based on his statement.

183.     Both plaintiffs stood in the living room of their home and noticed that CARUSO had a loaded firearm visible on his hip.

184.     CARUSO asked Mr. Kennedy whether he was planning on picking up his children in Tennessee, to which plaintiff replied in the affirmative.

185.     CARUSO'S face began to turn red and his tone rose in anger and he said "how can you pick them up if you are here?"  Mr. Kennedy replied that he would take an airplane.

186.     CARUSO then adopted a very angry tone and he began to put both of his hands near his hips in a controlling stance.  He stated very loud "didn't you and I

have a talk and didn't I make it clear to you that I would help you if you won the hearing? Why are you making plans to go get your children?"

187.    Mr. Kennedy asked CARUSO whether he was advising Mr. Kennedy not to return his children to Fairfield.

188.    CARUSO stated in a commanding tone "that's exactly what I'm telling you. You're a smart guy. You understood what I told you."

189.    Mr. Kennedy told CARUSO that he had only understood that CARUSO would not assist him unless he prevailed at a later hearing.

190.    CARUSO reiterated "You're a lawyer. You're not going to win a hearing. You don't have visitation with your children".

191.    Mr. Kennedy replied that the Superior Court Order gave him sole legal custody. CARUSO replied that the Superior Court Order was not valid.

192.    CARUSO told Mr. Kennedy "you do what you want to do".

193.    CARUSO insisted to plaintiffs that they had no rights in the matter.

194.    CARUSO did not inform Mr. Kennedy of what consequences there would be for not following CARUSO'S instructions.

195.    As CARUSO left, he told Mr. Kennedy that he was receiving calls from the minor children's school and also from De Almeida-Kennedy.

196.    CARUSO did not disclose that CARUSO had initiated contact that day with the Franklin County Sheriffs Department and "advised [them] of the facts of this case."

197.    CARUSO did not provide any information regarding his intended actions.

198.     On December 3, 2018, HIRSCH contacted De Almeida-Kennedy, Eldest Child and Youngest Child without notifying nor obtaining Mr. Kennedy's consent.

199.     Immediately after HIRSCH'S contact, the minor children ceased communication with plaintiffs except to inform them that they "did not want to talk".  This cessation continued from December 3, 2018, through January 16, 2019.

200.     Plaintiffs have had no contact allowed at all with Mr. Kennedy's children since the end of January.

201.     HIRSCH told Mr. Kennedy's children that she had "no authority nor power to step in and we have a hearing date 12/11.  The court's orders are in place until a hearing where the court will make further decisions."

202.     Neither minor child attended school from Tuesday, December 4, 2018, through Tuesday, December 11, 2018.  De Almeida-Kennedy removed them from school to prevent Mr. Kennedy from effectuating the Superior Court Order.

203.     On Tuesday, December 4, without the knowledge nor consent of Mr. Kennedy, CARUSO wrote out a report using FPD software with the FPD logo.

204.     HIRSCH contacted Tennessee public schools without Mr. Kennedy's knowledge nor consent and sent them documents indicating that she had authority to speak for the Court in Connecticut as GAL on the same day.

205.     In fact, HIRSCH did not have the authority, nor power, nor duty to contact the schools.

206.     CARUSO'S report included the designation of De Almeida-Kennedy as "V".  There is a legend on the form which indicates "V" is "Victim".  This designation is false and misleading and CARUSO knew it.

207.     CARUSO'S report stated that "Ms. Kennedy was granted sole legal and physical custody of the children [in 2010]."  This is false and does not reflect that Mr. Kennedy agreed to allow Ms. Kennedy sole legal custody due to CARUSO'S actions in 2009.  CARUSO knew this or was recklessly indifferent in adopting it as the truth.

208.     HIRSCH was aware that this statement was false, as she had been provided with a copy of the separation agreement that specified custody in March of 2016.

209.     CARUSO'S report stated "in 2013, Mr. Kennedy was granted Supervised visitation with his two minor children."  This is false.  In 2013, Mr. Kennedy, after filing a Motion to Modify and moving to Connecticut, was allowed unsupervised visitation with his two minor children pursuant to the recommendation of the then GAL.  CARUSO knew this or was recklessly indifferent in adopting it as the truth.

210.     HIRSCH was aware that this statement was false or was recklessly indifferent in adopting it as the truth.

211.     CARUSO'S report stated "[a]t some point Mr Kennedy's visitation was again restricted to supervised visitation [prior to November 8, 2017]."  This statement is false.  CARUSO knew this or was recklessly indifferent in adopting it as the truth.

212.     HIRSCH was aware that this statement is false, as she was involved in the case during this time period.

213.     CARUSO'S report stated "Mr Kennedy writes in his affidavit for the order that shares joint legal custody of the two minor children with Ms. Kennedy.  This statement is inconsistent with the facts as set forth in the court order dated November 8, 2017, which clearly states that his supervised visitation has been suspended."  This statement is false and is a statement of a legal opinion.

214.     HIRSCH was aware that this statement is false, as she was involved in the case during this time period.

215.     CARUSO'S report stated "Mr Kennedy … cleared out his house of all belongings while still married to Ms. Kennedy."  This statement is false.  Mr. Kennedy upon separation Mr. Kennedy left De Almeida-Kennedy with substantial belongings.  CARUSO never went out to the house to verify the information provided by De Almeida-Kennedy.

216.     HIRSCH was aware that this statement was false, as Mr. Kennedy had supplied HIRSCH with information about the separation in March of 2016.

217.     CARUSO'S report stated "[Mr. Kennedy] then fled Connecticut with both minor children leaving Ms. Kennedy with no usable cell phone, no vehicle and no idea where either of her two minor children were."  This statement is false.  CARUSO knew about the information provided to HINE in 2010, which was objectively verifiable.  CARUSO'S own report later states that De Almeida-Kennedy informed the detective of Mr. Kennedy's location.

218.     HIRSCH was either aware this statement was false, or was recklessly indifferent based on the significant number of falsehoods supplied to HIRSCH by De Almeida-Kennedy over the past three years.

219.     CARUSO'S report stated "Mr Kennedy writes that he had no idea that Ms Kennedy moved to Tennessee and did not know her address.  This is also an inconsistent statement as Ms. Kennedy kept him updated."  This statement is false and CARUSO knew or should have known it was false, as HIRSCH held that information in her own case file.

220.     HIRSCH knew the statement was false and had released prior information from her own case file indicating that Mr. Kennedy did not know De Almeida-Kennedy had moved until May 8, 2018, and did not know De Almeida-Kennedy's residential address for over a month after she moved.  There are at least eight emails in HIRSCH'S file from Mr. Kennedy continuing to ask where his children were living during May of 2018, and a number of emails from HIRSCH asking for the address during the same time period.

221.     CARUSO'S report states "Mr Kennedy's own parents issued a strong written letter denouncing his character and parental skills as it pertained to his two minor children."  This statement is false.  CARUSO has never spoken with Mr. Kennedy's parents and CARUSO was recklessly indifferent to whether and what opinion Mr. Kennedy's parents have about him.  Mr. Kennedy's parents have not been in the same room since 1971.

222.     HIRSCH knew this statement was false.  Mr. Kennedy's father is deceased and Mr. Kennedy's mother has come several times to Superior Court to testify on Mr. Kennedy's behalf.

223.     CARUSO'S report states "[Mr. Kennedy] has violated the court order as it pertains to support payments."  This statement is false and CARUSO was recklessly indifferent to its truth or falsity.

