**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| James Kennedy, et al., | : | |
| | : | |
| Plaintiffs, | : | No. 3:19-cv-260(VLB) |
| | : | |
| v. | : | |
| | : | November 19, 2021 |
| Frederick Caruso, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

**MEMORANDUM OF DECISION GRANTING**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [Dkts. 154, 155]**

Plaintiffs—James Kennedy ("Kennedy") and Besa Kennedy—bring this action against the Town of Fairfield ("Town"), Detective Frederick Caruso ("Caruso"), Detective Sergeant Frederick Hine ("Hine"), and Carmina Hirsch ("Hirsch") (collectively "Defendants") alleging various federal and state law claims stemming from an Incident Report drafted during a two week period in which Kennedy had legal custody of his two minor children pursuant to an emergency, temporary ex parte order issued by the Connecticut Superior Court. Kennedy[1] generally alleges that Hirsch and Caruso conspired to draft a false incident report ("Incident Report") that Hirsch would provide to the Connecticut Superior Court adjudicating Kennedy's custody of his children and the school officials of the

---

[1] Throughout this decision, the Court will repeatedly identify Kennedy as if he is the sole plaintiff. The Court understands he is not and that Besa Kennedy is listed as a plaintiff in the underlying action. However, as will be addressed in greater detail below, Besa Kennedy is not a significant part of this action considering she has a single claim of intentional infliction of emotional distress that she has constructively abandoned. *See* Part III.B.3.

schools where the children attend for the purpose of interfering with his custodial rights. Kennedy further alleges that Hine, as Caruso's superior, signed off on the Incident Report knowing it contained false statements and was generally negligent in his supervision of Caruso. Lastly, Kennedy alleges that the Town is liable for Caruso and Hines conduct.

Before the Court are two motions for summary judgment filed by Caruso, Hine, and the Town (collectively "Fairfield Defendants") and Hirsch seeking summary judgment on all counts. [Dkts. 154, 155, respectively]. Plaintiffs have filed oppositions to each. [Dkts. 157, 158].

For the following reasons, Defendants' motions are GRANTED.

## I.    LEGAL STANDARD

A motion for summary judgment may be granted only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Coppola v. Bear Stearns & Co.*, 499 F.3d 144, 148 (2d Cir. 2007). "Material facts are those which 'might affect the outcome of the suit under the governing law,' and a dispute is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Coppola*, 499 F. 3d at 148 (citing to *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) ("*Liberty Lobby*")). But "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Wang v. Hearst Corp.*, 877 F.3d 69, 76 (2d Cir. 2017) (citing to *Liberty*

*Lobby*, 477 U.S. 248)).  Whether a fact is material is determined by the substantive law.  *Liberty Lobby*, 477 U.S. at 248.

On a motion for summary judgment, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Green v. Town of E. Haven*, 952 F.3d 394, 405–06 (2d Cir. 2020) (citing to *Liberty Lobby*, 477 U.S. at 250).  "Thus, in ruling on a motion for summary judgment, 'the district court is required to resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" *Id.* (citing to *Kessler v. Westchester County Department of Social Services*, 461 F.3d 199, 206 (2d Cir. 2006)).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact . . . ."  *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014).  "[W]here the nonmoving party will bear the burden of proof on an issue at trial, the moving party may satisfy its burden by 'point[ing] to an absence of evidence to support an essential element of the nonmoving party's' case." *Id.* (citation omitted).  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.* (citing to *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)).

> A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible. At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in

> support of their allegations; allegations alone, without evidence to back them up, are not sufficient.

*Welch–Rubin v. Sandals Corp.*, No. 3:03-cv- 481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, 817 F. Supp. 2d 28, 37 (D. Conn 2011). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Hayut v. State Univ. of New York*, 352 F.3d 733, 743 (2d Cir. 2003) (citing to *Liberty Lobby*, 477 U.S. at 252)).   Where there is no more than a scintilla of evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712, 727 (2d Cir. 2010).

A party's own affidavit may be enough to fend off summary judgment if it is based on personal knowledge and its credibility is buttressed. *See Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 53 (2d Cir. 1998) (reversing district court grant of summary judgment because district court did not give party's affidavit weight and affidavit was corroborated by consistent prior pleadings and testimony); *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014) (same). However, if the affidavit is inconsistent with prior deposition testimony or pleadings, it does not create "a genuine issue for trial." *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996); *see Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 106 (2d Cir. 2011) ("in certain extraordinary cases, where

4

the facts alleged are so contradictory that doubt is cast upon their plausibility, the court may pierce the veil of the complaint's factual allegations and dismiss the claim.").

Kennedy is self-represented (also known as *pro se*).  Ordinarily, courts liberally construe a complaint filed by a *pro* se party to raise the strongest arguments they suggest. *See e.g., McCray v. Lee*, 963 F.3d 110, 116–17 (2d Cir. 2020). "This policy of liberally construing *pro se* submissions is driven by the understanding that '[i]mplicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training.'" *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006).  Kennedy is not entitled to liberal construction because he is a lawyer.  *See Harbulak v. Suffolk County*, 654 F.2d 194, 198 (2d Cir. 1981) (citing to *Haines v. Kerner*, 404 U.S. 519, 520 (1972)).  *See also Holtz c. Rockefeller & Co., Inc.*, 258 F.3d 62, 82 n.4 (2d Cir. 2001). With that said, the Federal Rules of Civil Procedure counsel courts to construe pleadings "so as to do justice." Fed. R. Civ. P. 8(e). Thus, the Court will address the claims and arguments raised by Kennedy "so as to do justice."

## II.    BACKGROUND

The Court assumes the parties' familiarity with the underlying facts and only repeats those relevant to this decision.

### A.   Rule 56(a)

The facts as outlined below come from the parties' Local Rule 56(a) statements of fact, exhibits attached to the motions, and information the Court can

judicially notice.  The Court will address the rules relating to Rule 56(a)2 statements to demonstrate flaws in Kennedy's filings and the impact those flaws have on the Court's recitation of the facts relevant to this decision and adjudication of the motions for summary judgment.

Local Rule 56(a) statements "must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial."  Local Rule 56(a)3.

> The "specific citation" obligation of this Local Rule requires parties to cite to specific paragraphs when citing to affidavits or responses to discovery requests and to cite to specific pages when citing to deposition or other transcripts or to documents longer than a single page in length. Failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming admitted certain facts that are supported by the evidence in accordance with Local Rule 56(a)1, or in the Court imposing sanctions, including, when the movant fails to comply, an order denying the motion for summary judgment, and when the opponent fails to comply, an order granting the motion if the motion and supporting materials show that the movant is entitled to judgment as a matter of law.

*Id.*  Rule 56 of the Federal Rules of Civil Procedure require "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by (A) citing to particular parts of materials in the record . . .; or (B) *showing* that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. Pro. 56(c) (emphasis added).  In reviewing a motion for summary judgment, "[t]he court need consider only cited materials, but it may consider other materials in the record."  Rule 56(c)(3). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by

Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order."  Rule 56(e).

Kennedy filed a Rule 56(a)2 statement in response to both motions for summary judgment.  However, at multiple points in his 56(a)2 statements, he simply states "objection" but provides no basis for the objection, nor does he cite to anything in the record establishing the basis for his objection.  The Court will consider the facts that were not properly objected to as undisputed pursuant to Rule 56(e).

### B. Pre-Ex Parte Order Background

This case is related to a heavily litigated divorce and custody case that began in 2009 before the Connecticut Superior Court (the "Family Court").  *See De Almeida-Kennedy v. Kennedy*, Conn. Super. Ct. FBT-FA09-4030227-S.[2]  Kennedy married Fatima De Almeida-Kennedy ("De Almeida-Kennedy") in 2001 and had two children with her, the first born in 2003 and the second born in 2005.  [Fairfield Mot. at Ex. A, PDF p. 93–94].  In August 2009, Kennedy purchased a plane ticket for his then-wife De Almeida-Kennedy to go to France for a week.  [Fairfield Mot. at Ex A, PDF p. 94–96].   While De Almeida-Kennedy was in France, Kennedy emailed her stating he was leaving her and taking the children.  [Fairfield Mot. at Ex. B].  This

---

[2] The Court takes judicial notice of the docket sheet in the Family Court case.  *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) ("docket sheets are public records of which the court could take judicial notice . . . .").

email does not provide any information on where the children were being taken or how she could get in direct contact with the children.  [*Id.*].  Rather, the email provides Kennedy's stepfather's telephone number to call to convey "urgent matters, requests or to communicate [] intent in relation" to the children and his mother's California address for "legal service."  [*Id.*; Fairfield Mot. at Ex. A, PDF p. 17].  Kennedy used a bank account that he shared with De Almeida-Kennedy to purchase plane tickets to Austin, Texas, and for a hotel.  [Fairfield Mot. at Ex A, PDF p. 101–02].