224.     HIRSCH knows that the statement is false, as she has been included on numerous communications from De Almeida-Kennedy filled with unsubstantiated allegations.

225.     CARUSO'S report states "[Mr. Kennedy] voluntarily left the State of Connecticut in an effort to avoid those payments."  This statement is false and CARUSO was recklessly indifferent to its truth or falsity.  CARUSO has never asked plaintiffs why they left the state.

226.     HIRSCH knows that the statement is false, as she was serving as GAL and received an email with information about the move at the time.

227.     CARUSO'S report states "[Mr. Kennedy's] own parents have written a comprehensive report detailing his poor parental skills and lack of compassion." That statement is false.  CARUSO has never spoken with Mr. Kennedy's parents and CARUSO was recklessly indifferent to whether and what opinion Mr. Kennedy's parents have about him.

228.     HIRSCH knew this statement was false.  Mr. Kennedy's father is deceased and Mr. Kennedy's mother has come several times to Superior Court to testify on Mr. Kennedy's behalf.

229.    CARUSO'S report states "[Mr. Kennedy's] disregard for the rule of law is blatant in the false affidavit he presented to obtain custody." This statement is false. CARUSO is not an attorney and is not qualified to render a legal opinion. CARUSO was recklessly indifferent to the truth or falsity of his statement, but he wrote it as a statement of his own knowledge and belief.

230.    HIRSCH knew that the affidavit was not false but the statement by CARUSO was. Further, there was a hearing scheduled on December 11, 2018, where the affidavit would have been under discussion, anyway.

231.    CARUSO'S report states "[Mr. Kennedy] knows full well that as of November 8, 2017 he had lost his supervised visitation with his children." This is a false statement and also a legal opinion. CARUSO was recklessly indifferent as to the truth or falsity of his statement.

232.    HIRSCH knew this statement was false, as she was present in the hearing referenced.

233.    CARUSO'S report states "That was the last standing order of the court." That is a false statement. CARUSO knew it was false as he had a copy of the granted Ex Parte Order.

234.    HIRSCH knew the statement was false, as she had filed a status conference request after the issuance of the Ex Parte Order.

235.    HINE reviewed CARUSO'S report and approved it on behalf of TOWN sometime on December 6, 2018.

236.    On December 6, 2018, without Mr. Kennedy's knowledge nor consent, CARUSO emailed his report to HIRSCH using a TOWN-issued email account.

237.     HIRSCH reviewed the report.

238.     HIRSCH knew that De Almeida-Kennedy had written an email in May that stated that Mr. Kennedy was dangerous and that something needed to be done about Mr. Kennedy.

239.     HIRSCH was aware that on May 31, 2018, De Almeida-Kennedy had written a motion calling for Mr. Kennedy's incarceration for an indefinite time period.

240.     HIRSCH was aware that De Almeida-Kennedy's own Ex Parte Motion had been denied.

241.     HIRSCH was aware that she had a status conference not scheduled until December 11, 2018.

242.     HIRSCH was aware that De Almeida-Kennedy had sent a warning to Mr. Kennedy on Saturday, December 1, threatening legal action if Mr. Kennedy or his family approached Mr. Kennedy's children.

243.     HIRSCH distributed the incident report to six further parties, including five members of Tennessee public schools, among them their legal counsel, on December 6.

244.     CARUSO and HIRSCH were both aware that De Almeida-Kennedy was going to file a registration of foreign decree in the Chancery Court of Tennessee on December 7, 2018.

245.     CARUSO and HIRSCH both intended to provide a document admissible in evidence under a hearsay exception in Tennessee on De Almeida-Kennedy's behalf.

246.     An attorney for a victim's rights organization was provided with a copy of CARUSO'S report.  The attorney agreed to represent De Almeida-Kennedy at the hearing on December 11, 2018, on the basis of the "V" designation in the report.

247.     On December 11, 2018, no hearing took place.

248.     CARUSO was present at Superior Court, without disclosing such intent to Mr. Kennedy prior.

249.     HIRSCH was aware that CARUSO would be present.

250.     HIRSCH told the Court that Mr. Kennedy's children were in danger from Mr. Kennedy and that CARUSO was there to testify to that effect.

251.     HIRSCH and CARUSO were to be the only two witnesses on De Almeida-Kennedy's behalf.

252.     The Ex Parte Order was "frozen" by the court, pending an evidentiary hearing.

253.     Since that date, no hearing has taken place.

254.     Mr. Kennedy has not been able to return his children to Connecticut.

255.     Mr. Kennedy has not been allowed contact with the minor children except for one to three minute periods, with the exception of one 16-minute call.

256.     De Almeida-Kennedy has started referencing CARUSO'S report in recent filings with Superior Court.

257.     CARUSO and HIRSCH both acted with malice, wantonness and intent to injure.

258.     HINE knew about CARUSO'S prior contact with Mr. Kennedy.

259.     HINE discussed specifically with Mr. Kennedy the numerous lies in De Almeida-Kennedy's writings.

260.     HINE read the report written by CARUSO and approved it.

261.     HINE read in the report about CARUSO'S trip to Mr. Kennedy's home.

262.     HINE knew that his failure to act and supervise CARUSO would be likely to subject plaintiffs to imminent harm.

263.     HINE did not validate any of the statements in CARUSO'S report.

264.     HINE did not validate the report for compliance with Connecticut law on privacy nor on the erasure of records.

265.     TOWN was aware of CARUSO'S prior contact with Mr. Kennedy.

266.     TOWN was aware that HINE had been the subject of litigation for the failure to intercede while supervising police officers who engaged in the violation of the civil rights of TOWN residents.

267.     In fabricating evidence and communicating with third parties in Tennessee and Connecticut, defendants acted under color of state law and conducted a coordinated campaign to deprive Mr. Kennedy the ability to enforce a valid order of a competent court of jurisdiction, which deprived him of his right of intimate association with his minor children and his substantive due process rights.  TOWN had actual notice that allowing CARUSO'S report to be issued would be substantially certain to result in a constitutional violation, and TOWN consciously and deliberately chose to disregard the risk.  Further HINE was negligent in failing to supervise CARUSO adequately in terms both of preparation of the report and also the visit to the plaintiffs' home.

33

268.     TOWN failed to train HINE in handling complainants with prior history with FPD who have had a favorable resolution to their contact.

269.     TOWN further failed to train HINE to recuse himself from a case that had also involved HINE.

270.     TOWN further failed to train HINE on complying with Ex Parte Orders and reviewing incident reports for violations of statute and complainants' rights.

271.     TOWN further failed to train HINE on what information should be distributed to a GAL.

272.     TOWN further failed to train HINE on the proper protocol for not fabricating evidence.

273.     TOWN'S failures resulted in CARUSO disseminating a fabricated incident report containing private information to a GAL in violation of Mr. Kennedy's rights and causing plaintiffs tremendous loss.

274.     As a direct and proximate result of the violation of his constitutional rights by all the defendants, plaintiff suffered general and special damages as alleged in this Complaint.  Mr. Kennedy cannot regain the lost time with his children.  In this specific case, the violation is more egregious given the past actions of HIRSCH and CARUSO.  Mr. Kennedy cannot easily repair the damage that CARUSO and HIRSCH have caused to plaintiffs in relation to their relationship with Eldest Child and Youngest Child.  Plaintiff has suffered anxiety and depression as a result of defendants' actions.  Plaintiff is further afraid of CARUSO and HIRSCH.  The minor children will require extensive therapy to reunify with plaintiff.  Plaintiff has further suffered from anxiety to the point of

seeking medical intervention.  Plaintiff does not have an entire day pass by without suffering the loss of the minor children in plaintiff's life.