On August 31, 2009, De Almeida-Kennedy went to the Fairfield Police Department, met with Caruso and informed him that: she received an email from Kennedy indicating he was separating from her, Kennedy moved the family and its belongings from the residence without her knowledge or consent, the couple is neither legally separated nor divorced, there was no Court orders concerning custody, there were no domestic issues except for normal marital arguments over money and sex, she and Kennedy recently filed for bankruptcy, she had no valid credit cards, both of her vehicles were awaiting repossession, her house is going to be foreclosed, she had little money and no job, when she returned the home was empty and Kennedy did not provide a forwarding address, her and Kennedy's cell phones were cut off and so was the home phone, the majority of the furnishings and clothes were removed except for her belongings, her personal paperwork was gone, the children's identification paperwork was gone, one of the vehicles was gone and the other did not have a key, she could not determine where Kennedy was through his mother, their joint debit card was being used in a hotel in Austin,

8

their joint debit card was used for airplane tickets, and $7,000 in cash was withdrawn from their joint bank account. [Fairfield Mot. at Ex. C, PDF p. 1–3].[3]

On September 1, 2009, Caruso applied for and was granted an arrest warrant for Kennedy for two counts of custodial interference in the first degree[4] and two counts of risk of injury. [Fairfield Mot. at Ex. C, PDF p. 3; Ex. D]. Later that day, Kennedy was arrested in Austin Texas by Texas law enforcement and charged with two counts of custodial interference in the first degree and two counts of risk of injury. [Fairfield Mot. at Ex. A, PDF p. 103, 108–09; Ex. C, PDF p. 3]. On September 17, 2009, Caruso and another FPD detective traveled to Texas, took custody of Kennedy, then flew Kennedy back to Connecticut to be processed at the FPD. [Fairfield Mot. at Ex. A, PDF p. 120–22; Ex. C, PDF p. 3]. These charges were ultimately nolled[5] in March 2010. [Fairfield Mot. at Ex. A, PDF p. 125].

On September 15, 2009, De Almeida-Kennedy filed for divorce in the Connecticut Superior Court. *See De Almeida-Kennedy v. Kennedy*, Conn. Super. Ct. FBT-FA09-4030227-S. On August 3, 2010, the divorce between Kennedy and De Almeida-Kennedy was finalize after the parties entered into a separation agreement, where they agreed to De Almeida-Kennedy having sole legal and primary physical custody of the children. [Fairfield Mot. at Ex. A, PDF p. 129–130].

---

[3] Kennedy indicated during his deposition he has no basis to dispute what in fact De Almeida-Kennedy told Caruso. [Fairfield Mot. at Ex. A, PDF p. 119–20].

[4] First Degree Custodial Interference has been referred to as "parental abduction" by legislative researchers, the family court judge in the separate but related family case, by Kennedy, the family court judge, counsel, and the GAL. Hirsch Mot. at Ex. C, Ex. D, Ex. E; Fairfield Mot. at Ex. I, PDF p.11, Ex. J, at PDF p.8].

[5] "Nolle," which is short for "nolle prosequi" is a Latin phrase for "unwilling to prosecute" and is commonly used on Connecticut courts for cases where the state decides not to prosecute formal charges.

Under the separation agreement, Kennedy would have supervised visits with the children and agreed to pay $1,000 per week.  [Fairfield Mot. at Ex. A, PDF p. 129–130].

Kennedy's supervised visitation was renewed in March 2013, when the parties entered into a renewed agreement following a delinquency in support payments.  [Fairfield Mot. at Ex. A, PDF p. 131–33, 136–38].

In September 2014, Kennedy married Besa Kennedy.  [Fairfield Mot. at Ex. A, PDF p. 146].

On December 9, 2014, Kennedy and De Almeida-Kennedy entered into an agreement in which the parties agreed that Kennedy would now share joint legal custody of the children and primary custody would remain with De Almeida-Kennedy.  [Fairfield Mot. at Ex. A, PDF p. 140–42].  This agreement also identified an arrearage on alimony and child support.  [Fairfield Mot. at Ex. A, PDF p. 140–42].  In June 2015, Kennedy moved to Trumbull, Connecticut.  [Fairfield Mot. at Ex. A, PDF p. 146].

In December 2015, Kennedy filed a motion to modify the custody agreement, seeking sole legal and primary physical custody, and a downward modification or elimination of unallocated alimony and support payments.  [Fairfield Mot. at Ex. A, PDF p. 147].  Also, in December 2015, De Almeida-Kennedy petitioned Support Enforcement to enforce the order for Kennedy to pay weekly unallocated alimony and support.  [Fairfield Mot. at Ex. A, PDF p. 147–48].

On March 10, 2016, following the filing of the motions to modify custody and support but before the adjudication of the motions, Hirsch was appointed GAL in

the family court matter.  [Fairfield Mot. at Ex. A, PDF p. 149; Hirsch Mot. at Ex. H].
As part of the appointment, Hirsch was granted authority to review police reports,
communicate with the children, review educational records and confer with
teachers and school authorities.  [Fairfield Mot. at Ex. E, PDF p. 2–3; Ex. F; Hirsch
Mot. at Ex. J].

In July and August 2017, the Connecticut Family Court held a hearing on
Kennedy's December 2015 Motion to Modify and denied the motion.  [Fairfield Mot.
at Ex. A, PDF p. 157–58].

Then in October 2017, Kennedy moved to Florida.  [Fairfield Mot. at Ex. A,
PDF p. 159].  On November 8, 2017, during a scheduled hearing before the Family
Court, Kennedy failed to appear.  [Fairfield Mot. at Ex. I, PDF p. 24–25].  Presiding
judge Wenzel, found (1) Kennedy had notice of the hearing and no evidence was
presented showing that his absence from the hearing was anything other than
entirely voluntary and calculated, and (2) Kennedy was in willful contempt of the
Court's judgment.  [Fairfield Mot. at Ex. I, PDF p. 24–25].  Judge Wenzel then
ordered the suspension of Kennedy's visitation rights, authorizing Kennedy to only
supervised visits in the state of Connecticut and with permission from De Almeida-
Kennedy or the GAL.  [*Id.* at Ex. I, PDF p. 25].  Judge Wenzel further ordered that
"[s]hould Kennedy choose to seek modification of this order he must appear here
in the state of Connecticut at a properly scheduled time and place."  [*Id.* at Ex. I,
PDF p.26].

As of the November 8, 2017 family court hearing, Support Enforcement was
taking action against Kennedy to collect delinquent unallocated alimony and

support. [Fairfield Mot. at Ex. A, PDF p. 165].  On December 5, 2017, a capias was issued for Kennedy's arrest for failure to pay unallocated alimony and child support.[6]  [Fairfield Mot. at Ex. A, PDF p. 170].  Kennedy was not arrested on this capias. [*Id.*].

On May 7, 2018, De Almeida-Kennedy emailed Kennedy to inform him that she and the children moved to Tennessee.  [Fairfield Mot. at Ex. A, PDF p. 178–79]. The next day, on May 8, 2018, Kennedy—who still lived in Florida—filed an emergency ex parte custody order, which was denied by the Court.  [Fairfield Mot. at Ex. A, PDF pp. 180, 183].  In late May 2018, De Almeida-Kennedy filed a motion for order pertaining to the unpaid child support and alimony.  [Fairfield Mot. at Ex. A, PDF p. 184–85].

In late September and early October 2018, Kennedy moved back to Fairfield, Connecticut.  [Fairfield Mot. at Ex. A, PDF p. 186–87].  On October 23, 2018, Hirsch informed the family court that Kennedy wanted the children to visit him in Connecticut, but De Almeida-Kennedy refused.  [Hirsch Mot. at Ex. P, PDF p.2]. Hirsch also informed the court that De Almeida-Kennedy offered to allow Kennedy to visit the children in Tennessee, which he did not wish to consider at the time. [*Id.*].

On November 7, 2018, De Almeida-Kennedy filed a motion to dismiss the divorce proceeding raising the issue of jurisdiction under the Uniform Child

---

[6] Kennedy argues without support that the capias was for his failure to appear. [Opp. to Fairfield Mot. 56(a)2 at ¶ 36].  The citation he provides to support his claim; [Opp. to Fairfield Mo. At Ex.15 at 1]; is to a screenshot of a text message does not discuss or reference this capias, failure to appear, or arrearage.

Custody Jurisdiction and Enforcement Act (UCCJEA).[7]  [Fairfield Mot. at Ex A, PDF p. 192–93; Opp. to Fairfield Mot. at Ex. 16, PDF p. 2].

C. __Ex Parte Order__

On November 27, 2018, Kennedy filed a motion for an emergency ex parte custody order ("Ex Parte Order").  [Fairfield Mot. at Ex. A, PDF p. 193; Ex. J]. Kennedy's motion states shared joint legal custody with De Almeida-Kennedy of the two children.  [Fairfield Mot. at Ex. J, PDF p. 14].  It also represented that De Almeida-Kennedy unilaterally withdrew the children from school sometime between April 7, 2018 and June 22, 2018; De Almeida-Kennedy relocated to Tennessee without notifying Kennedy, the GAL, or the court; De Almeida-Kennedy unilaterally withdrew the children from all extracurricular activities, counseling, and academic activity in Connecticut; and De Almeida-Kennedy unilaterally cut off all communication and access to the minor children on November 8, 2017. [Fairfield Mot. at Ex. J].  Kennedy concluded his motion by stating that he held videoconferences with De Almeida-Kennedy and the children and is deeply concerned with the minor children's health, safety and welfare.  [*Id.*].  Kennedy signed the motion using his Connecticut Bar juris number. [*Id.*].  The Family Court granted the motion that day, transferring temporary custody of the children to Kennedy.  [*Id.*].  The Family Court ordered De Almeida-Kennedy to return the

---

[7] The UCCJEA generally provides the body of law for changing jurisdiction over child custody orders where the child(ren) move out of the jurisdiction where the custody order was originally entered.  *See Construction and Operation of Uniform Child Custody Jurisdiction and Enforcement Act*, 100 A.L.R.5th 1 § 2 (2002).

children to Mr. Kennedy in Connecticut immediately and stated a hearing would be scheduled AS SOON AS POSSIBLE. [*Id.*].