275.     The conduct of defendants CARUSO and HIRSCH was willful, malicious, oppressive and/or reckless, and was of such a nature that punitive damages should be imposed on CARUSO and HIRSCH in an amount commensurate with the wrongful acts alleged herein.

276.     TOWN is responsible for any liability for HINE under this Count pursuant to Connecticut General Statutes §7-465.

**J. COUNT II (42 U.S.C. §1983 – First Amendment - Retaliation) All Defendants**

277.     On November 27, 2018, Mr. Kennedy applied for, and was granted, temporary sole legal custody by Bridgeport Superior Court ("Superior Court"), the Honorable Mark J. Gould, Presiding Judge ("Judge Gould"), through an Ex Parte Motion.

278.     Filing the Ex Parte Motion was an activity protected by the First Amendment, specifically an exercise in Freedom of Speech.

279.     The Ex Parte Order granted Mr. Kennedy a right protected by the First, Ninth and Fourteenth Amendments, specifically Freedom of Association.

280.     HIRSCH became aware of the Ex Parte Order on November 27, 2018.

281.     Mr. Kennedy provided a certified copy of the Order to HIRSCH on November 28 and to CARUSO on November 29.

282.     Mr. Kennedy's contact with FPD on November 29, 2018, was protected First Amendment activity.  To wit, Mr. Kennedy called and asked for assistance in enforcing a granted Ex Parte Order.

283.     CARUSO initiated a meeting with Mr. Kennedy on November 30, 2018, and attempted to dissuade Mr. Kennedy from exercising his rights.

284.     CARUSO further attempted to dissuade Mr. Kennedy from appearing on December 11, 2018, telling Mr. Kennedy that he would lose the hearing.

285.     CARUSO was aware of the threat issued by De Almeida-Kennedy on Saturday, December 1, 2018.

286.     HIRSCH was aware of De Almeida-Kennedy's action of withdrawing the minor children from school in order to prevent them from being returned to Connecticut.

287.     CARUSO and HIRSCH were aware that Mr. Kennedy had flown to Tennessee on November 28, 2018.

288.     Mr. Kennedy contacted two Tennessee public schools on December 3, 2018, a protected First Amendment activity.

289.     CARUSO went to plaintiffs' home on December 3, 2018, as a direct and proximate result of Mr. Kennedy's contact with Tennessee schools.

290.     CARUSO also went to plaintiffs' home as a result of Mr. Kennedy's filing an Ex Parte Motion and then Mr. Kennedy's attempt to execute the Ex Parte Order, and attempted to threaten and coerce Mr. Kennedy.

291.     CARUSO placed Mr. Kennedy in fear of executing the Ex Parte Order.

292.     CARUSO placed Mr. Kennedy in fear of communicating freely with the Tennessee public schools where Mr. Kennedy's children were attending.

293.     CARUSO placed Mr. Kennedy in fear of returning to Court and filing further motions.

294.     Mr. Kennedy did not acquiesce to CARUSO'S demand.

295.     CARUSO wrote up an incident report.

296.     CARUSO discussed the report with HIRSCH.

297.     CARUSO completed the report on December 6, 2018.

298.     HINE knew the background of CARUSO'S involvement with Mr. Kennedy.

299.     HINE ratified CARUSO'S conduct.

300.     HINE signed CARUSO'S report in his official capacity.

301.     TOWN authorized CARUSO to proceed to plaintiffs' home for the purpose of coercion.

302.     CARUSO documented the threats and coercion in his incident report.

303.     The incident report was sent by CARUSO to HIRSCH.  HIRSCH sent the incident report to multiple third parties, including De Almeida-Kennedy.

304.     Both CARUSO and HIRSCH induced third parties to take actions adverse to plaintiffs, including ceasing to cooperate with Mr. Kennedy, ceasing to attempt to enforce the Ex Parte Order, and ceasing to treat the Ex Parte Motion as valid.

305.     CARUSO appeared in Court for four hours on December 11, 2018, while on-duty and for the purpose of quashing Mr. Kennedy's First, Ninth, and Fourteenth Amendment rights as a consequence of Mr. Kennedy's exercise of protected First Amendment activity.

306.     HINE authorized CARUSO to appear in Court.

307.     TOWN authorized CARUSO to appear in Court.

308.     HIRSCH stated on January 16, 2019, to a Family Services coordinator, that Mr. Kennedy was potentially subject to federal prosecution.

309.     HIRSCH made the statement for the purpose of punishing Mr. Kennedy for filing an Ex Parte Motion.

310.     TOWN was aware of prior communication between De Almeida-Kennedy and CARUSO.

311.     TOWN has engaged in a longstanding practice or custom of allowing officers to threaten or coerce litigants.

312.     The incident report was retaliatory and caused Mr. Kennedy injury.  Not only did Mr. Kennedy lose his Freedom of Association, but also was chilled from exercising his Freedom of Speech.

313.     Mr. Kennedy claims damages.

314.     TOWN failed to train HINE in handling complainants presenting valid Ex Parte Orders based on filed Ex Parte Motions.

315.     TOWN failed to train HINE on ordering officers not to go threaten complainants for exercising their freedom of speech and contacting other states.

316.     As a direct and proximate result of the violation of his constitutional rights by all the defendants, Mr. Kennedy suffered general and special damages as alleged in this Complaint.  Mr. Kennedy cannot regain the lost time with his children.  In this specific case, the violation is more egregious given the past actions of HIRSCH and CARUSO.  Mr. Kennedy cannot easily repair the damage that CARUSO and HIRSCH have caused to Mr. Kennedy in relation to his relationship with Eldest Child and Youngest Child.  Mr. Kennedy has suffered anxiety and depression as a result of defendants' actions.  Mr. Kennedy is further afraid of CARUSO and HIRSCH.

317.    The conduct of defendants CARUSO and HIRSCH was willful, malicious, oppressive and/or reckless, and was of such a nature that punitive damages should be imposed on CARUSO and HIRSCH in an amount commensurate with the wrongful acts alleged herein.

318.    TOWN is responsible for any liability for HINE under this Count pursuant to Connecticut General Statutes §7-465.

### K. COUNTS III-XX  (42 U.S.C. §1983 – Defamation, Stigma-Plus) CARUSO and HINE only

319.    On Tuesday, December 4, without the knowledge nor consent of Mr. Kennedy, CARUSO wrote out a report using FPD software with an FPD logo.

320.    On December 6, 2018, HINE approved the distribution of the report on TOWN letterhead using an official TOWN-issued email address.

321.    On December 6, 2018, without Mr. Kennedy's knowledge nor consent, CARUSO emailed his report to HIRSCH using a TOWN-issued email account.

322.    CARUSO'S report stated that "Ms. Kennedy was granted sole legal and physical custody of the children [in 2010]."  That publication was false and stigmatizing.  It is a major misrepresentation of the agreement that was reached by the parties and the circumstances of that agreement and, taken in context with the next statement, implies that a Judge was involved in the decision, which is untrue.