On November 28, 2018, De Almeida-Kennedy filed an ex parte custody motion as well.  [Fairfield Mot. at Ex. A, PDF p. 193–94; Ex. K].  De Almeida-Kennedy's motion informed the family court that Kennedy's representation that he had joint custody was false, because the family court on November 8, 2018 suspended Kennedy's visitation rights, authorizing only supervised visits with permission of De Almeida-Kennedy. [Fairfield Mot. at Ex. K, PDF p. 1].  De Almeida-Kennedy argued that Kennedy voided the provisions of the separation agreement that require prior notice before relocation when he relocated to Florida without notification.  [*Id.*, PDF p. 2].  The motion goes on to state that Kennedy lied in is motion because the children are enrolled in school in Tennessee and are doing well.  [*Id.*].  Further, the motion states that Kennedy lied because Hirsch was notified of the relocation, who confirmed that the relocation was done properly and the children were well taken care of.  [*Id.*]. De Almeida-Kennedy also indicates that Kennedy lied by filing the motion for custody under an emergency status because no emergency existed, that the children were happy, well-adjusted, and doing well in school since April.  [*Id.*].  The family court docket report reports that this motion was denied the same day it was filed.  *See De Almeida-Kennedy v. Kennedy*, Conn. Super. FBT-FA09-4030227-S, Dkt. 396.00.  The reasons for the denial have not been provided by either party and the Court is unable to access the Family Court's sealed order.

14

Hirsch stated that she received the November 27, 2018 Ex Parte Order the day of or two days after it was issued and then reviewed the emergency ex parte application.  [Hirsch Mot. at Ex. K, PDF p.89].  She further stated Kennedy filed an affidavit in support of his motion containing his juris number (signifying he was an officer of the court) which contained "many misrepresentations, incomplete facts, misleading facts. . . . [and contained] certain trigger language to make it appear as an emergency situation was happening, even though the children had been living in Tennessee at this point for [about] eight months."  [*Id.*].  Hirsch went to the courthouse immediately and filed a written request for an emergency status conference.  [Hirsch Mot. at Ex. K, PDF p. 9].  The court scheduled a hearing for December 11, 2018.  [*Id.*].

On November 28, 2018, Kennedy flew to Tennessee in an attempt to obtain custody of his children from De Almeida-Kennedy's address, but he was unsuccessful and returned to Connecticut.  [Fairfield Mot. at Ex. A, PDF p. 199–204].  At some point following the entry of the Ex Parte Order and November 30, 2018, Kennedy contacted the FPD seeking assistance in the enforcement of the Ex Parte Order.  [Fairfield Mot. at Ex. A, PDF p. 194–95].  On November 30, 2018, Kennedy went to the FPD, where he met with Caruso.  [Fairfield Mot, at Ex. A, PDF p. 195].  It appears Caruso was expecting Kennedy's visit.  Kennedy provided Caruso with an affidavit outlining several points and discussed the upcoming hearing on his Ex Parte Order.  [Fairfield Mot. at Ex. A, PDF p. 196].  Caruso informed Kennedy that he spoke with De Almeida-Kennedy and was going to speak with Attorney Hirsch.  [Fairfield Mot. at Ex. A, PDF p. 198].  Kennedy stated at his

15

deposition that Caruso told him that he did not believe Kennedy would win a hearing on his ex parte motion.  [Fairfield Mot. at Ex. A, PDF p. 197].

On December 3, 2018, De Almeida-Kennedy went to pick up one of her sons from school early when the school principal and local law enforcement informed her  that they received a copy of the Ex Parte Order and De Almeida-Kennedy was not permitted to pick up her child.  [Opp. to Fairfield Mot. at Ex. 8].  Sometime thereafter, De Almeida-Kennedy reached out to Hirsch by text message, email, phone calls, and voice messages relating to the Ex Parte Order.  [Hirsch Mot. at Ex. K, PDF p. 9]. Hirsch provided handwritten notes from December 3, 2018, when she spoke with De Almeida-Kennedy.  [Hirsch at Ex. L].  The notes indicate that De Almeida-Kennedy was frantic and stated that Kennedy sent the court order to the children's schools and the youngest child's school would not release the child to De Almeida-Kennedy.  [*Id.*].  The notes from this conversation provide that Hirsch told De Almeida-Kennedy that she had "no authority or power to step in and [there is] a hearing date [on] 12/11[/2018]."  [*Id.*]. That day, De Almeida-Kennedy filed an emergency motion to quash Kennedy's Ex Parte Order.  [Fairfield Mot. at Ex. A, PDF p. 205].

Around this time, Caruso contacted Hirsch to determine if she was still the GAL in the family court case and what her position was on the Ex Parte Order. [Hirsch Mot. at Ex. K, PDF p. 10].  Hirsch told Caruso that she believed the ex parte application was fraught with misleading, incomplete and inaccurate information, and that she had already filed for a status conference for the Court to review the order.  [*Id.* at PDF p. 10–11].

16

D. **Caruso Incident Report**

Caruso drafted a report of his investigation dated December 4, 2018 and signed December 5, 2018 (the "Incident Report").  [Fairfield Mot. at Ex. L].   This report details Caruso's involvement and perspective following Kennedy's November 30, 2018 visit to the FPD.  [*Id.*].  The report was also signed by Hine.  [*Id.*]. The Incident Report plays a key part in this case.

The incident report states Caruso met with Kennedy on November 30, 2018 and was given several documents referencing the family law case.  [*Id.* at 1].  He also indicates that Kennedy informed him that Kennedy went to Tennessee in an effort to gain custody of his children but was unsuccessful.  [*Id.*].

The Incident Report provided general information about the family law case under the banner "Background Information relative to the Kennedy Family."  [*Id.* at 2].  In that section, Caruso states that in September 2009 De Almeida-Kennedy reported that Kennedy "emptied her house of all belongings . . . leaving her with no knowledge of the whereabouts of her children."  [*Id.*].  Then, Caruso states that he then "tracked" Kennedy to Texas, "[a]n arrest warrant was obtained charging Kennedy with Custodial Interference 1st degree[, and] he was subsequently arrested by the Texas Authorities and held as a Fugitive of Justice."  [*Id.*].

The report then indicates that in August 2020, "Ms. [De Almeida-Kennedy] was granted sole legal and physical custody of the children at that time."  [*Id.*]. Caruso also states that "[i]n 2013 Kennedy was granted Supervised visitation." [*Id.*].  Then Caruso outlined that the parties reached an agreement on joint legal

custody, but "[a]t some point [thereafter] Kennedy's visitation was again restricted to supervised visitation."  [*Id.* at 3].

The report further states that "[o]n May 8, 2018[,] Kennedy was living in Florida when he filed an emergency order of custody in the State of Connecticut[, which] was dismissed as neither party was living in the state at that time."  [*Id.*]. Further, Caruso states that "[o]n November 18, 2017, the Honorable Judge Wenzel then granted the suspension of Kennedy's supervised visitations[, and] [t]his order is still in place today."  [*Id.*].

The Incident Report then reviews the allegations made in Kennedy's November 27, 2018 ex parte motion.  First, Caruso states that Kennedy's claim in his motion that "he shares join[t] legal custody of the two minor children . . . is inconsistent with the facts as set forth in the court order dated November 8, 2017." [*Id.* at 4].  Second, Caruso states that Kennedy's claim that the children were relocated from Connecticut to Tennessee without notifying him, omits the fact that Kennedy moved from Connecticut to Florida in October of 2017.  [*Id.*].  Third, Caruso states that "Kennedy was arrested in August of 2009 because he cleared out his house of all belongings while still married[,] . . . [h]e then fled Connecticut with both minor children leaving Ms. [De Almeida-]Kennedy with no usable cell phone, no vehicles and no idea where either of her two minor children were."  [*Id.*]. Fourth, Caruso indicates that Kennedy's claim that he did not know De Almeida-Kennedy's Tennessee address "is also inconsistent . . .  as Ms. [De Almeida-]Kennedy kept him updated[,] Kennedy did in fact have Ms. [De Almedia-]Kennedy's Tennessee address."  [*Id.*].

18

Caruso reported that "Kennedy's own parents issued a strong written letter denouncing his character and parenting skills." [*Id.* at 5]. The report indicates that Kennedy "has violated the court order as it pertains to support payments" and Kennedy "voluntarily left the State of Connecticut in an effort to avoid those payments." [*Id.* at 7]. Further, Caruso states that Kennedy's "disregard for the rule of law is blatant in the false affidavit he presented to obtain custody." [*Id.*]. Caruso states that Kennedy "knows full well that as of November 8, 2017 he had lost his supervised visitation with his children[, and] [t]hat was the last standing order of the court." [*Id.*].

Hirsch indicated that she sent the Incident Report to the children's schools in Tennessee and to Family Relations in Connecticut. [Hirsch Mot. At Ex. K, PDF p. 11]. Hirsch stated during her deposition that she sent the Incident Report to the Tennessee schools because she believed she had a duty to confer with the schools. [Hirsch Mot. at Ex. K, PDF p. 95]. Hirsch stated that she reviewed the contents of the Incident Report and agreed with the general scope and tenor. [Hirsch Mot. at Ex. K, PDF p. 13].

On December 11, 2018, two weeks after the Ex Parte Order was entered, Kennedy appeared before the family court. [Fairfield Mot. at Ex. A, PDF p. 207]. Hirsch was present and addressed the Family Court. [Hirsch Mot. at Ex. F]. Caruso was also present. Hirsch informed the Family Court Caruso was present and that he "issued a police report regarding his investigation as to the matter." [Opp. to Hirsch Mot. at Ex. 16, PDF p.3]. However, Caruso was never called upon to testify or otherwise address the Family Court. [Fairfield Mot. at Ex. A, PDF p. 207–08]. The

Incident Report was not introduced or provided to the Family Court at this hearing. [*Id.*].  At the conclusion of that hearing, the Family Court put all existing orders regarding custody of the children in "abeyance."  [Hirsch Mot. at Ex. F at PDF p. 2]. At that time, Hirsch asked the Family Court if a transcript of his order could be sent to the Tennessee schools because the children were held in protective custody, and the court gave her permission.  [*Id.*].