323.    CARUSO'S report next stated "in 2013, Mr. Kennedy was granted Supervised visitation with his two minor children."  That publication was false and stigmatizing and implies Mr. Kennedy had no right of visitation from 2009 until 2013.  Further, the statement implies that Mr. Kennedy involuntarily had

supervised visitation in 2013 by Order and not agreement and does not reflect that Mr. Kennedy reached agreement to end supervised visitation in 2013, not commence it.

324.     CARUSO'S report stated "[a]t some point Mr Kennedy's visitation was again restricted to supervised visitation."  That publication was false and stigmatizing, as there were no restrictions on visitation prior to November 8, 2017.  In fact, the opposite.  After CARUSO stopped being involved in Mr. Kennedy's life in 2010, Mr. Kennedy eventually had gained joint legal custody and substantially increased parenting time.

325.     CARUSO'S report stated "Mr Kennedy writes in his affidavit for the order that shares joint legal custody of the two minor children with Ms. Kennedy.  This statement is inconsistent with the facts as set forth in the court order dated November 8, 2017, which clearly states that his supervised visitation has been suspended."  That statement is false and stigmatizing.  It misstates the Order, suggests that Mr. Kennedy had had supervised visitation prior to November 8, 2017, and implies that Mr. Kennedy did not have joint legal custody.  It also implies that CARUSO has legal knowledge of the status of the case.  Further, the Ex Parte Order granted Mr. Kennedy sole legal custody.

326.     CARUSO'S report stated "Mr Kennedy … cleared out his house of all belongings while still married to Ms. Kennedy."    That statement is false and stigmatizing.  The house was not empty upon separation of Mr. Kennedy with De Almeida-Kennedy.

327.     CARUSO'S report stated "[Mr. Kennedy] then fled Connecticut with both minor children leaving Ms. Kennedy with no usable cell phone, no vehicle and no idea where either of her two minor children were."  That statement is false and stigmatizing.  No one fled Connecticut.  The home was about to go into foreclosure and a move had been planned.  There was a vehicle left, De Almeida-Kennedy had two cell phones, and she herself told CARUSO where the children were.

328.     CARUSO'S report stated "Mr Kennedy writes that he had no idea that Ms Kennedy moved to Tennessee and did not know her address.  This is also an inconsistent statement as Ms. Kennedy kept him updated."  That publication is false and stigmatizing.  It suggests Mr. Kennedy is a liar.  It also suggests De Almeida-Kennedy is a truthteller and that CARUSO is vouching for De Almeida-Kennedy's veracity.

329.     CARUSO'S report states "Mr Kennedy's own parents issued a strong written letter denouncing his character and parental skills as it pertained to his two minor children."  That publication is false and stigmatizing.  The statement implies that Mr. Kennedy did not have familial support and further implies that Mr. Kennedy has a bad character and lacks parenting skills.  It implies that Mr. Kennedy's children would not be safe with him.

330.     CARUSO'S report states "Guardian-Ad-Litem, Attomey Carmina Hirsch has advocated against Mr Kennedy in regards to physical custody and or unsupervised visitation, due in large part to his past history and his lack of parental skills."  That is a republication of false and stigmatizing statements made

41

by HIRSCH that suggested Mr. Kennedy was guilty of a crime to which an infamous penalty attaches.  In addition, it omits relevant case history.

331.     CARUSO'S report states "[Mr. Kennedy] told me he misunderstood our conversation.  (He did not)."  That publication is false and stigmatizing.  It suggests that CARUSO has knowledge and information that supports his statement.  As the creator of the report, it implies that his knowledge, tied with other statements, is more than mere opinion.  It also implies Mr. Kennedy is a liar who should not be trusted nor taken at face value.

332.     CARUSO'S report states "[Mr. Kennedy] has violated the court order as it pertains to support payments."  That publication is false and stigmatizing.  It labels Mr. Kennedy as a deadbeat dad and suggests that CARUSO has information about Mr. Kennedy that is not contained within his report.  Further, Mr. Kennedy has not violated any court orders pertaining to support.

333.     CARUSO'S report states "[Mr. Kennedy] voluntarily left the State of Connecticut in an effort to avoid those payments."  That publication is false and stigmatizing and suggests that Mr. Kennedy has engaged in a crime of moral turpitude.  Further, it implies that CARUSO has information beyond what is contained within his report.

334.     CARUSO'S report states "[Mr. Kennedy's] own parents have written a comprehensive report detailing his poor parental skills and lack of compassion."  That publication is false and stigmatizing.  The statement implies that Mr. Kennedy did not have familial support and further implies that Mr. Kennedy lacks

parenting skills and compassion.  It further purports to have psychological insights.

335.     CARUSO'S report states "[Mr. Kennedy's] disregard for the rule of law is blatant in the false affidavit he presented to obtain custody."  That publication is false and stigmatizing and suggests that Mr. Kennedy has engaged in a crime of moral turpitude.  Further, it suggests that the Ex Parte Order is not a valid Order to be followed.

336.     CARUSO'S report states "[Mr. Kennedy] knows full well that as of November 8, 2017 he had lost his supervised visitation with his children."  That publication is false and stigmatizing.  It suggests Mr. Kennedy had had supervised visitation prior to November 8, 2017, and further suggests that CARUSO had knowledge not contained within his report.

337.     CARUSO'S report states "That was the last standing order of the court."  That publication is false and stigmatizing.  It implies that Mr. Kennedy did not have a valid court order for the return of the minor children and suggests that Mr. Kennedy is a liar.  Further, it implies that legally the Ex Parte Order is not valid.

338.     CARUSO'S report states "[Mr. Kennedy's] sole motivation is to take these children from their mother."  That publication is false and stigmatizing.  It attributes to Mr. Kennedy a false pretense and implies knowledge that is not contained within the report.  It makes Mr. Kennedy out to have ulterior motives for associating with his own children.

339.     CARUSO'S report designates De Almeida-Kennedy as "V" for victim.  That publication is false and stigmatizing and suggests that Mr. Kennedy is a perpetrator in the eyes of TOWN.

340.     Plaintiff Mr. Kennedy claims damages, including for the loss of reputation, for the violation of due process, and for Mr. Kennedy's difficulties in interacting with the children's schools as a result of CARUSO'S publication.

341.     CARUSO'S publications were willful, wanton, and made in reckless disregard of Mr. Kennedy's rights.  CARUSO acted with actual malice, with the intent to injure Mr. Kennedy's reputation and prevent him from exercising his First Amendment, Ninth Amendment and Fourteenth Amendment rights in relation to the Ex Parte Order of November 27, 2018.

342.     Mr. Kennedy has not, in fact, been able to execute the Ex Parte Order and associate with his children from November 27, 2018, to present.

343.     HINE reviewed the report, knew that unconstitutional acts were occurring directed specifically at Mr. Kennedy, and exhibited a deliberate indifference by failing to act.

344.     Further, CARUSO'S publication was done without offering Mr. Kennedy an opportunity to respond to the report and clear his name.  CARUSO intentionally released the report without Mr. Kennedy's review in order to stigmatize Mr. Kennedy and deprive Mr. Kennedy of due process.  CARUSO also knew that his later testimony would not result in any ability of Mr. Kennedy to clear his name, as the report had gone to another state and various third parties who would not correct it, including De Almeida-Kennedy.

345.     Mr. Kennedy in effect would have no ability to move to exclude or objection to the submission of the report in any court, anywhere.  Since the original publication, the report has gone to at least five organizations in two states.  Mr. Kennedy has no practical method of correcting the contents of the report any longer.