This suit was filed on February 22, 2019.  [Compl, Dkt. 1].

III.    DISCUSSION

Both Fairfield Defendants and Hirsch move for summary judgment on all counts of the complaint.  Kennedy objects on all grounds.  Though Fairfield Defendants and Hirsch filed separate motions and raise separate arguments as to why they are entitled to summary judgment, the Court will consider the motions together.  This is because many of the arguments raised by both Defendants are similar and invoke similar legal issues.  As will be illustrated below, many of the defects with the claims against one defendant are fatal as to all defendants.

The Court will first address the federal law claims raised under section 1983. The federal law claims require consideration of whether each defendant is subject to section 1983 as a person acting under color of law, and if so, whether that defendant deprived Kennedy's rights relating to the violations alleged, which include: (1) stigma-plus defamation, (2) familial association, (3) retaliation, (4) equal protection, (5) procedural due process, and (6) conspiracy.  After addressing the federal claims, the Court will address the state law claims.  These claims include: (1) invasion of privacy, (2) conspiracy to interfere with custodial relations, (3)

intentional infliction of emotional distress, (4) Personal Data Act violation, and (5) negligence.

A. <u>Federal Law Claims</u>

Kennedy brings several claims against Defendants under Title 42 of the United States Code Section 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

"In order to establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a "person" acting "under the color of state law," and (b) that the defendant caused the plaintiff to be deprived of a federal right." *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir. 2004).

*1. Person Acting Under Color of Law*

The Court will first consider whether a genuine issue of material fact exists relating to the first element of a section 1983 claim—that defendant is a person acting under the color of state law—against Defendants.

"The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49 (1988). *See also Gleason v. Scoppetta*, 566 Fed. Appx. 65, 68 (2d Cir. 2014). To constitute a state action, "the

deprivation must be caused by the exercise of some right or privilege created by the State . . . or by a person for whom the State is responsible," and "the party charged with the deprivation must be a person who may fairly be said to be a state actor." *West*, 487 U.S. at 49.

i)      Caruso and Hine

"[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *West*, 487 U.S. at 49. Here, Caruso and Hine do not argue Kennedy cannot establish they are persons acting under color of state law. Thus, Caruso and Hine have abandoned any such claim. Regardless, it is quite clear that Caruso and Hine are state actors because all of the alleged wrongful conduct on their part consist of acts performed in their official roles as municipal law enforcement officers. Therefore, the Court finds that Caruso and Hine are persons acting under state law as alleged.

Only under prescribed circumstances are private citizens and entities subject to section 1983 liability. *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999). "A private entity acts under color of state law for purposes of [section] 1983 when '(1) the State compelled the conduct (the 'compulsion test'), (2) there is a sufficiently close nexus between the State and the private conduct (the 'close nexus test' or 'joint action test'), or (3) the private conduct consisted of activity that has traditionally been the exclusive prerogative of the State (the 'public function test').'" *McGugan v. Aldana-Bernier*, 752 F.3d 224, 229 (2d Cir. 2014) (citations

22

omitted); *see Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001).

a)     Guardian Ad Litem

The first issue is whether Hirsch is a "state actor" as contemplated under section 1983 jurisprudence because she was appointed by a state judicial officer to represent the children and a GAL.  A guardian ad litem for minor children is not a state actor because she is not charged with advancing the state's interests.  She is charged with ascertaining and advocating for the custody, care, education, visitation, and support which is in the best interest of the child.  *See In re Tayquon H.*, 76 Conn. App. 693, 704 (2003) ("It is well established that the role of the guardian ad litem is to speak on behalf of the best interest of the child.").  Like a public defender, although her role is "supplied . . . by the state," she "acts according to the best interests of the client with 'no obligation to the mission of the state.'" *Milan v. Wertheimer*, 808 F.3d 961, 964 (2d Cir. 2015) (quoting *Meeker v. Kercher*, 782 F.2d 153, 155 (10th Cir. 1986) (per curiam)); *see Arena v. Dep't of Soc. Servs. of Nassau Cty.*, 216 F. Supp. 2d 146, 155 (E.D.N.Y. 2002) (collecting district court cases stating "guardians ad litem, although appointed by the court, exercise independent professional judgment in the interests of the clients they represent and are therefore not state actors for purposes of Section 1983.").  Here, Hirsch is a GAL for the minor children.  Her challenged actions related to and were aimed at effecting the custody of the Kennedy children, not state interest. There are no allegations that she is otherwise an independent state actor.  Therefore, the Court finds that Hirsch is not a state actor simply because she is the GAL to the minor

children and she discharged her duty as such by intervening in a custody dispute between the parents to provide the court with information germane to the custodial best interests of the children.

**b)    Joint Action Doctrine**

The next issue is whether Hirsch can be deemed a person acting under color of state law under the joint action doctrine.  Under the "joint action" doctrine, a private actor may be found "to act 'under color of' state law for § 1983 purposes… [if the private party] is a willful participant in joint action with the State or its agents." *Dennis v. Sparks*, 449 U.S. 24, 27 (1980). A plaintiff complaining that the actions of a nominally private entity violated her constitutional rights makes this showing by demonstrating that "there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.' *Grogan v. Blooming Grove Volunteer Ambulance Corps*, 768 F.3d 259, 264 (2d Cir. 2014) (quoting *Brentwood Academy*, 531 U.S. at 295 (2001)). "The touchstone of joint action is often a 'plan, prearrangement, conspiracy, custom or policy' shared by the private actor and the police." *Forbes v. City of New* York, No. 05-CV-7331 (NRB), 2008 WL 3539936, at *5 (S.D.N.Y. Aug. 12, 2008) (citing *Ginsberg v. Healty Car & Truck Leasing , Inc.,* 189 F.3d 268, 272 (2d Cir. 1999)) "A private actor can only be 'a willful participant in joint activity with the State or its agents' if the two share some common goal to violate the plaintiff's rights." *Betts v. Shearman*, 751 F.3d 78, 85 (2d Cir. 2014).

"In order to establish 'joint action,' a plaintiff must show that 'the private citizen and the state official shared a common unlawful goal; the true state actor

and the jointly acting private party must agree to deprive the plaintiff of rights guaranteed by federal law.'" *Mercer v. Schriro*, 337 F. Supp. 3d 109, 144 (D. Conn. 2018) (citing to *Bang v. Utopia Restaurant*, 923 F. Supp. 46, 49 (S.D.N.Y. 1996)). Merely "requesting police assistance and providing information that led to police action" does not constitute joint action for the purposes of a section 1983 claim. *Id.* (citing to *Ginsberg v. Healy Car & Trick Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir. 1999)).

*Mercer* provides a discussion about *Spear v. West Hartford*, 954 F.2d 63 (2d Cir. 1992), where a newspaper editor brought suit against various town officials, including the police department, and a local women's health center after the town brought, but later dropped a, suit against him under RICO.  The suit was brought by the town officials, not the health center.  *Id.* at 64.  The only joint conduct alleged between the town officials and the health center was a meeting.  *Id* at 68.  More importantly, nothing to the detriment of the plaintiff came following that meeting because the charges against the plaintiff in the RICO action were dropped.  The Court found this was not enough to establish joint action and dismissed the § 1983 claims against the health center.  *Id.* at 68–69.  In *Mercer*, the court drew a distinction between its case and the *Spear* case, because in *Mercer* the plaintiff suffered a clear detriment immediately following a close-door meeting between the defendant and the state officials.  337 F. Supp. 3d at 146.

Here, Hirsch argues no genuine dispute of material fact exists with respect to her being a person acting under color of state law and points to an absence of evidence to support the agreement element under the joint action doctrine.

Kennedy argues there is evidence to show conspiracy between Hirsch and Caruso because he can show that Hirsch spoke with Caruso before the Incident Report was drafted, she gave Caruso information, she told Caruso the Ex Parte Order was invalid, she requested Caruso's permission to send the Incident Report to the Tennessee school officials, she asked Caruso to appear and present historical evidence at the December 11, 2018 Family Court hearing, and Caruso appeared upon Hirsch's request.   Kennedy also claims that both Caruso and Hirsch acknowledge the express purpose of this conduct was to prevent Kennedy from enforcing the Ex Parte Order; however, Kennedy did not provide any citation to the record to support this claim.

The Court finds Kennedy fails to prove the agreement element under the joint action doctrine.  The evidence Kennedy relies on in his opposition when viewed in the light most favorable to Kennedy does not exhibit an agreement between Hirsch and Caruso, let alone an agreement to deprive Kennedy of his federally protected rights.  At most, this evidence shows that Caruso investigated the circumstances relating to Kennedy's request for assistance from the FPD and in that investigation he contacted the GAL for the children at the center of the investigation.   No reasonable jury could infer a conspiratorial agreement based on Hirsch's cooperation with Caruso's investigation. By conveying information to which she was privy as the Kennedy children's GAL, even if they contradicted those asserted in the motion for the Ex Parte Order.  Further she was discharging her duty to advocate for the custody arrangement which she believed was in the best interest of the Kennedy children. Arranging for the Incident Report to be released to the

Tennessee school officials to assist them in deciding whether to release the child to Mrs. Kennedy was also within the purview of her duty to advocate for the best custodial interests of the children.  Arranging for Caruso to appear and testify at the Family Court custody hearing also furthered her performance of her duty to advise the court of and advocate before the court for the best custodial arrangement for the children. None of Hirsh's acts veer into the realm of police investigation.