346.     Plaintiff Mr. Kennedy claims punitive damages.

## L. COUNTS XXI-CXLIX (42 U.S.C. §1983 – Defamation, Stigma-Plus) HIRSCH Only

347.     Mr. Kennedy realleges and incorporates herein by reference the facts and allegations set forth in paragraphs 320-340 of this Complaint.

348.     Mr. Kennedy has no criminal record.

349.     HIRSCH continued to maintain that Mr. Kennedy had kidnapped his children, in front of and outside of Mr. Kennedy's presence.

350.     HIRSCH republished CARUSO'S report as written.

351.     HIRSCH did not offer Mr. Kennedy any review of the report prior to distribution.

352.     HIRSCH did not offer Mr. Kennedy and has not offered Mr. Kennedy any method of clearing his name.

353.     HIRSCH knew that CARUSO'S report would be shared with the minor children by De Almeida-Kennedy.

354.     On January 16, 2019, HIRSCH stated to a different Family Services caseworker that "[Mr. Kennedy] kidnapped his children."  That publication is false and stigmatizing and suggests a crime to which an infamous penalty attaches.  Furthermore, HIRSCH referenced CARUSO'S report and ratified its truthfulness

to the same Family Services caseworker, thus republishing yet again the statements contained in that report.

355.     HIRSCH was aware of numerous false statements published by De Almeida-Kennedy over the course of prior years.

356.     HIRSCH knew that De Almeida-Kennedy's psychological evaluation showed a tendency to prevaricate.

357.     HIRSCH knew that De Almeida-Kennedy had issues with telling the truth and disclosing information to Mr. Kennedy.

358.     Plaintiff Mr. Kennedy claims damages.

359.     HIRSCH'S publications were done without offering Mr. Kennedy an opportunity to respond to the report and clear his name.  HIRSCH intentionally released the report without Mr. Kennedy's review in order to stigmatize Mr. Kennedy and deprive Mr. Kennedy of due process.  HIRSCH also knew that her later testimony would not result in any ability of Mr. Kennedy to clear his name, as the report had gone to another state and various third parties who would not correct it, including De Almeida-Kennedy.  HIRSCH published the report at least eight times to different parties, including Mr. Kennedy.

360.     HIRSCH'S publications were willful, wanton, and made in reckless disregard of Mr. Kennedy's rights.  HIRSCH acted with actual malice, and knew that many of the statements within CARUSO'S report were false based on her own experience.  HIRSCH intended to and did injure Mr. Kennedy's reputation and prevented him from exercising his First Amendment, Ninth Amendment and

Fourteenth Amendment rights and further deprived him of procedural due process.

361.      Plaintiff Mr. Kennedy claims punitive damages.

### M. COUNT CL (42 U.S.C. §1983 – Fourteenth Amendment – Procedural Due Process) CARUSO and HIRSCH Only

362.      Plaintiffs incorporate and reallege prior paragraphs 10-127, as if they were contained herein.

363.      CARUSO fabricated evidence, specifically the incident report written on December 6, 2018.

364.      HIRSCH agreed to republish the fabricated evidence.

365.      Further, HIRSCH agreed to attempt to influence a tribunal in the state of Tennessee.

366.      De Almeida-Kennedy filed a request to register a foreign decree on December 7, 2018 in Tennessee.

367.      A hearing was scheduled for December 11, 2018, in Connecticut, wherein HIRSCH and CARUSO could have provided admissible, non-fabricated testimony to a judge.

368.      HIRSCH and CARUSO agreed not to provide Mr. Kennedy with notice and an opportunity to be heard prior to publication.

369.      The fabricated evidence did result in Mr. Kennedy being denied a hearing.

370.      The fabricated evidence was shared with a tribunal in the state of Tennessee for the purpose of denying Mr. Kennedy a hearing in Connecticut.

371.      The fabricated evidence was transmitted through an incident report to allow its admission without a valid hearsay objection in Tennessee.

372.	Mr. Kennedy has not been allowed a hearing since November 27, 2018.

373.	The fabricated evidence denied Mr. Kennedy procedural due process.

374.	Mr. Kennedy has suffered general and specific damages in terms of lost economic opportunity, lost association, and both anxiety and depression over being denied an opportunity to return his children to Connecticut and clear his name.

375.	HIRSCH and CARUSO'S actions were malicious and egregious.

376.	Mr. Kennedy requests punitive damages.

**N. COUNT CLI (42 U.S.C. §1983 – Fourteenth Amendment – Procedural Due Process) HIRSCH Only - REMOVED**

**O. COUNT CLII (42 U.S.C. §1983 – Conspiracy) CARUSO and HIRSCH Only**

377.	Plaintiffs incorporate prior paragraphs 351-405, as if they were contained herein.

378.	HIRSCH and CARUSO made an agreement to generate a police report with falsified evidence.

379.	HIRSCH and CARUSO made an agreement to distribute a police report with stigmatizing, false content.

380.	HIRSCH and CARUSO made an agreement to influence tribunals in two states not to enforce a granted Ex Parte Order.

381.	HIRSCH and CARUSO made an agreement to prevent Mr. Kennedy from prevailing at any future hearings.

382.	HIRSCH and CARUSO made an agreement to utilize official FPD computer systems and a TOWN-issued email address to effectuate their agreement.

383.     HIRSCH communicated with CARUSO and agreed to distribute CARUSO'S report.

384.     HIRSCH reviewed CARUSO'S report prior to distributing it.

385.     HIRSCH and CARUSO further agreed to provide CARUSO'S report to Bridgeport Superior Court for the purpose of terminating Mr. Kennedy's sole legal custody of the minor children.

386.     HIRSCH and CARUSO further agreed to have both CARUSO and HIRSCH urge officials in Tennessee not to comply with the Ex Parte Order.

387.     HIRSCH and CARUSO further agreed to prevent Mr. Kennedy from having any direct contact with the minor children.

388.     HIRSCH and CARUSO further agreed to have CARUSO testify and introduce his report into evidence in tribunals in Tennessee, Connecticut and in Federal District Court, if that were to come to pass.

389.     HIRSCH and CARUSO have communicated with third parties in the State of Tennessee and referenced the report as "the facts of this [custody] case".

390.     HIRSCH and CARUSO have communicated to multiple third parties, including the public schools that Mr. Kennedy's children attend and Family Services in Connecticut, to ignore the Ex Parte Order and, those parties have in fact ignored the Ex Parte Order in reliance upon their representations.

391.     CARUSO wrote in his report that he had shared its contents with other people and was sending it to HIRSCH only, in furtherance of their agreement.

392.     CARUSO distributed his report on December 6, 2018, per his agreement with HIRSCH.  HIRSCH distributed CARUSO'S report on December 6, 2018, per her agreement with CARUSO.

393.     CARUSO appeared at Superior Court on December 11, 2018, by agreement with HIRSCH.  CARUSO attended for four hours in preparation to testify and introduce his report into evidence.

394.     HIRSCH, by agreement with CARUSO, delayed proceedings until January 16, 2019, in order to have CARUSO return from vacation to testify and introduce his report into evidence.

395.     CARUSO and HIRSCH made an agreement to deny Mr. Kennedy's Constitutional Rights under the First, Fifth, Ninth and Fourteenth Amendments. CARUSO and HIRSCH committed overt acts, referenced above, in furtherance of their conspiracy.

396.     CARUSO and HIRSCH'S conduct was willful and malicious and Mr. Kennedy requests nominal and compensatory damages for economic and non-economic loss, including for anxiety and depression and the loss of intimate association as a result of their conspiracy.  Further, Mr. Kennedy requests punitive damages.