There is nothing in the record to suggest that Caruso agreed with Hirsch to testify falsely to negatively impact Kennedy's custodial rights.   Finding a conspiratorial agreement based on this record would require rank speculation.

The fact that Caruso, a state actor, and Hirsh, a private actor, shared information germane to their respective duties and relied upon one another to perform their respective duties does not converge their individual goals into a common goal. Their actions are not joint they are coincident or parallel.

Finally, the role performed by the GAL is not one traditionally played by the state.  The state through the presiding judge determines which parent will have custody of the minor children.  Judges are independent arbiters not investigators. This is the very reason a GAL is appointed, to conduct an investigation and based on the facts gathered, advise the court so that the court has objective information upon which to make a fair and proper custody decision.

The Court finds no reasonable jury could find Hirsch was a person acting under color of state law and grants Hirsch summary judgment on Kennedy's section 1983 claims.  Nonetheless, the Court will still consider whether there is a

genuine dispute of fact material to the deprivation of the federal right element of Kennedy's 1983 claims against Hirsch.

### 2. *Deprivation of Federal Right*

Next, the Court will consider whether there is a genuine factual dispute that any defendant caused the plaintiff to be deprived of a federal right as he claims. Kennedy alleges the following claims: stigma-plus defamation, a violation of his right of intimate association, a violation of his First Amendment right to be free of unconstitutional retaliation, a violation of his rights under the Fourteenth Amendment Equal Protection Clause, a violation of his right under the Fourteenth Amendment Due Process Clause, and unlawful conspiracy. The Court addresses each claim below in that order.

### i) Stigma-Plus Defamation

Kennedy raises section 1983 stigma-plus defamation claims against Caruso, Hine, and Hirsch based on the publication of the Incident Report, which Kennedy claims contains knowingly false statements. "To prevail on a "stigma plus" claim, a plaintiff must show (1) the utterance of a statement "sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false," and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights." *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004). There is no requirement on courts reviewing stigma-plus claims to analyze the first element—the "stigma" requirement—before the second element—the "plus" requirement. *See id.* (finding the plaintiff failed to meet the "plus" requirement without considering the "stigma" requirement).

28

With respect to the "plus" requirement, "[t]he state-imposed burden or alteration of status must be *in addition* to the stigmatizing statement. Thus, even where a plaintiff's allegations would be sufficient to demonstrate a government-imposed stigma, such defamation is not, absent more, a deprivation of a liberty or property interest protected by due process." *Id.* (internal citations and quotation marks omitted) (emphasis in original). "[D]eleterious effects [flowing] directly from a sullied reputation,' standing alone, do not constitute a 'plus' under the 'stigma plus' doctrine." *Id.* (citing to *Valmonte v. Bane*, 18 F.3d 992, 1001 (2d Cir. 1994)).

a)        Parties Arguments

The Fairfield Defendants argue that Kennedy's stigma-plus claim fails because there were no false statements in the Incident Report as he claims. [Fairfield Memo at 2–16]. In support, the Fairfield Defendants rely on Kennedy's deposition testimony where he identified the portions of the report he claimed were false. [Fairfield Memo at 2 (citing to Fairfield Mot. at Ex. A, PDF p.40, 224)]. Fairfield Defendants then systematically go through each section—totaling over 50 sections—of the Incident Report and argue that each statement is either true, something Kennedy had no basis to dispute, immaterial to his claims, or Caruso's own opinion. [Fairfield Memo at 3].

Hirsch repeated many of the same claims relating to why the individual claims cannot establish defamation. [Hirsch Memo at 21–30]. She also adds that, even if the claims were factually false, Plaintiffs have presented no evidence showing a material state-imposed burden or state-imposed alteration of plaintiff's status or rights. [*Id*. at 29–30]. Hirsch argues that the Family Court's decision to

29

hold the Ex Parte Order in abeyance was not predicated on the statements contained in the Incident Report because the Family Court did not see the Incident Report until *after* the hold was put in place.  Hirsch also argues that Plaintiffs have failed to show that the Incident Report influenced the Tennessee school official's decision to release the children to their mother.

Kennedy objects—agreeing in part with Defendant's that some of the highlighted sections were based in technicality or are not material—arguing that many of the statements in the Incident Report are false and defamatory.  [Opp. Memo to Fairfield Mot. at 5–15; Opp. Memo to Hirsch Mot. at 12–16].  Kennedy argues that "Hirsch is aware of the statements Hirsch made to Judge Malone indicating Defendant Caruso's presen[ce], as well as the existence of the Incident Report. . . Later, it was entered into evidence."  Kennedy also argue that there is a genuine dispute as to whether Defendant's actions resulted in the Family Court's decision.[8]  [Opp. Memo to Hirsch Mot. at 16].

b)     "Plus" Requirement

_____

[8] Kennedy inexplicably states "It is a genuine dispute of material fact whether Defendant Hirsch's actions resulted in Malone's decision, *let alone Judge Gould being prevented from hearing it.*"  [Opp. Memo. to Hirsch Mot. at 16 (emphasis added)].  Kennedy does not explain his reference to Judge Gould.  The citation provided by Kennedy merely shows that on December 11, 2018 before the Family Court, the court asked if the matter was scheduled for a hearing before Judge Wenzel, to which Hirsch said no.  Hirsch then added "Judge Gould is conflicted out because we have a personal history . . . ."  [Opp. to Hirsch Mot. at Ex. 16 PDF p.4].  Kennedy does not provide anything further to explain why Hirsch's conflict of interest with Judge Gould is of any consequence to this action.  Therefore, the Court finds Kennedy have abandoned any claim with respect to any claim relating to Judge Gould.

Here, Kennedy alleges that the state-imposed burden or alteration of rights caused by the allegedly defamatory statements within the Incident Report is his loss of custody of his children granted in the Ex Parte Order.  As discussed in greater detail above, the Ex Parte Order was signed by the Family Court on November 27, 2018.  The next day, on November 28, 2018, Kennedy flew to Tennessee in an attempt to obtain his children pursuant to the Ex Parte Order.  He was unsuccessful and returned to Connecticut that same day.  Then on or around December 3, 2018, Kennedy sent the Ex Parte Order to the Tennessee school's where his children were enrolled.  One of the schools held one of his children who was later released to the child's mother after an unspecified period.  On December 5, 2018, Caruso signed the Incident Report.  Some point thereafter, Hirsch released the Incident Report to a Tennessee school official.  Kennedy never obtained custody of his children before the Incident Report was issued. Thus the Incident Report did not alter Kennedy's custodial rights.

Moreover, Kennedy does not allege, nor is there any evidence that, he tried to obtain custody of his children after the Incident Report was written.  On December 11, 2018, Kennedy appeared before the Family Court where Hirsch noted Caruso's presence, but Caruso did not submit his Incident Report or make statements to the Family Court relating to the contents of the Incident Report.  That day the Family Court held the Ex Parte Order in abeyance due to the pending jurisdictional motion.

(1) Family Court's Decision

31

First, the Court will consider whether Kennedy has presented evidence showing a genuine dispute of material fact on the "plus" element relating to the Family Court's decision to hold the Ex Parte Order. *Velez v. Levy*, 401 F.3d 75 (2d Cir. 2005) is helpful in answering this question because it provides guidance in "stigma-plus" cases where the party responsible for the "stigma" is not the party who imposed the "plus." In *Velez*, the plaintiff—an elected member of the school board—alleged that political rivals on the board fabricated false allegations that the plaintiff sprinkled suspicious, pink, powder-like substance in front of the office door of the acting superintendent. *Id.* at 81–82. The board members then authored a letter to the Chancellor of the school district—who had authority to remove the plaintiff—requesting her removal. *Id.* She was ultimately removed by the Chancellor of the school district relying on the allegations made by the board members. *Id.* at 82–83. The Second Circuit found that the plaintiff sufficiently alleged "stigma-plus" relying on the allegation that the board members imposed a "stigma" and requested a "plus," then the Chancellor adopted the "stigma" by imposing the "plus." *Id.* at 90. *Velez* teaches that a plaintiff must establish causation between the false statement and the burden or alteration of status or rights; i.e., the claims must be "sufficiently proximate." *Id.* Sufficient proximity can be found where "(1) the stigma and plus would, to a reasonable observer, appear connected . . . and (2) the actor imposing the plus adopted (explicitly or implicitly) those statements in doing so." *Id.*

This case is unlike *Velez*, because in *Velez* the party who imposed the state-imposed burden knew of and then relied on the stigmatizing statements in

imposing the burden.  Here, there is no connection between the Family Court's decision to hold the Ex Parte Order in abeyance and the Incident Report because the Family Court did not know about the Incident Report and could not have relied on the allegedly stigmatizing statements contained therein in holding the Ex Parte Order in abeyance.

The Court rejects Kennedy's argument that Caruso's presence at the December 11, 2018 hearing influenced the Family Court's decision because Caruso's presence could not possibly be found to be defamatory or stigmatizing as claimed.  Caruso did not divulge the contents of the Incident Report and thus the content of the report could not have been influential in the court's decision. There must be a causation between the stigma and the plus to be actionable under federal law.

In addition, Kennedy's general claims that statements made by Hirsch to the Family Court caused the further delay in adjudication of his custody claim fail for two reasons.  First, Kennedy has not presented any evidence suggesting what statements Hirsch made or the circumstances relating to those statements. Kennedy can not rely on unsupported allegations to establish a genuine dispute of material fact.  Second, assuming Hirsch did make statements to the Family Court that impacted the adjudication of Kennedy's custody dispute, those statements are not actionable because, as explained in the decision on Hirsch's motion to dismiss, Hirsch is entitled to absolute immunity for statements made to the Family Court in her role as the GAL.  *See* [Dec. on Mot. to Dismiss at 11].