**P. COUNT CLIII (42 U.S.C. §1983 – Equal Protection – Selective Enforcement) All Defendants**

397.     Plaintiffs incorporate prior paragraphs 103-106 and 129-257 as to all defendants.

398.     CARUSO'S treatment of Mr. Kennedy is unique.

399.     CARUSO has treated other complainants with granted Ex Parte Orders all differently than Mr. Kennedy.

400.     CARUSO has never before issued a false report in relation to a complainant with a granted Ex Parte Order.

401.     CARUSO has never before made any attempts to prevent a complainant from enforcing a granted Ex Parte Order.

402.     CARUSO singled out Mr. Kennedy due to CARUSO'S prior actions taken in 2009, because CARUSO'S prior contact was resolved favorably to Mr. Kennedy.

403.     HIRSCH'S treatment of Mr. Kennedy is unique.

404.     HIRSCH has never disobeyed a granted Ex Parte Order prior to Mr. Kennedy's presentment.

405.     HIRSCH has never before presented false evidence in relation to a granted Ex Parte Order.

406.     HIRSCH singled out Mr. Kennedy due to Mr. Kennedy's prior criticism of HIRSCH'S work.

407.     CARUSO and HIRSCH were both motivated by willful disobedience of a granted Ex Parte Order because it was Mr. Kennedy who had obtained it.

408.     Both CARUSO and HIRSCH were motivated by a bad faith intent to injure Mr. Kennedy in his exercise of his First, Ninth, and Fourteenth Amendment rights.

409.     CARUSO'S and HIRSCH'S actions did prevent Mr. Kennedy from exercising his First, Ninth, and Fourteenth Amendment rights.

410.      HINE knew about CARUSO'S prior contact with Mr. Kennedy and the

disposition in Mr. Kennedy's favor.

411.      HINE knew about the Letter of Commendation that CARUSO received in

2010 related to Mr. Kennedy.

412.      HINE knew about CARUSO'S attempts to coerce Mr. Kennedy into not

enforcing the Ex Parte Order because they were in CARUSO'S report.

413.      HINE approved the report for distribution.

414.      Plaintiffs reallege paragraphs 266-276, as if they were contained herein.

415.      TOWN is responsible for any liability for HINE under this Count pursuant

to Connecticut General Statutes §7-465.

## Q. COUNTS CLIV-CLXVIII (Common Law Invasion of Privacy) CARUSO And HINE Only

416.      On Tuesday, December 4, without the knowledge nor consent of Mr.

Kennedy, CARUSO wrote out a report using FPD software, on FPD systems.

417.      On December 6, 2018, HINE approved the distribution of the report on

TOWN's systems using an official TOWN-issued email address.

418.      On December 6, 2018, without Mr. Kennedy's knowledge nor consent,

CARUSO emailed his report to HIRSCH using a TOWN-issued email account.

419.      CARUSO knew the incident report would be made public.

420.      CARUSO utilized the Internet and a TOWN-issued email address to

ensure the report could be obtained through a FOIA request.

421.      CARUSO and HIRSCH further intended to submit the incident report into

evidence in two states, and possibly at the Federal level, where they would then

be made part of the public record and further published.

422.     CARUSO'S report stated "[Mr. Kennedy] was living in Florida when he filed an emergency order of custody in the State of Connecticut.  This was dismissed as neither party was living in the state at that time."  That publication constitutes an invasion of privacy in that the matter published (1) was not true, (2) is information not relevant nor necessary for this report, and (3) creates both an impression that the matter was dismissed, which it was not, and that the reason for dismissal was due to jurisdictional issues, which is not known. Further, it creates the impression that the motion was without merit and was designed to mislead the reader into assuming jurisdiction rests with Tennessee.

423.     CARUSO'S report stated "[o]n November 18, 2017 the Honorable Judge Wenzel then granted the suspension of Mr Kennedy's supervised visitation.  This order is still in place today."  That publication constitutes an invasion of privacy in that the matter published (1) is not true, (2) is information not relevant nor necessary for this report, and (3) creates an impression that Mr. Kennedy somehow had no right to the custody of his minor children and also that a Judge had suspended a right of supervised visitation, which suggests that there was an order of supervised visitation *ab initio*.

424.     CARUSO'S report stated "Mr Kennedy writes that prior to taking either or both minor children out of the State of Connecticut the other party shall be notified.  However, he chose to move to Florida in October of 2017."  The matter published (1) is not true in suggesting that Mr. Kennedy's move to Florida had any relevance to the obligation of De Almeida-Kennedy, (2) is information not

relevant nor necessary for this report, and (3) suggests that Mr. Kennedy violated an obligation or agreement.

425.     CARUSO'S report stated "[Mr. Kennedy] was eventually tracked to the State of Texas, via his usage of a joint credit card."  The matter published (1) is false, (2) is extremely misleading in that Mr. Kennedy has no criminal record and was never prosecuted in relation to CARUSO'S investigation, (3) is information not relevant nor necessary for this report, and (4) is a major misrepresentation of Mr. Kennedy's character, history, beliefs and the situation surrounding events in 2009 as detailed in earlier paragraphs.

426.     CARUSO'S report states "Mr. Kennedy did in fact have Ms. Kennedy's Tennessee address of 266 Rich Circle, Franklin, Tennessee, which has not been disputed."  The matter published (1) is not true and implies that Mr. Kennedy had knowledge he did not, as the address provided by Ms. Kennedy at the time was a P.O. Box in a different city, (2) is a residence with the listed owner as De Almeida-Kennedy's boyfriend, Joseph Meade, with whom De Almeida-Kennedy has stated in numerous documents she does not live despite his residing there, (3) is information not relevant nor necessary for this report, and (4) is not within the personal knowledge of CARUSO.

427.     CARUSO'S report states "From 2009 until present I have had intermittent conversations with Ms. Kennedy relative to her two minor children.  When speaking with Ms. Kennedy during those times she would often complain about Mr Kennedy's treatment of the two minor children.  She was advised to lodge a complaint with the Trumbull Police Department as that is where Mr Kennedy was

living during those times."  The matter published (1) creates an impression that Mr. Kennedy has engaged in behavior that would constitute actionable mistreatment of the minor children by police officers in another jurisdiction without ever having notified Mr. Kennedy of any of those complaints nor offering Mr. Kennedy the opportunity to address any of them and further, (2) is information not relevant nor necessary for this report, and (3) is not true to the extent any maltreatment is alleged.  Further, Mr. Kennedy has never had any contact with the Trumbull Police Department in relation to the health, safety and welfare of either minor child, which fact is not included in CARUSO'S report.

428.     CARUSO'S report states "During my discussion with Mr. Kennedy I advised him that he should not return to Tennessee at this time."  The matter published (1) is not true, (2) is information not relevant nor necessary for this report, (3) suggests that Mr. Kennedy did not have the right to seek the return of his minor children to Fairfield per the Superior Court Order, and (4) is a post-hoc justification for traveling to Mr. Kennedy's home unannounced.

429.     CARUSO'S report states "During the early morning hours of December 4, 2018 Officer Montgomery reported to me early that Mr. Kennedy had a scheduled appointment in 30 minutes with the principal at one of his son's schools.  Officer Montgomery told me that he would keep me informed.  Later that day he stated that Mr. Kennedy did not show up."  The matter published (1) is not true in relation to what happened, (2) intentionally omits the key detail that neither minor child attended school over the following eight-day period, including the day listed in the report, (3) is information not relevant nor necessary for this

report, and (4) creates a false impression that Mr. Kennedy did not carry out his intentions.