(b) Tennessee School Official's Decision

Second, the Court will consider whether Kennedy has presented evidence showing a genuine dispute of material fact on the "plus" element relating to the Tennessee school official's decision to release the children to their mother and not Kennedy.  Though little evidence has been presented relating to the hold of the child, at the very least the record shows that Kennedy did not travel to Tennessee any time after or while the Tennessee school was holding the child.  Meaning, Kennedy did not exercise his right to obtain his children from the school.  This is similar to *Tucker v. Decker* 683 Fed. Appx. 20 (2d Cir. 2017).  In *Tucker*, a former school superintendent sued a Vermont State Trooper who brought a citation against her for failure to comply with Vermont's mandatory reporter statute.  *Id.* at 21–22.  Following the citation, the former superintendent voluntarily resigned from her position and there was a lack of evidence showing constructive dismissal.  *Id.* at 23.  The Second Circuit affirmed the finding that the former superintendent failed to show a material dispute of fact regarding the "plus" element because she voluntarily resigned.  *Id.*  As in *Tucker,* Kennedy cannot establish the "plus" element where he voluntarily abandoned his rights.  His rights under these circumstances was his right to obtain his children from their school.

Further, there is an absence of evidence supporting a claim that the Tennessee school officials relied on the Incident Report in releasing the child or even that the officials had the Incident Report at the time they released the child.

Therefore, the Court grants Defendants summary judgment as to Kennedy's stigma-plus defamation claim because Kennedy has not presented evidence to support the "plus" element of the claim.

ii)     **Familial Association**

**Kennedy claims all Defendants violated his right to intimate/familial association due to the alleged fabrication and dissemination of the Incident Report, which he claims deprived him of the ability to associate with his children. "The Fourteenth Amendment guarantees a substantive right under the Due Process Clause to intimate familial association . . . ." *Gorman v. Rensselaer Cty.*, 910 F.3d 40, 47 (2d Cir. 2018). "A claim for infringement of the right to familial association requires conduct 'so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection.'" *Id.* "[A] claim under the Due Process Clause for infringement of the right to familial associations requires the allegation that state action was specifically intended to interfere with the family relationship." *Id.* at 48. As stated above, a plaintiff raising a section 1983 claim must show "that the defendant *caused* the plaintiff to be deprived of a federal right." *Back*, 365 F.3d at 122 (emphasis added).**

**Here, Fairfield Defendants argue that the Incident Report could not be found to wrongfully interfere with Kennedy's family relationship because the statements contained therein were not defamatory, as they argued in addressing the stigma-plus defamation claim. Hirsch argues (1) there is an absence of evidence that the Incident Report caused Kennedy's deprivation of custodial rights or ability to obtain his children, (2) Kennedy did not have a custodial right during the pendency of the Ex Parte Order because the Ex Parte Order was invalid *ab initio*, and (3) the**

infringement *de minimis* because Kennedy only had arguable custodial rights for a period of fourteen days on the temporary Ex Parte Order.

Kennedy argues that a genuine dispute of material fact remains as to whether the Incident Report was defamatory.  Kennedy does not challenge Hirsch's argument that the Incident Report cannot be found to have caused the deprivation of familial association, but rather raises claims relating to statements Hirsch made before the Family Court that he claims caused the indefinite delay of his custody challenge. Kennedy further argues that the Ex Parte Order has not been found to be invalid.  Lastly, Kennedy argues that, if Caruso and Hirsch did not interfere with Kennedy's ability to obtain his children during the period the Ex Parte Order was in effect, "perhaps a hearing would have been held."  [Opp. to Hirsch Mot. at 20].

The Court need not expend significant judicial resources to consider whether the 50 plus highlighted statements in the Incident Report are defamatory or not because there is no genuine dispute as to whether the Incident Report caused the deprivation of his right to familial association.  The analysis here is similar to the analysis under the stigma-plus defamation claim. To briefly summarize what has been found above, the Family Court decision to hold the Ex Parte Order was not caused by the Incident Report because the Family Court did not have the Incident Report before making that decision, nor did it know the contents of the report.  Kennedy's general claims that the Incident Report is somehow involved in the further delay in adjudication of his custody claim is unsupported by any factual evidence.

36

Therefore, the Court grants Defendants summary judgment for the Defendants on Kennedy's claims of interference with his right to familial association because Kennedy has not presented any evidence that he was deprived of his rights by Defendants' actionable conduct.

        iii)    Retaliation

Kennedy claims all Defendants violated his First Amendment right by retaliating against him for seeking/attempting to enforce the Ex Parte Order and were motivated by personal animus towards Kennedy. A plaintiff raising a First Amendment retaliation claim must prove the following elements: "(1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right." *Curley v. Village of Suffern,* 268 F.3d 65, 73 (2d Cir. 2001). "[R]etaliation cannot be established where no adverse action has been alleged." *Kuck v. Danaher*, 600 F.3d 159, 168 (2d Cir. 2010) (finding that the strict enforcement of laws did not constitute adverse action).

        a)    Motivation

"Specific proof of improper motivation is required in order for plaintiff to survive summary judgment on a First Amendment retaliation claim." *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001).

Fairfield Defendants and Hirsch point to an absence of evidence that Caruso and Hirsch's actions were motivated or substantially caused by Kennedy exercising a First Amendment right. Hirsch states that she provided the Incident Report to the Tennessee school officials, not out of personal or improper animus

for Kennedy, but because she believed it is part of her official duties as the children's GAL.  [Hirsch Mot. at Ex. J (court order listing Hirsch's GAL duties as including: "confer[ing] with teachers and other school authorities.")].  Hirsch also argues that Kennedy has presented nothing other than bare assertions to support his claim of personal animus.

Kennedy argues that during Hirsch's deposition, she provided evidence that she and Caruso were motivated by Kennedy's exercise of speech.  [Opp. to Fairfield Mot. at Ex. 6, PDF p.95; Opp to Hirsch Mot. at 20 (citing to Hirsch 56(a)1 Statement ¶¶ 29, 37, 48, 59–61, 66–68)].  Kennedy also argues that there was no objective purpose for Caruso's actions because Caruso stated during his deposition "we don't investigate civil cases," inferring a subjective purpose of punishing Kennedy. [Opp. to Fairfield Mot. at Ex. 1, PDF p. 9].

Here, Kennedy has not presented evidence of improper motive.  Kennedy's citation to the record does not support the proposition he claims it does.  For example, Kennedy cites to page 95 of Hirsch's deposition and claims that it provides proof Hirsch and Caruso's conduct was motivated by his speech. However, this is not what page 95 provides.  On page 95, Kennedy asked Hirsch why she sent the Incident Report to the Tennessee school officials.  She said:

> When I had spoken with principal Lifsey, this had had -- I think we connected after you had already sent the ex partes to the schools and they tried to hold the children in protective custody. They held the youngest child in protective custody, refused to release him to mom. The oldest child, I think, was released before the school got your fax. And principal Lifsey was very concerned. He wanted me to keep him updated in real time. So as a courtesy to the school so they wouldn't have to submit their own request -- I mean, if they were in state, it might be faster to obtain a copy of a public record, the police report.

>But, being in Tennessee, they might have to go through some other
>hoops, I don't know.
>So since I have a duty to confer with the school anyhow, I thought it
>would be easier if I was able to coordinate them obtaining that
>information.

[Opp. to Fairfield Mot. at Ex. 6, p.95]. Hirsch's deposition testimony does not prove animus. Rather it tends to prove she sent the Incident Report because communication with the children's school officials was within her purview as guardian al litem, the children's school asked her to update them, and it was more efficient for her to send it to them as they were out-of-state. This is not evidence of animus by Hirsch and even less so evidence of animus by Caruso.

Kennedy's citations to Hirsch's 56(a)1 Statement also does not support the proposition he claims. Nothing in these paragraphs suggest Hirsch harbored animus towards Kennedy. The Plaintiff has provided no specific evidence of improper motivation other than his suspicion that such motivation existed.

Kennedy claims that Caruso harbored animus against him because he conducted an investigation of a civil matter when he said the police department did not. Kennedy initiated the investigation and ensuing Incident Report by asking FPD to help him enforce the Ex Parte Order and possibly bringing criminal charges against De Almeida-Kennedy. Caruso was not investigating a civil case, per se, he was investigating Kennedy's allegations that De Almeida-Kennedy was violating a court order and committed child abduction.

The Court recognizes establishing a genuine dispute relating to improper motivation is difficult on summary judgment, but some specific proof is required. *Curley*, 268 F.3d 73. The evidence when viewed in the light most favorable to

Kennedy tends to show that Caruso drafted the Incident Report because Kennedy involved the FPD and the Tennessee school officials in the child custody dispute; and Hirsch sent the Incident Report because the school officials asked for an update on Kennedy's claim that he was granted custody of the Kennedy children. No reasonable jury could find on this record that Caruso drafted the Incident Report and Hirsh sent the report to the Tennessee officials because they harbored animus against Kennedy. All these things flowed ineluctably from Kennedy's own actions and both Caruso and Hirsh acted reasonable within the scope of their duties in reaction to Kennedy's acts.

b)      Effect

In satisfying the third prong, the plaintiff must show "*either* that his speech has been adversely affected by the government retaliation or that he has suffered some other concrete harm." *Dorsett v. Cty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013) (emphasis in original).