430.     CARUSO'S report states "[Mr. Kennedy's] actions in this case are deplorable and purely selfish."  The matter published (1) creates a false impression by omitting any facts favorable to Mr. Kennedy, (2) is information not relevant nor necessary for this report, and (3) is a major misrepresentation of Mr. Kennedy's character, history, beliefs and the situation surrounding events in 2018.

431.     CARUSO'S report states "[Mr. Kennedy] has made no real attempt at being involved in his children's lives."  The matter published (1) is not true, (2) combined with other statements suggests that CARUSO has actual knowledge of Mr. Kennedy's relationship with his minor children, (3) is information not relevant nor necessary for this report, and (4) suggests falsely that CARUSO'S own continual interference in that relationship is not relevant.

432.     CARUSO'S report states "[Mr. Kennedy] pretends to want what's best for his children."  The matter published (1) is not true, (2) is information not relevant nor necessary for this report, and (3) suggests that CARUSO has personal knowledge and experience and has reached a conclusion through personal knowledge and experience, coupled with other statements made by CARUSO.

433.     CARUSO'S report states "Mr Kennedy may abscond with [minor children]. It is my believe that if given the opportunity Mr Kennedy would not return to Connecticut with these two children."  The matter published (1) is not true, (2) is information not relevant nor necessary for this report and (3) suggests that

CARUSO has personal knowledge and experience and has reached a conclusion through personal knowledge and experience for which there is no basis in fact.

434.    CARUSO'S report includes the language "THE UNDERSIGNED, AN INVESTIGATOR HAVING BEEN DULY SWORN DEPOSES AND SAYS THAT: I AM THE WRITER OF THE ATTACHED POLICE REPORT PERTAINING TO THIS INCIDENT NUMBER THAT THE INFORMATION CONTAINED THEREIN WAS SECURED AS A RESULT OF (1) MY PERSONAL OBSERVATION AND KNOWLEDGE OR (2) INFORMATION RELAYED TO ME BY OTHER MEMBERS OF MY POLICE DEPARTMENT OR OF ANOTHER POLICE DEPARTMENT OR (3) INFORMATION SECURED BY MYSELF OR ANOTHER MEMBER OF A POLICE DEPARTMENT FROM THE PERSON OR PERSONS NAMED OR IDENTIFIED THEREIN, AS INDICATED BY THE ATTACHED REPORT.  THAT THE REPORT IS AN ACCURATE STATEMENT OF THE INFORMATION SO RECEIVED BY ME".  The signed report itself published indicates that the statements by CARUSO about Mr. Kennedy are a result of CARUSO'S personal knowledge and true and correct in the eyes of TOWN, and ratified by HINE.  The report on the whole is designed to paint Mr. Kennedy as a criminal with no interest in his children and no right to associate with them or to the enforcement of the Ex Parte Order.

435.    HINE read CARUSO'S report and authorized its publication to multiple third parties, and the public at large through dissemination by De Almeida-Kennedy and HIRSCH and by utilizing a TOWN-issued email address.

436.     The publications by CARUSO with HINE'S approval were lies and/or major misrepresentations highly offensive to Mr. Kennedy, have caused distress and mental suffering, have caused emotional and mental anxiety, and harm to his interest and privacy.

437.     CARUSO made those statements without disclosing that Mr. Kennedy achieved a favorable outcome from CARUSO'S involvement with Mr. Kennedy in 2009.

438.     Mr. Kennedy claims damages.

439.     CARUSO'S publications were willful, wanton, and made in reckless disregard of Mr. Kennedy's rights.  CARUSO acted with the intent to offend and calculated to invade Mr. Kennedy's privacy and cause him intentional distress.  CARUSO and HINE were both aware of numerous misleading statements published by De Almeida-Kennedy over the course of prior years and knew that De Almeida-Kennedy would republish the report.

440.     Mr. Kennedy claims punitive damages.

**R. COUNTS CLXIX-CLXXXIII (Common Law Invasion of Privacy) HIRSCH Only**

441.     HIRSCH republished CARUSO'S report multiple times and provided a copy to De Almeida-Kennedy, who has further republished to multiple parties.  Further, HIRSCH provided a copy of CARUSO'S report both to Tennessee public schools, knowing they would become part of a public record and also to Family Services at Superior Court, where the report would be published to several caseworkers.  HIRSCH knew that CARUSO'S report would be shared with the minor children, painting Mr. Kennedy in an extremely negative light.

442.     Publication to five persons in the State of Tennessee using official email addresses further places the report in the public domain, and all invasions of privacy in consequence distributed to the wider public.

443.     The publications by HIRSCH were lies and/or major misrepresentations highly offensive to Mr. Kennedy, have caused distress and mental suffering, have caused emotional and mental anxiety, and harm to his interest and privacy.

444.     Mr. Kennedy claims damages.

445.     HIRSCH'S publications were willful, wanton, and made in reckless disregard of Mr. Kennedy's rights.  HIRSCH acted with the intent to offend and calculated to invade Mr. Kennedy's privacy and cause him intentional distress. HIRSCH was both aware of numerous misleading statements published by De Almeida-Kennedy over the course of prior years and knew that De Almeida-Kennedy would republish the report.

446.     Mr. Kennedy claims punitive damages.

## S. COUNTS CLXXXIV (Common Law Conspiracy to Interfere with Custodial Relations) CARUSO and HIRSCH Only

447.     On November 27, 2018, HIRSCH became aware of the Ex Parte Order.

448.     On November 28, 2018, HIRSCH was provided a copy of the Ex Parte Order.

449.     The Ex Parte Order demanded the immediate return of Mr. Kennedy's children to Mr. Kennedy's sole legal custody with no visitation to De Almeida-Kennedy.

450.     On November 27, 2018, and again on November 28, 2018, HIRSCH was informed by De Almeida-Kennedy that De Almeida-Kennedy would not comply with the Ex Parte Order.

451.     On November 29, 2018, CARUSO was provide a copy of the Ex Parte Order.

452.     On November 29 or 30, 2018, CARUSO was informed by De Almeida-Kennedy that De Almeida-Kennedy would not comply with the Ex Parte Order.

453.     On December 3, 2018, CARUSO attempted to coerce Mr. Kennedy into not returning his children to Connecticut.

454.     On December 3, 2018, HIRSCH contacted the minor children without Mr. Kennedy's consent.  HIRSCH did not notify Mr. Kennedy she was attempting to make contact.  HIRSCH told De Almeida-Kennedy she did not have to return Mr. Kennedy's children to Connecticut.

455.     On December 4, 2018, HIRSCH and CARUSO made an agreement to interfere with Mr. Kennedy's custody of his children.

456.     On December 6, 2018, CARUSO sent HIRSCH a fabricated report.

457.     HIRSCH sent out the fabricated report in furtherance of their agreement, to various third parties, including law enforcement in Tennessee, for the purpose of interfering with Mr. Kennedy's custodial rights.

458.     The fabricated report did interfere with Mr. Kennedy's custodial rights.

459.     Mr. Kennedy has suffered general and specific damages from the conspiracy, including anxiety, depression, and lost economic opportunity.