Here, Fairfield Defendants point to an absence of evidence that Caruso and Hine effectively chilled Kennedy's exercise of his First Amendment rights. Kennedy argues that his behavior changed due to the Incident Report because Kennedy did not return to Tennessee to pick up his children. Kennedy also claims that "[t]he change in behavior has had [a] long-term impact on plaintiff and his family." [Opp. to Fairfield Mot. at 21].

Kennedy does not allege that his speech was chilled, rather he alleges he suffered a concrete harm. However, as detailed above, Kennedy has failed to establish a causal connection between the drafting and publishing of the Incident

40

Report and alleged "concrete harm"—the impact on his rights to his children.  His conclusory allegation that he did not try to obtain his children after the Incident Report does not explain why or how the Incident Report impacted his decision.

Regardless, no reasonable jury could find concrete harm under these facts. The Second Circuit's decision in *Dorsett* is instructive here.  732 F.3d 157.  In *Dorsett*, the plaintiff alleged that county legislators retaliated against him for his political activities by refusing to put up to a vote his $8 million settlement reached in a civil rights action that required the legislatures vote of approval.  *Id.* at 159–60. The Second Circuit found that the plaintiff could not show concrete harm because the legislators were not required to approve the settlement by a date certain or approve it at all.  *Id.* at 161.  In other words, uncertain prophecy is not sufficient to establish concrete harm.

Like in *Dorsett*, Kennedy's ability to obtain his children was uncertain and cannot establish concrete harm under these facts.   Kennedy did not go to Tennessee to obtain his children after Hirsch and Caruso became involved.  There is nothing to suggest that, had Kennedy went to Tennessee, he would have been unsuccessful in obtaining his children because of Caruso and Hirsch's actions. Meaning, the alleged "harm"—that he was unable to obtain his children when he had the right to do so—is uncertain.  Kennedy did not have custody of his children before he got the ex parte order and the order was temporary.  There is nothing on the record to suggest the order would have been made permanent.    On the contrary, the record suggests the order may have been obtained under false pretenses and would have been vacated after the court heard both sides.

41

Therefore, the Court grants Defendants summary judgment on Kennedy's claim of retaliation in violation of the First Amendment because there is a lack of evidence to support the motivation and effect elements.

iv)   **Equal Protection**

Kennedy claims that all Defendants violated his rights under the Equal Protection Clause, alleging that he was improperly singled out by Defendants' conduct.  "The Equal Protection Clause [of the Fourteenth Amendment] requires that the government treat all similarly situated people alike." *Harlen Assocs. v. Inc. Vill. Of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).  "Although the prototypical equal protection claim involves discrimination against people based on their membership in a vulnerable class, we have long recognized that the equal protection guarantee also extends to individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials." *Id.*

Supreme Court "cases have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  In raising a class-of-one claim, a plaintiff must establish that:

> (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake.

*Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 140 (2d Cir. 2010).  "[C]lass-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves."  *Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010).  The failure to present evidence of a similarly situated comparator is grounds for denying summary judgment on a class-of-one equal protection claim.  *Kusel*, 626 F.3d at 143.

Here, all Defendants argue that Kennedy has not presented evidence of a similarly situated comparator for the purpose of his equal protection claim.  Kennedy disagrees, arguing that the similarly situated comparator is De Almeida-Kennedy, whom he claims was treated much more fairly by Defendants than he was.  Kennedy focuses on the way De Almeida-Kennedy was treated when she sought assistance from the FPD in 2009 compared to how Kennedy was treated when he sought assistance in enforcing the Ex Parte Order.  Kennedy also focuses on things De Almeida-Kennedy did that Kennedy similarly did but Hirsch never reported.  For example, Kennedy claims that when Kennedy moved out of state and sought visitation it was "outrageous," but De Almeida-Kennedy was able to leave the state without issue.

The Court finds that Kennedy has not shown the "extremely high degree of similarity" between himself and De Almeida-Kennedy necessary for a class-of-one equal protection claim.  Kennedy has not presented evidence relating to De Almeida-Kennedy other than what can be found in the reports and descriptions by the parties.  However, from that evidence, a rational person could find that the difference in treatment of Kennedy and De Almeida-Kennedy was based on

differing circumstances.  Kennedy, unlike De Almeida-Kennedy, has a prior arrest for custodial interference and risk of injury.  Kennedy, unlike De Almeida-Kennedy, has had and lost permanent visitation and custody of his children.  Kennedy, unlike De Almeida-Kennedy, submitted an application to a court of law that contained material omissions.[9]  While there are some similarities because both are parents to the same children, parties in the same case, and seeking the same relief (sole legal custody of the children), it cannot be said that they have the extremely high similarity sufficient for a class-of-one claim.

Therefore, the Court grants Defendants summary judgment as to the equal protection claims because Kennedy has failed to present evidence of a similarly situated comparator.

---

[9] For example, Kennedy's application would appear to the passive reader to suggest that De Almeida-Kennedy removed the children from school all together but it fails to say is that the children were enrolled in another school.  Kennedy knew the children were in school, evidenced by his knowledge on where to send the Ex Parte Order, but failed to report that to the Family Court in his application.  This omission is material and likely would have been highly relevant to the court's determination on whether to grant his ex parte application.  Also, Kennedy claimed in his ex parte application that De Almeida-Kennedy relocated without notifying Kennedy, the GAL, or the court.  However, Kennedy admitted to receiving an email from De Almeida-Kennedy telling him she moved at least six months before he filed his application.  In addition Hirsch and the Family Court were notified of De Almeida-Kennedy's move at least as early as October 2018 based on the Family Court hearing transcripts where in Hirsch reported to the Court that De Almeida-Kennedy offered for Kennedy to visit the children in Tennessee, but Kennedy did not wish to consider that at the time.  Also, Kennedy's application would appear to claim that Kennedy had no ability to see his children, but he had visitation rights and choose not to use them.  Any reasonable court would find that Kennedy's ex parte application was at the very least misleading.

v) **Due Process Clause**

Kennedy raises a procedural due process claim against Caruso and Hirsch alleging that the Incident Report deprived him of his custodial rights.  The Court need not engage in lengthy discussion of this claim because Kennedy has failed to show a genuine dispute of material fact that Caruso or Hirsch's conduct caused the deprivation of his custodial rights.  As stated above, the Family Court did not have the Incident Report when it held the Ex Parte Order in abeyance and there is no evidence suggesting that the further delay is at all attributable to the Incident Report.  Therefore, the Court grants Defendants summary judgment as to the due process claims because Kennedy has failed to present evidence that the alleged wrongful conduct deprived him of his custodial rights.

vi) **Conspiracy**

Kennedy raises a section 1983 conspiracy claim against Caruso and Hirsch claiming that they conspired to create and publish the Incident Report in an attempt to unconstitutionally deprive the Plaintiff of his right of intimate association.  The Court need not engage in lengthy discussion of this claim because "[a] plaintiff raising a § 1983 claim must first establish a violation of a federal right"; *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995); and as found above, Kennedy has failed to establish a violation of a federal right.  Therefore, the Court grants Defendants summary judgment on the section 1983 conspiracy claim because Kennedy has failed to establish a violation of a federal right.

3. *Monell Claim*

Kennedy generally asserts a section 1983 *Monell* claim against the Town of Fairfield. *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978).  "In order to bring a claim against a municipal defendant, a plaintiff must establish both a violation of his constitutional rights and that the violation was motivated by a municipal custom or policy."  *Henry v. Cty. of Nassau*, 444 F. Supp. 3d 437, 449 (E.D.N.Y. 2020) (citing to *Monell*, 436 U.S. at 690–91)).  As stated above, Kennedy failed to establish a violation of a federally protected right, which is the first element of a *Monell* claim. Therefore, the Court grants Defendants summary judgment on the *Monell* claims because Kennedy has not established a violation of a federally protected right.

B. <u>Common and State Law Claims</u>

Kennedy raises five state and common law claims: (1) invasion of privacy against Caruso, Hine, and Hirsch, (2) conspiracy to interfere with custodial relations, (3) intentional infliction of emotional distress against Caruso, (4) negligence-liability against the Town, and (5) negligence-indemnity against the Town.  The Court will address each claim in that order.

1. *Invasion of Privacy*

Kennedy raises a state law invasion of privacy under the false light theory claim against Caruso, Hine, and Hirsch relating to the drafting and publication of the Incident Report.   Connecticut follows the Second Restatement of Torts definition of false light invasion of privacy, which requires a showing that: "(a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be

46

placed." *Goodrich v. Waterbury Republican-Am., Inc.*, 188 Conn. 107, 131 (1982) (citing to 3 Restatement (Second), Torts § 652E).  *See also Borg v. Cloutier*, 200 Conn. App. 82, 109 (2020) (same).  "The essence of a false light privacy claim is that the matter published concerning the plaintiff (1) is not true . . . and (2) is such a 'major misrepresentation of his character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable man in his position.'"  *Id.* (internal citations omitted).

Here, Fairfield Defendants and Hirsch raise similar arguments that there is an absence of evidence to support the falsity element of the false light claim.  In addition, Defendants argue that the report has not been communicated to the public at large or so many people that it is substantially certain to become public knowledge.  Further, Hirsch points to an absence of evidence to satisfy the highly objectionable element.  Hirsch cites to evidence that the report of his 2009 arrest could not be found highly objectionable considering Kennedy himself reported the arrest in his ex parte application. [Fairfield Mot. at Ex. J, PDF p.5].