460.     CARUSO and HIRSCH'S conspiracy was malicious and wanton.

461.     Mr. Kennedy is requesting punitive damages.

### T. COUNT CLXXXV (Common Law Negligence) CARUSO and HINE only

462.     On April 2, 2011, TOWN had a duty to erase all records relating to

CARUSO and HINE'S activities initiated by De Almeida-Kennedy in 2009.

463.     As of April 2, 2011, CARUSO and HINE had a duty not to disclose any

information related to activities undertaken in their official capacity in 2009 on

behalf of De Almeida-Kennedy.

464.     The duty to erase and the duty not to disclose are both ministerial, not

within the discretion of CARUSO nor HINE.

465.     CARUSO made at least three references to information that should not

have been disclosed nor referenced in his report of December 6, 2018.

466.     HINE supervised the release of the report and had personal knowledge

that the information should not have been disclosed nor referenced in the report.

467.     Both CARUSO and HINE breached their duty.  The release of the report

provided to a wider audience information not permitted to be reported.  The

release of the report to a wide audience has caused damage to Mr. Kennedy's

reputation and business prospects.

468.     Mr. Kennedy has as a normal course of business the requirement to

obtain security clearance where background questions are asked of the nature

that this disclosure impacts.  Further, Mr. Kennedy will continue to be impacted

as De Almeida-Kennedy will continue to distribute the report for the foreseeable

future.

469.     Mr. Kennedy has suffered financial loss and reputational loss as a result of
the disclosure, caused by the disclosure.

### U. COUNT CLXXXVI (Common Law Negligence - Liability) TOWN Only

470.     Mr. Kennedy incorporates and realleges prior paragraphs 657-664, as if
they were contained herein.

471.     TOWN is responsible for CARUSO'S and HINE'S negligent acts
committed while acting within the scope of their duties.  Mr. Kennedy asserts
liability for Count CLXXXV under Connecticut General Statutes §52-557n.

### V. COUNT CLXXXVII (Common Law Negligence - Indemnity) TOWN Only

472.     Mr. Kennedy incorporates and realleges prior paragraphs 657-664, as if
they were contained herein.

473.     TOWN is responsible for any liability for CARUSO and HINE under Count
CLXXXV pursuant to Connecticut General Statutes §7-465.

### W. COUNT CLXXXVIII (Common Law Intentional Infliction of Emotional Distress) CARUSO Only

474.     Plaintiffs incorporates and realleges prior paragraphs 167-198.

475.     Mrs. Kennedy's fear increased at seeing CARUSO enter her home with a
firearm on December 3, 2018.

476.     Mr. Kennedy also began to experience anxiety.

477.     CARUSO was aware, or should have been aware, that De Almeida-
Kennedy had stated that Mr. Kennedy was "dangerous" and that something
"should be done" about him earlier in 2018.

478.     CARUSO knew that his conduct would upset both plaintiffs.

479.    CARUSO knew or should have known Mrs. Kennedy's background.

480.    CARUSO knew that Mr. Kennedy had not seen his children in person since November 6, 2017.

481.    CARUSO knew that Mr. Kennedy had an Ex Parte Order that directed that the minor children be "returned immediately" to Connecticut.

482.    CARUSO knew that he had engaged in prior activity with Mr. Kennedy that resulted in a favorable disposition for Mr. Kennedy.

483.    CARUSO chose to go to plaintiffs' home unannounced.

484.    CARUSO did not announce the purpose of his visit prior to entering the plaintiffs' home.

485.    CARUSO chose to enter the plaintiffs' home with a loaded weapon.

486.    CARUSO chose to direct Mr. Kennedy.

487.    CARUSO chose to raise his voice.

488.    CARUSO chose to enter a controlling stance.

489.    CARUSO'S angry tone, raised voice and controlling stance upset and scared Mr. Kennedy into thinking that CARUSO was threatening his freedom if he did not comply.

490.    CARUSO'S angry tone, raised voice and controlling stance placed Mrs. Kennedy in fear of her safety and Mr. Kennedy in fear of his own safety.

491.    CARUSO was aware that De Almeida-Kennedy had called him and requested Mr. Kennedy be arrested on multiple occasions.

492.    CARUSO made no attempt to calm Mrs. Kennedy, who was visibly upset.

493.     Following CARUSO'S visit, plaintiffs both experienced severe anxiety and depression, especially over the knowledge they would not see the minor children even with a granted Ex Parte Order.

494.     Mrs. Kennedy became fearful for her safety in Fairfield.

495.     Mr. Kennedy became fearful for his safety at his home.

496.     Plaintiffs claim compensatory and exemplary damages.

497.     Plaintiffs have lost work opportunities and have been depressed, demoralized and made anxious from CARUSO'S unannounced visit.

498.     CARUSO'S conduct was extreme and outrageous.

499.     Plaintiffs claim punitive damages.

**X. COUNT CLXXXIX (Violation of Personal Data Act) TOWN Only**

500.     CARUSO is an employee of TOWN.

501.     CARUSO created a report on December 4, 2018.

502.     CARUSO'S report contains Mr. Kennedy's date of birth.

503.     CARUSO'S report contains Mr. Kennedy's driver's license number.

504.     CARUSO'S report contains false information.

505.     CARUSO'S report contains information about Mr. Kennedy not relevant nor necessary for the agency to accomplish its lawful purpose.

506.     CARUSO released his report to third parties.

507.     CARUSO did not offer Mr. Kennedy an opportunity to review it prior to releasing it.

508.     CARUSO did not offer Mr. Kennedy an opportunity to correct inaccurate information.

509.     CARUSO did not allow Mr. Kennedy to challenge the relevancy of information contained within the report.

510.     CARUSO did not offer Mr. Kennedy an opportunity to notate in the record Mr. Kennedy's objections to information contained therein.

511.     CARUSO made no attempt to safeguard the private information.

512.     Mr. Kennedy claims damages, including loss of potential revenue due to the harm from the improper disclosure, under Connecticut General Statutes §4-197.

513.     Mr. Kennedy requests an injunction against any further distribution of the incident report by TOWN or any of its agents.

514.     Mr. Kennedy requests a writ of mandamus instructing the TOWN'S agents to erase any electronic or printed copies of the incident report in TOWN'S possession.

## Y. REQUEST FOR RELIEF

WHEREFORE, the plaintiffs respectfully request relief as follows:

515.     Nominal damages for each violation of plaintiffs' Constitutional rights by the defendants.

516.     Compensatory damages in an amount to be proved at trial.

517.     Punitive damages against defendants CARUSO, HIRSCH, and HINE in an amount to be proved at trial.

518.     Costs, including reasonable attorneys' fees actually incurred, under 42 U.S.C. §1988, and under other applicable law.

519.     An injunction against any further publication of the incident report written

by CARUSO on December 4, 2018, and published on December 6, 2018, related

to plaintiffs, under Connecticut General Statutes §§4-197, 54-142a(c), and 54-

142a(e).

520.     A writ of mandamus directing TOWN to direct its agents to erase all copies

of the aforementioned report under Connecticut General Statutes §§4-197, 54-

142a(c), and 54-142a(e).

521.     Any other relief that this Court deems just and equitable.

## Z. JURY DEMAND

Plaintiffs demand a jury trial.


_____          _____

Original signature of attorney (if any)          **Plaintiff's Original Signature**


_____          _____

Printed Name                                                Printed Name

                                                                  James Kennedy
                                                                  Besa Kennedy
                                                                  145 Reid St
                                                                  Fairfield, CT  06824


                                                                  james@kennedyideaworks.com