Kennedy argues that the Incident Report is false, and Caruso and Hirsch had knowledge of its falsity when publicized.  Kennedy argues that the Incident Report was published, stating that it was provided to De Almeida-Kennedy, her counsel, the Tennessee school officials, two non-family members, it was filed on the docket in the Family Court case, and it is a public record controlled by the FPD.  Lastly, Kennedy argues that the Incident Report is highly objectionable because the reference to the 2009 arrest should not be published anymore than the claims of attorney misconduct that Hirsch overcame or other lawsuits Hine overcame.

47

i)      **Publicity Element**

To establish a false light claim, a plaintiff must show that the objectionable material was publicized.  "The 'publicity' associated with invasion of privacy 'means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.'"  *Holmes v. Town of E. Lyme*, 866 F. Supp. 2d 108, 131 (D. Conn. 2012).  "Publicity is a communication that reaches, or is sure to reach, the public at large."  *Id.* at 132.  The Second Restatement of Torts section 652D illustrates the type of publicity generally required under this rule as "any publication in a newspaper or a magazine, even of small circulation, or in a handbill distribution to a large number of persons, or any broadcast over the radio, or statement made in an address to a large audience, . . ."

Here, the Court need not engage in the lengthy and unnecessary process of analyzing whether the 50+ statements Kennedy highlighted in the Incident Report as being false are indeed false because Kennedy has not presented evidence that a reasonable jury would find in his favor on the publicity element of the false light claim.  Kennedy has presented no evidence relating to the two non-family members he claims received a copy of the Incident Report.  Similarly, Kennedy has presented no evidence that the Incident Report was filed with the Superior Court other than his claim that it was.  While the Court would ordinarily check the Family Court docket, it cannot do so here because the filings in the Family Court cases are not accessible to the public online.  *See De Almeida-Kennedy v. Kennedy*, FBT-FA09-4030227S.  Finally, Kennedy has presented no evidence that the Incident Report is

publicly available because it is a police report.  *See Doe v. Hartnett*, No. CV960134840, 2002 WL 1293354, at *4 (Conn. Super. Ct. May 8, 2002) (rejecting the plaintiff's publicity argument based on the police report being a public record where she failed to show it was a public record).

Even if Kennedy showed that the Incident Report is public because it is a police report, the mere fact that the police report is publicly available and could be disseminated is not enough to satisfy the publicity requirement under Connecticut law.  *See Gullong v. Nurmi*, No. CV156013784, 2016 WL 7165014 (Conn. Super. Ct. Nov. 8, 2016) (finding the plaintiff failed to establish publicity of a police report subject to public access); *Ridgefield Waterside Motors, LLC v. Borg*, No. CV165015844S, 2017 WL 3332744, at *5 (Conn. Super. Ct. June 30, 2017) (finding plaintiff did not allege facts as to how false information in a police report was published).

Therefore, the Court grants Defendants summary judgment on the invasion of privacy claim because Kennedy has failed to present evidence that a reasonable jury could rely upon to find he satisfied the publicity element of his claim.

### 2. Conspiracy to Interfere with Custodial Relations

Kennedy raises a state law claim of conspiracy to interfere with custodial relations against Hirsch and Caruso, generally alleging that they conspired to interfere with his parental rights under the Ex Parte Order.  Under Connecticut law, "[t]he [elements] of a civil action for conspiracy are: (1) a combination between two or more persons, (2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the conspirators pursuant to

the scheme and in furtherance of the object, (4) which act results in damage to the plaintiff." *Macomber v. Travelers Prop. & Cas. Corp.*, 277 Conn. 617, 635–36 (2006). There is, however, "no independent claim of civil conspiracy. Rather, [t]he action is for damages caused *by acts committed pursuant to a formed conspiracy* rather than by the conspiracy itself. . . .Thus, to state a cause of action, a claim of civil conspiracy must be joined with an allegation of a substantive tort." *Id.*

Connecticut follows the Second Restatement of Torts definition of custodial interference which provides: 'One who, with knowledge that the parent does not consent, abducts or otherwise compels or induces a minor child to leave a parent legally entitled to its custody or not to return to the parent after it has been left him, is subject to liability to the parent." *Marshak v. Marshak*, 226 Conn. 652, 665–66, 663 (1993), *overruled on other grounds by State v. Vakilzaden*, 251 Conn. 656 (1999) (citing to Restatement (Second) of Torts (1977) § 700). "In order to impose liability on a third party for conspiring with or aiding another in the removal of children from the custodial parent, the third party must have conspired with, or aided the other, 'to do a criminal or an unlawful act or a lawful act by criminal or unlawful means.'" *Id.* at 665–66.

Here, Fairfield Defendants argue that Caruso's conduct did not have an impact on the Superior Court's decision to stay the Ex Parte Order, that Kennedy has presented no evidence of the underlying tortious conduct alleged, Kennedy's Ex Parte Order was invalid at its inception, there is no evidence of a scheme, and Caruso is entitled to governmental immunity. Hirsch, similar to her arguments under the section 1983 conspiracy claim, points to an absence of evidence to

support the agreement element for a civil conspiracy claim.  Hirsch also points to an absence of evidence to support the underlying tort element because there is no evidence she or Caruso abducted or otherwise compelled or induced the minor children not to return to Kennedy.

Kennedy argues that Caruso's conduct did influence the Family Court's decision because he was present at the December 11, 2018 hearing, Caruso and Hirsch induced the children not to return to Kennedy, and there is no evidence the Ex Parte Order was invalid.

As found above, Kennedy has failed to present evidence on which a reasonable jury could find in his favor with respect to any conspiratorial agreement between Hirsch and Caruso.  *See* Part III.A.1.  In addition, Kennedy has failed to present evidence on which a reasonable jury could find in his favor with respect to the substantive tort element of his claim because there is a lack of evidence showing custodial interference by any Defendant here.  Kennedy's claim that Caruso and Hirsch induced the children not to return to Kennedy is unsupported by the record.  Though Kennedy cites to the December 3, Tennessee Incident Report, that report by no means states that Caruso and Hirsch induced the children not to return to Kennedy.  There is no evidence in the record to suggest that Caruso or Hirsch spoke with the minor children during the two week period Kennedy had temporary custody of them, none the less evidence to suggest that they abducted, compelled, or induced the minor children not to return to Kennedy.  Any claim that Hirsch or Caruso conspired with De Almeida-Kennedy to not return the children to Kennedy is unsupported by evidence.

51

Therefore, the Court grants Defendants summary judgment on the conspiracy to interfere with custodial rights claims because Kennedy has failed to establish a genuine dispute of material fact with respect to the conspiracy and substantive tort elements of such claim.

### 3. *Intentional Infliction of Emotional Distress*

Kennedy and Besa Kennedy raise a state law claim of intentional infliction of emotional distress against Caruso because he entered their home after Besa Kennedy granted him permission.  Kennedy and Besa Kennedy have abandoned this claim because they cited no credible supporting evidence in their 56(a)2 statement.  The only citations supporting this claim are statements that Caruso was agitated at his deposition.  The Court has no facts upon which it can consider whether Kennedy meets the elements of an intentional infliction of emotional distress claim because the Court does not have any facts relating to the claim.

Therefore, the Court grants Defendants summary judgment on the intentional infliction of emotional distress claim because Plaintiffs have cited to no evidence relating to the conduct making up the claim.

### 4. *Personal Data Act*

Kennedy alleges that the Town is liable for violating the Personal Data Act and seeks damages pursuant to Connecticut General Statute § 4-197. Section 4-197 makes actionable the violation of any provision of the Personal Data Act.  The complaint does not cite to what section of the Personal Data Act the Plaintiffs claim a violation of.  The only section of the Personal Data Act that the Plaintiffs cite to in their briefing is under § 4-193, which provides that:

> **Each agency shall: (a) Inform each of its employees who operates or maintains a personal data system or who has access to personal data, of the provisions of (1) this chapter, (2) the agency's regulations adopted pursuant to section 4-196, (3) the Freedom of Information Act, as defined in section 1-200, and (4) any other state or federal statute or regulation concerning maintenance or disclosure of personal data kept by the agency; . . .**
>
> **(h) Establish procedures which: (1) Allow a person to contest the accuracy, completeness or relevancy of his personal data; (2) Allow personal data to be corrected upon request of a person when the agency concurs in the proposed correction; (3) Allow a person who believes that the agency maintains inaccurate or incomplete personal data concerning him to add a statement to the record setting forth what he believes to be an accurate or complete version of that personal data. Such a statement shall become a permanent part of the agency's personal data system, and shall be disclosed to any individual, agency or organization to which the disputed personal data is disclosed.**

Here, Fairfield Defendants argue that the Personal Data Act does not apply. Kennedy claims that it does but he does not indicate with any degree of specificity what section of the Personal Data Act the Town violated.  He states generally that he had no effective remedy to correct the record due to the way it was distributed. However, Kennedy cites to nothing in the record to support his argument that the Personal Data Act does apply, let alone anything that would indicate that he tried to contest the accuracy of the Incident Report and was otherwise prohibited from doing so.   Thus, Kennedy has not presented any genuine dispute of material fact relating to the Personal Data Act claim.

The Court grants Defendants summary judgment on the Personal Data Act claim because Kennedy fails to articulate what claim he is raising or what evidence he has to support such a claim.

### 5. *Negligence Claims*

Kennedy raises negligence claims against the Town of Fairfield only.   In raising these claims, Kennedy limits them to impose liability on the Town for the alleged torts committed by Caruso and Hine.   Because the Court does not find that Caruso or Hine committed a tort, there is no liability on the Town.   Therefore, the Court grants Defendants summary judgment on the negligence and negligence per se counts because Kennedy has not established that Caruso and Hine committed a wrongful act that would result in civil liability.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Motions for Summary Judgement are GRANTED.   The Clerk is directed to close this case.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated this day in Hartford, Connecticut: November 19, 2021